IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

<table>
<tr><td>
Waukee Community School District<br>
and Heartland Area Education Agency,<br><br>
      Plaintiffs,<br><br>
v.<br><br>
Douglas &amp; Eva L., individually and<br>
by and on behalf of Isabel L., a child,<br><br>
      Defendants.
</td>
<td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td>
<td>
Docket Number 4:07-cv-00278-REL-CFB<br><br><br>
DEFENDANTS' APPEAL BRIEF<br>
&amp; REQUEST FOR ORAL ARGUMENT
</td></tr>
</table>

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENTS & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.  THE STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A.  THE STANDARD OF REVIEW
     ON APPEAL TO THE U.S. DISTRICT COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    1.    CONTRARY TO THE PLAINTIFFS' ASSERTION, THE COURT'S REVIEW
          OF THE EVIDENCE IS NOT *DE NOVO*, BUT IS INSTEAD GOVERNED BY
          THE RULE OF DUE DEFERENCE; AS THE EIGHTH CIRCUIT HAS RULED,
          THE SCOPE OF REVIEW IS, "IN REALITY, QUITE NARROW." . . . . . . . . 16

        a.    Reviewing courts must give due deference to the determinations of the
               trier of facts on questions concerning the weight of the evidence and the
               credibility of the witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      b.      Reviewing courts must give due deference to the State's Administrative Law Judge on questions involving educational expertise. . . . . . . . . . . . . 28

      c.      Reviewing courts must give due deference to the state educational standards that are an integral part of the federal guarantee of a free appropriate public education. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    2.      SINCE DUE DEFERENCE MUST BE GIVEN TO THE OUTCOME OF THE STATE ADMINISTRATIVE PROCEEDINGS, THE PARTY OR PARTIES CHALLENGING THAT OUTCOME MUST BEAR THE BURDEN OF PERSUASION ON APPEAL TO THE U.S. DISTRICT COURT. . . . . . . . . . . 41

B.  THE STANDARD OF REVIEW
      BEFORE THE ADMINISTRATIVE LAW JUDGE . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    1.      CONTRARY TO THE PLAINTIFFS' ASSERTIONS ON APPEAL, ALJ ETSCHEIDT WAS BOUND BY A RULE OF IMPARTIAL DECISION-MAKING AND WAS NOT OBLIGED TO DEFER TO THE TESTIMONY OF WITNESSES FOR THE SCHOOL DISTRICT AND THE AEA . . . . . . . . . . . 49

      a.      The School District and the AEA waived any argument that the ALJ was obliged to defer to the testimony of their witnesses by asserting a dramatically different theory in the proceedings below. . . . . . . . . . . . . 53

      b.      The Plaintiffs' theory that the ALJ was obliged to defer to their witnesses is contrary to precedent and inconsistent with three fundamental principles of IDEA law–the rule against imposing new substantive standards on the states, the emphasis on the primacy of the state on questions of educational policy, and, most important, the principle that due process hearings must be impartial. . . . . . . . . . . . . . . . . . . . . . . . . 56

      c.      Contrary to the Plaintiffs' assertions, each of the ALJ's key findings on questions of educational policy are carefully and thoroughly documented by reference to state and federal standards and by research-based evidence duly introduced into the record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    2.      THE STATE'S ADMINISTRATIVE LAW JUDGE CORRECTLY PLACED THE BURDEN OF PROOF ON ISABEL AND HER PARENTS, AS THE PARTIES SEEKING RELIEF IN THE PROCEEDINGS BELOW. . . . . . . . . . 66

II. THE SUBSTANTIVE ISSUES ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

A.    FOR EACH OF TWO REASONS, THE STATE'S ADMINISTRATIVE LAW JUDGE
      CORRECTLY RULED THAT ISABEL AND HER PARENTS SUSTAINED THEIR
      BURDEN OF PROVING THAT THE SCHOOL DISTRICT AND THE AEA
      VIOLATED THE LRE PROVISIONS OF THE IDEA. . . . . . . . . . . . . . . . . . . . . . . . . . . 79

      1.    FIRST, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE LRE
            PROVISIONS OF THE IDEA BY GIVING INSUFFICIENT CONSIDERATION
            TO SUPPLEMENTAL AIDS AND SERVICES TO SUPPORT ISABEL'S
            EDUCATION IN THE GENERAL EDUCATION CLASSROOM. . . . . . . . . . . 81

            a.    The Eighth Circuit recognizes a statutory presumption in favor of a
                  child's education in the general education classroom, and, while this
                  presumption is not absolute, the ALJ correctly ruled that the IEP team
                  must give reasonable consideration to the provision of supplemental aids
                  and services that would permit the child to be educated with her peers
                  without disabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

            b.    A preponderance of the evidence fully supports the State's finding that
                  Isabel was fully capable of benefitting from greater integration with
                  children without disabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

            c.    A preponderance of the evidence fully supports the State's finding that the
                  School District and the AEA did not give adequate consideration to the
                  provision of the aids and services necessary for Isabel to be educated with
                  her peers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

      2.    SECOND, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE LRE
            PROVISIONS OF THE IDEA BY FAILING TO ENSURE THE PRESENCE OF
            ISABEL'S GENERAL EDUCATION TEACHER DURING THE IEP TEAM'S
            CRITICAL DISCUSSIONS OF THE AIDS AND SERVICES NECESSARY FOR
            HER INCLUSION IN THE GENERAL EDUCATION CLASSROOM.  . . . . . 107

B.    FOR EACH OF FIVE REASONS, THE STATE'S ALJ CORRECTLY RULED THAT
      ISABEL AND HER PARENTS SUSTAINED THEIR BURDEN OF PROVING THAT
      THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY THEIR
      EXCESSIVE USE OF HIGHLY INTRUSIVE BEHAVIORAL INTERVENTIONS.
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

      1.    FIRST, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY
            IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS THAT
            WERE NOT CONSISTENT WITH ISABEL'S IEP.  . . . . . . . . . . . . . . . . . . . 116

a.      Contrary to the Plaintiffs' implied assertions, the rule that a school district's implementation of an IEP need not be perfect does not sanction serious and substantial failures to follow the provisions of Isabel's IEP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

b.      As the trier of fact properly found, the credible evidence established that the School District and the AEA failed to implement "substantial and significant" provisions of Isabel's IEP, including but not limited to the failure to implement prescribed antecedent strategies and the use of physical force to implement the hand-over-hand intervention. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

2.      SECOND, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS THAT WERE EXCESSIVE IN LENGTH AND OTHERWISE INCONSISTENT WITH ISABEL'S INDIVIDUAL NEEDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

a.      Contrary to the Plaintiffs' assertions, neither state nor federal law authorizes the types of behavioral interventions used on Isabel. . . . . . . 129

b.      Again contrary to the Plaintiffs' assertions, both state and federal law mandate that a school district's programs of behavioral intervention be consistent with research-based evidence of effective practices to the extent that it is possible to do so. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

c.      As the trier of fact properly found, the credible evidence established that the behavioral interventions used on Isabel violated the IDEA because they were excessive in length, because they were implemented without giving adequate consideration to the potential harmful effects, and because there was a serious failure to monitor the impact of the interventions on targeted behaviors. . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

3.      THIRD, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS THAT WERE NOT SUPPORTED BY THEIR FUNCTIONAL ASSESSMENTS OF THE CHILD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

4.      FOURTH, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS THAT WERE INCONSISTENT WITH THE POSITIVE BEHAVIORAL SUPPORTS MANDATED BY THE IDEA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

5.    FIFTH, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY
      IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS WITHOUT
      PROVIDING PRIOR WRITTEN NOTICE TO THE PARENTS &/OR BY
      PROVIDING FALSE OR MISLEADING NOTICE TO THE PARENTS. . . . . 171

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

REQUEST FOR ORAL ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

## INTRODUCTION

In this proceeding, a local school district and an intermediate educational agency are asking

the U.S. District Court to reverse the decision of an Administrative Law Judge duly appointed by

the Iowa Department of Education to conduct an "impartial due process hearing" pursuant to the

provisions of 20 U.S.C. § 1415(f) (2000 ed., Supp. IV).[1]  The 56-page decision in DoE Docket No.

SE-320 was rendered on March 29, 2007 and is set forth in the record certified to the U.S. District

Court by the Iowa Department of Education.[2]  The decision followed more than three months of

preparation by the parties and ten days of hearing, including the direct and cross-examination of

fifteen witnesses and the introduction of more than four thousand pages of exhibits.  The decision

also followed more than two hundred pages of briefs and arguments.

In attacking the outcome of the administrative proceedings conducted by the Iowa

_____

[1] The IDEA was amended in 2004.  *See* Individuals with Disabilities Education
Improvement Act of 2004, Pub. L. No. 108-446, § 101, 111 Stat. 2647 (2004).  With one
exception, no changes were made in 2004 that would materially affect the arguments presented
in this brief. That exception will be expressly noted in the text discussing the issue, and with that
exception, all citations to the IDEA in this brief are to the act as amended in 2004.

[2] Certification of Pleadings, Motions and Decision, as entered on the dockets of the
above-captioned case on December 12, 2007, at 300-355.  This compilation will hereinafter be
referred to as the Certified Pleadings.

Department of Education, the Waukee Community School District (hereinafter, "the School District") and the Heartland Area Education Agency (hereinafter, "the AEA") have amalgated a broad array of assertions and arguments. This Defendants' Appeal Brief will systematically answer each of those assertions and refute each of those arguments. We begin with an assertion set forth in the Introduction to the Plaintiffs' Appeal Brief,[3] *to wit*, that the State's decision has introduced "serious uncertainty" among local educational agencies in Iowa. (Plaintiffs' Appeal Brief at 3.) The local educational agencies allege that "[t]he already difficult job of educating disabled students with serious behavioral difficulties in public schools has become more difficult and uncertain because of this Decision." (*Id.*)

The Plaintiffs' assertion regarding the alleged post-ruling impact of the ALJ's Decision is not supported by citation to the record. It is merely the assertion of counsel, and the School District and the AEA have not introduced, and have not even attempted to introduce, evidence to support that assertion in the pending proceedings. They have not invoked or attempted to invoke the provisions of 20 U.S.C. § 1415(i)(2)( C)(ii), which, subject to limitations set forth in the governing precedents,[4] permits the U.S. District Court to "hear additional evidence at the request of a party."

The Plaintiffs' unsupported assertion regarding the alleged post-ruling impact of the ALJ's decision strains credulity. The Plaintiffs would have this District Court believe that the "already

---

[3] Appeal Brief of Waukee Community School District and Heartland Area Education Agency, as entered on the dockets of the above-captioned case on December 27, 2007. This brief will hereinafter be referred to as the Plaintiffs' Appeal Brief.

[4] "Because the reviewing court must give due weight to the administrative proceedings, 'a party seeking to introduce additional evidence at the district court level must provide some solid justification for doing so.'" *Independent School District No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 560 (8th Cir. 1996) (quoting *Roland M. v. Concord School Comm.*, 910 F.2d 983, 996 (1st Cir. 1990)).

difficult job" of educating Isabel would be rendered unduly difficult if they are not permitted to teach her compliance by having two or three adults hold her in a chair while another adult forces her to color against her will.  The Plaintiffs would have this District Court believe that "the already difficult job" of educating Isabel would be unduly complicated unless the School District and the AEA are permitted to educate her in a room without windows, ventilation, or peers until she earns her way back into the special education setting.  Most important, the Plaintiffs would have this District Court create and impose a new substantive standard upon the Iowa Department of Education by dictating its relationship to local educational agencies and compelling it to defer to local policy decisions regarding the efficacy of behavioral and other educational interventions.

In submitting the forthcoming Arguments and Authorities, and on behalf of Isabel and her parents, we appreciate this opportunity to defend the standards promulgated by the Iowa Department of Education to secure an appropriate education for children with disabilities in the state.  We appreciate this opportunity to defend the careful and thorough opinion rendered by the Administrative Law Judge appointed to the task by the Iowa Department of Education.  Most important, we appreciate this opportunity to defend the newly-enacted federal guarantee that the behavioral and other educational interventions used on children with disabilities in our public schools will be consistent with accepted practices grounded in sound research.

ARGUMENTS & AUTHORITIES

To promote clarity, the arguments and authorities presented on behalf of Isabel and her parents are divided into two parts.  Part I addresses the standard of review on appeal to the U.S. District Court, as well as the standards governing the hearing conducted by the Administrative Law Judge in the proceedings below.  Part II addresses the two substantive issues successfully asserted in those due process proceedings.

Although such matters are usually recited in a perfunctory fashion, Part I devotes substantial and careful attention to the standard of review issues asserted by the School District and the AEA on appeal.  The reason is that assertions by the Plaintiffs with respect to those issues constitute the foundation upon which their edifice of attack upon the decision of ALJ Etscheidt is built.  Indeed, the Plaintiffs have identified one of those assertions–the extraordinary theory that the ALJ was legally obligated to defer to the testimony of School District and AEA witnesses–as their primary grounds for seeking a reversal of the decision rendered in the State's due process proceedings.  (*See* Plaintiffs' Appeal Brief at 40) (asserting that "[t]he Decision is contrary to law primarily . . . because the ALJ substituted her own judgment for the judgment of the school authorities as to what were appropriate interventions for Isabel.")

As will be documented at length in Part I, the Plaintiffs' assertions with respect to the standard of review on appeal are wholly inconsistent with established IDEA principles.  If sustained, those assertions would undermine the rule of due deference to the findings of the trier of fact, to the expertise of the State educational agency, and to the State standards that are an integral part of the federal guarantee of an appropriate education.  If sustained, those assertions would violate Supreme Court and Eighth Circuit precedent by failing to accord "due weight" to the outcome of the State

8

of Iowa's administrative proceedings. Indeed, the Plaintiffs' attempt to impose the burden of proof on the prevailing parties in the proceedings would effectively create a legal presumption that the outcome of those proceedings was in error. Any such presumption is wholly contrary to the governing precedents and established IDEA law.

With respect to the standards governing the proceedings before the proceedings before ALJ Etscheidt, the Plaintiffs' assertions on appeal are wholly inconsistent with the arguments presented below. There, the Plaintiffs recognized that the ALJ, as the trier of fact, was in a unique position to gauge the credibility of the witnesses. Now, the Plaintiffs urge a wholly different theory, that ALJ Etscheidt was legally obliged to defer to the testimony of the witnesses for the School District and the AEA. As will be documented at length in Part I of this Defendants' Appeal Brief, the Plaintiffs' assertion runs afoul of the statutorily-grounded rule of impartial decision-making. If sustained, that assertion would create a new substantive standard to be imposed upon the states–a rule of State deference to the contentions of the local educational agencies whose actions are being challenged. As will be demonstrated below, there is no statutory foundation for the creation of such a standard or for imposing such a standard on the Iowa Department of Education. To the contrary, the Plaintiffs' primary theory on appeal is wholly inconsistent with the statute, the governing principles, and with well-established principles of IDEA law.

In short, Part II of this Defendants' Appeal Brief will address the two substantive issues that Isabel and her parents successfully documented in the proceedings below. Part I will address critical foundational issues by systematically addressing and refuting the Plaintiffs' assertions regarding the standard of review on appeal, as well as the standards governing the proceedings below. Part I will establish that the edifice of the Plaintiffs' attack upon the decision of Administrative Law Judge

Susan Etscheidt is built on the legal equivalent of quicksand.

## PART I.  THE STANDARD OF REVIEW

As the U.S. Court of Appeals for the Eighth Circuit has observed, due process hearings under the IDEA "occur neither before a court of the United States, nor before a court created by an act of Congress.  Rather, Congress reserved judicial review . . . to the district courts of the United States." *Neosho R-V School Dist. v. Clark*, 315 F.3d 1022, 1035 (8th Cir. 2003).  Accordingly, the Complaint filed by the School District and the AEA in the above-captioned case is in the nature of an appeal from the decision rendered by the Administrative Law Judge appointed by the Iowa Department of Education.  Although Isabel and her parents are designated as defendants in the action, they were the prevailing parties in the proceedings below and now stand in the position of appellees.  *See, e.g., id.* (ruling that the district court is a "reviewing court" that "is expected to give due weight to the findings" of the state administrative agency) (Pratt, J., concurring & dissenting): *School Board of Independent School District No. 11 v. Renollet*, 440 F.3d 1007, 1010 (8th Cir. 2006) ("Under the IDEA, a party may appeal from the state administrative proceedings to a federal district court"); *Wall v. Mattituck-Cutchogue School Dist.*, 945 F. Supp. 501, 508 (E.D.N.Y. 1996) (noting that the action "is in substance an appeal from an administrative determination.")

In addressing the standard of review on appeal to the U.S. District Court, it is important to note that this question is separate and distinct from the question of what standards governed the proceedings before the Administrative Law Judge.  *See, e.g., Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 658 (8th Cir. 1999) (distinguishing between the burden of proof at the due process hearing and the burden of proof on appeal to the federal courts); *E.S. v.*

*Independent School Dist., No. 196*, 135 F.3d 566, 569 (8th Cir. 1998) (distinguishing between the burden of proof at the administrative level and the burden of proof on appeal); *Hiller ex rel. Hiller v. Board of Educ. of Brunswick Cent. School Dist.*, 743 F. Supp. 958, 967 (N.D.N.Y. 1990) (ruling that the district court's reasoning "illustrates that its discussion focused on the burden of proof before a hearing officer, and not the burden of proof before a district court.")

This distinction is important because, in presenting their arguments on the standard of review, the School District and the AEA confuse the standard of review on appeal to the U.S. District Court with the standards governing the proceedings before the administrative agency. A singularly important example is the Plaintiffs' attempt to impose the due deference standard applicable to a judicial review of the outcome of the administrative proceeding with the standards applicable to the original proceeding. (*See* Plaintiffs' Appeal Brief at 4, 7, 10, 27, 34 36, 40, 41, 42, 50, 53, & 59) (repeatedly chastising ALJ Etscheidt for allegedly failing to defer to the testimony of the witnesses for the School District and the AEA).

To help explain why the Plaintiffs' arguments are contrary to well-established law, this Part I of the Defendants' Appeal Brief gives separate discussion to separate subjects. Thus, Section A addresses the standard of review when a state's decision under the IDEA is appealed to the U.S. district courts, and it documents the well-established rule that the party challenging the outcome of a state's administrative proceeding bears the burden of persuasion on appeal. Section B addresses the standards applicable to the hearing conducted by the Administrative Law Judge in the proceedings below, and it gives special emphasis to the well-established rule of impartial decision-making.

## A.  THE STANDARD OF REVIEW
## ON APPEAL TO THE U.S. DISTRICT COURT

The Individuals with Disabilities Education Act is the statute that mandates the opportunity for an impartial due process hearing conducted by the Iowa Department of Education, that underpins the rights asserted by Isabel and her parents in such a hearing, and that authorizes the Plaintiffs' current appeal from the outcome of the state administrative proceedings.  With respect to the right of judicial review, the statute provides, in relevant part, as follows:

> [A]ny party aggrieved by the findings and decision made [in a due process hearing conducted by the State educational agency] shall have the right to bring a civil action with respect to the complaint presented [in the proceedings below], which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

20 U.S.C. § 1415(i)(2)(A) (2000 ed., Supp. IV).  The governing statute also sets forth the standard of review on appeal:

> In any action brought under this paragraph, the court–
> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)( C).  In construing this statutory provision, the School District and the AEA have invited the U.S. District Court to determine the evidentiary questions *de novo.*  (*See* Plaintiffs' Appeal Brief at 4 ("The District and the AEA strongly believe that the Decision is not supported by the preponderance of the credible evidence, a matter for this Court to determine *de novo.*")) In reply, we respectfully submit that the Plaintiffs' contention is contrary to well-established law, including Supreme Court and Eighth Circuit precedents mandating due deference to the outcome of the administrative proceedings.

12

The standard of review set forth in Section 1415 is somewhat different from the ordinary standard governing the judicial review of an administrative decision, but, as the Ninth Circuit Court has observed, "[w]e have the benefit of controlling Supreme Court authority construing this unusual judicial review provision." *Capistrano Unified School Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). More specifically, the Supreme Court of the United States addressed the statutory language that governs judicial review of due process proceedings under the IDEA (then codified at 20 U.S.C. § 1415(e)) in its landmark decision in *Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). Speaking for a majority of the Court, Justice Rehnquist ruled as follows:

> The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given these proceedings.

458 U.S. at 206, 102 S. Ct. at 3051 (bracketed material in original). Justice Rehnquist added that "we find nothing in the Act to suggest" that Congress "intended that reviewing courts should have a free hand to impose substantive standards of review *which cannot be derived from the Act itself.*" *Id.* (emphasis supplied).

In ruling upon the subject of judicial review of IDEA decisions rendered by state educational agencies, the U.S. Court of Appeals for the Eighth Circuit has repeatedly emphasized the rule first articulated in *Rowley, to wit*, that "due weight shall be given [the State] administrative proceedings." *See, e.g.*, *CJN v. Minneapolis Public Schools*, 323 F.3d 630, 636 (8th Cir. 2003) (ruling that a district court "must give 'due weight' to agency decision-making"); *Neosho R-V School Dist. v. Clark*, 315 F.3d 1022, 1028 (8th Cir. 2003) (quoting *Rowley* and emphasizing the words "due weight"); *Missouri Dep't of Elementary & Secondary Education v. Springfield R-12 School Dist.*, 358 F.3d 992, 998

13

(ruling that "we must give 'due weight' to the outcome of administrative proceedings, giving particular consideration to state officials' educational judgments"); *T.F. v. Special School Dist. of St. Louis County*, 449 F.3d 816, 818 (8th Cir. 2006) (ruling that "we must give 'due weight' to the outcome of the administrative proceedings.")

As articulated in virtually every Eighth Circuit opinion to address the subject since the Supreme Court's opinion in *Rowley* was rendered in 1982, the rule of due deference significantly narrows the scope of judicial review of state administrative proceedings under the IDEA. As the Eighth Circuit has expressly stated, a district court's review of the decision of the administrative hearing officer "is, in reality, quite narrow." *Petersen ex rel. Petersen v. Hastings Public Schools*, 31 F.3d 705, 707 (8th Cir. 1994).

A case on point is *Yankton School Dist. v. Schramm*, 900 F. Supp. 1182 (D.S.D. 1995). There, as here, the parents were the prevailing parties in a due process hearing conducted by the state educational agency. *Id.* at 1185. There, as here, the school district sought judicial review. *Id.* In conducting this review, the U.S. District Court judge expressly noted the Supreme Court's ruling in *Rowley* and the Eighth Circuit's holding that a federal court's review of the state administrative decision "is, in reality, quite narrow." *Id.* at 1186-87. The Court entered judgment in favor of the parents, "thereby upholding the state hearing officer's decision." *Id.* at 1185. This decision was affirmed (with a modification not relevant to the pending case) by the U.S. Court of Appeals for the Eighth Circuit. *See Yankton School Dist. v. Schramm,* 93 F.3d 1369, 1377 (8th Cir. 1996).

It appears that the Eighth Circuit rule is more differential to the outcome of the administrative proceedings than might be the case in other circuits. Even so, there is no circuit that embraces the de novo review requested by the School District and the AEA in the instant

2c57539c9296a7f7

proceedings. *See, e.g., Miller ex rel. S.M. v. Board of Education of the Albuquerque Public Schools*, 455 F. Supp. 2d 1286, 1302 (D.N.M. 2006) ("The district court's proceedings must maintain the character of review and not rise to the level of a de novo trial") (citing *L.B. ex rel. K.B. v. Nebo School Dist.*, 379 F.3d 966, 973-74 (10th Cir. 2004)); *Viola v. Arlington Central School Dist.*, 414 F. Supp. 2d 366, 377-78 (S.D.N.Y. 2006) (The Second Circuit has emphasized that both it and the "Supreme Court . . . have interpreted the IDEA as strictly limiting judicial review of state administrative decisions") (quoting *Grim v. Rhinebeck Cent. School Dist.*, 346 F.3d 377, 380-81 (2nd Cir. 2003); *Mr. I. v. Maine School Administrative Dist. 55*, 416 F. Supp. 2d 147, 156 (D. Me. 2006) ("The First Circuit has characterized this standard as both 'well short' of de novo review and 'something short of de novo review'") (quoting *Lenn v. Portland School Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993) & *Roland M. v. Concord School Comm.*, 910 F.2d 983, 989 (1st Cir. 1990)).

In their Appeal Brief, the School District and the AEA appear to acknowledge the rule that the U.S. District Court must "give 'due weight' to the administrative proceedings." (Plaintiffs' Appeal Brief at 10). This seeming acknowledgment, however, proves to be little more than lip service. Thus, on the very page of their brief where they acknowledge the rule that due weight must be given to the outcome of the administrative proceedings, the Plaintiffs ask this Court to hold that deference is due to the testimony of the witnesses for the school district, and not to the determinations of the Administrative Law Judge. (*See id.* at n.2) (stating that ALJ Etscheidt "is not a 'school authority' to whom deference must be given.") Further, the Plaintiffs effectively ask this Court to presume that the ALJ's decision was in error by placing the burden of proof on appeal on the prevailing parties in the proceedings below. (*See, e.g., id.* at 102) (contending that "[t]he Parents bear the entire burden of proof (both the burden of proof and the burden of persuasion) in

this appeal . . . .")

In direct response to the Plaintiffs' contentions regarding the rule that due weight must be given to the administrative proceedings, this brief submits two brief points. The first brief point documents three critical elements of the rule of due deference, elements that the Plaintiffs have ignored in drafting their arguments to this Court. The second brief point documents the fundamental principle that a party challenging the outcome of a state's administrative determination under the IDEA must bear the burden of persuasion on appeal to the U.S. District Court.

1.      CONTRARY TO THE PLAINTIFFS' ASSERTION, THE COURT'S REVIEW OF THE EVIDENCE IS NOT *DE NOVO*, BUT IS INSTEAD GOVERNED BY THE RULE OF DUE DEFERENCE; AS THE EIGHTH CIRCUIT HAS RULED, THE SCOPE OF REVIEW IS, "IN REALITY, QUITE NARROW."

By its very nature, the application of the rule that "due weight" must be given to the State's administrative decision depends upon the circumstances of the particular case, and it may not be possible "to capture the appropriate deference in [a] formula." *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989). This being said, deference does not extend to erroneous conclusions of law. The t" federal courts are the ultimate authorities regarding the meaning of federal statutes, and their review of questions of law is de novo. *See, e.g., N.C. ex rel. M.C. v. Bedford Central School Dist.*, 473 F. Supp. 2d 532, 542 (S.D.N.Y. 2007) (ruling that a "district court is not required to give state administrative proceedings the usual 'due weight' when the administrative decision concerns an issue of law"); *John T. v. Marion Independent School Dist.*, 173 F.3d 684, 687 (8th Cir. 1999) (stating that questions of law are reviewed de novo); *Muller v. Committee on Special Education of the E. Islip Union Free School Dist.*, 145 F.3d 95, 102 (2nd Cir. 1998); *Mrs. B. v. Milford Board of Education*, 103 F.3d 1114, 1122 (2nd Cir. 1997).

On appeal, the School District and the AEA have asserted that ALJ Etscheidt's decision contains errors of law.  (*See, e.g.*, Plaintiff's Appeal Brief at 34) (asserting that the ALJ applied "an incorrect legal standard" by failing to measure behavioral interventions against the standard of "a substantial departure from accepted professional judgment.") This Defendant's Appeal Brief will give systematic consideration to each of the alleged errors of law asserted in the Plaintiff's Appeal Brief, and it will document that she has carefully adhered to the legal principles set forth in the governing statute and the controlling precedents.[5]  It should be noted, however, that the vast bulk of the Plaintiffs' Appeal Brief is not devoted to questions of contested law, but, rather, to questions concerning the credibility of the witnesses and the weight of the evidence, especially questions that involve educational expertise.

Recognizing the Eighth Circuit's rule that a federal court's review of the state administrative decision "is, in reality, quite narrow," three elements of the rule of due deference are of particular importance to the pending appeal: (1) the rule of deference to the trier of fact on questions concerning the weight of the evidence and the credibility of the witnesses, (2) the rule of deference to the expertise of the hearing officer appointed by the State on questions of educational policy, and (3) the rule of deference to the state educational standards that are an integral part of the federal guarantee of a free appropriate public education.  Each of these elements is firmly supported by the governing precedents, and each will now be separately documented and discussed.

---

[5] For example, the Plaintiffs' assertion that the ALJ failed to assign the burden of persuasion to the party seeking relief is answered in Part I(B)(1), *infra*.  The Plaintiffs' theory that the ALJ was required to defer to the testimony of their witnesses is refuted in Part I(B)(2), *infra*.  The Plaintiffs' various contentions on the subject of the least restrictive environment are answered in Part II(A), *infra*, etc.

a.    *Reviewing courts must give due deference to the determinations of the trier of facts on questions concerning the weight of the evidence and the credibility of the witnesses.*

The Plaintiffs' Appeal Brief contains numerous and frequently lengthy passages detailing their perspectives on the weight of the evidence and the credibility of the witnesses.  For example, the School District and the AEA argue that the testimony of the expert witness they retained to testify, Dr. Keith Allen, "was particularly compelling" because, in their words,  he was "completely free to form his own independent judgment." (Plaintiffs' Appeal Brief at 51).  In the next paragraph, the School District and the AEA acknowledge that the testimony of Dr. Vincent Carbone, an expert witness called by Isabel and her parents,  was adverse to them, but imply that his testimony was not entitled to great weight because, among other alleged reasons,  he was "[o]nly one witness."  (*Id.*) In the next paragraph, the School District and the AEA attempt to dismiss the credibility of the testimony of Dr. Wanda Mohr, another expert witness called by the parents in the proceedings below.  Among other arguments, they describe her as a "psychiatric nurse with experience working with children who are hospitalized." (*Id.* at 52).  They neglect to mention that she is a doctor and professor of psychiatric nursing and that she is a pioneer in peer-reviewed research on the efficacy and dangers of using seclusion and restraint as behavioral interventions.  (*See* Appellants' Records in DoE Docket No. SE-320 at 4721-4754 (setting forth a fraction of her published work on the subject)  & 5075-5105 (setting forth her Curriculum Vitae); *see also* Transcript at 569 *et seq.* (reviewing Dr. Mohr's experience, credentials, and published research findings)).

The substantive issues addressed by the witnesses in the proceedings below will be addressed in Part II of this Defendants' Appeal Brief.  At this juncture, however, we respectfully submit that the Plaintiffs' arguments concerning the credibility of the witnesses, as well as their arguments

18

concerning the weight to be accorded to their respective testimonies, are inconsistent with the "due weight" to be accorded to the outcome of administrative proceedings under the IDEA. The reason is that ALJ Etscheidt was the trier of fact, and she had the opportunity to see and hear the witnesses and to gauge their credibility. As explained by the U.S. Court of Appeal for the Third Circuit,

> As a matter of general appellate principle . . . , appeals panels ordinarily defer to the trial presider's factual findings based on credibility judgments about the witnesses presented at the trial or hearing. For example, Rule 52(a) of the Federal Rules of Civil Procedure states: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."
> . . . .
> We thus embrace the Fourth Circuit's approach in *Doyle v. Arlington County School Board*, 953 F.2d at 105, to the extent that that decision was premised on this specific principle, that credibility-based findings deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirely would compel a contrary conclusion.

*Carlisle Area School v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 528 (3rd Cir. 1995); *see also Mr. I. ex rel. L.I. v. Maine School Admin. Dist. No. 55*, 480 F.3d 1, 10 (1st Cir. 2007) ("Mixed questions generally 'fall along a degree-of-deference continuum, ranging from non-deferential plenary review for law-dominated questions, to deferential review for fact-dominated questions'"); *Greenwood ex rel. Greenwood v. Wissahickon School* Dist., 2006 WL 279085 at 3 (E.D. Pa. 2006) (ruling that "administrative factual findings are considered prima facie correct"); *cf. Batson v. Kentucky*, 476 U.S. 79, 98 n.21, 106 S. Ct. 1712, 1724 n.21, 90 L. Ed. 2d 69 (1986) ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.")

The rule of judicial deference to the findings of the trier of fact in state administrative proceedings conducted pursuant to the IDEA is supported by a long and unbroken line of Eighth

Circuit precedents.  *See, e.g,  Fort Zumwalt School Dist. v. Clyne,* 119 F.3d 607, 610 (8th Cir. 1997)

(addressing the issue in the context of a two-tier administrative review proceeding and ruling that,

where "there is a conflict between the findings and conclusions of the hearing panel and the final

reviewing officer, a court may choose to credit the hearing panel's findings based on observation

of the witnesses"); *Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 654-

55 (8th Cir. 1999) (ruling that "a district court must give consideration 'to the fact that the state

hearing panel has had the opportunity to observe the demeanor of the witnesses'"); *Strawn v.*

*Missouri State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000) (ruling that "[t]he district court must

give 'due weight' [to the administrative decision] because the administrative panel had an

opportunity to observe the demeanor of the witnesses"); *School Board of Independent School Dist.*

*No. 11 v. Renollett*, 440 F.3d 1007, 1010 (8th Cir. 2006) (repeating the rule that the "district court

must give 'due weight' because the administrative panel had an opportunity to observe the demeanor

of the witnesses.")

  In determining the weight that is due to the decision rendered at the state level, it is

appropriate to consider the thoroughness of the administrative findings.  As the U.S. District Court

for the Eastern District of New York has explained:

> The amount of weight given to the administrative proceedings is subject to the
> court's exercise of informed discretion and should be based, in part, on the
> thoroughness of the administrative findings.

*Wall v. Mattituck-Cutchogue School Dist.*, 945 F. Supp. 501, 507 (E.D.N.Y. 1996); *see also, e.g.,*

*Union School Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) ("We give deference to the

administrative findings of the Hearing Officer particularly when, as here, they are thorough and

careful.")

Even a cursory review of ALJ Etscheidt's decision reviews that it is thorough and careful. A more in-depth review only underscores this conclusion.  Consider, for example, the following sentence from the decision:

> The [parents] offered empirical research from both Dr. Mohr and others to support their claim that the holding and restraining interventions implemented with Isabel were excessive and inconsistent with Isabel's needs.

(Decision at 37, Certified Record at 336).  This sentence from the decision is footnoted to a listing of eleven research articles introduced by the parents and supporting the parents' position; the footnote carefully summarizes the key findings in each article.  (Decision at 51 n.27, Certified Record at 350 n.27).  This listing was not submitted to the ALJ by either of the parties, and we respectfully submit that it could only have been prepared by conducting a thorough and careful review of the hundreds upon hundreds of pages of research articles introduced into evidence in the proceedings below.  (*See* Appellants' Records in DoE Docket No. SE-320 at 3784 through 5056; *see also* Appellees' Records in DoE Docket No. SE-320 at 2001-2241).

Consider, as a second example, another sentence from the ALJ's decision:

> While the initial applications planned 11/22/2004 and implemented throughout the Spring of 2005 may have been the intended guidance in classroom setting, the seventeen recorded applications of hand-over-hand interventions throughout the Fall of 2005 were for 54 minutes, 25 minutes, 30 minutes, 20 minutes, 1 hour 25 minutes, 1 hour 10 minutes, 40 minutes, 25 minutes, 8 minutes, 7 minutes, 1 hour 23 minutes, 37 minutes, 59 minutes, 32 minutes, 1 hour 4 minutes, 2 hours 30 minutes, and 1 hour 30 minutes, often involving several adults to implement the intervention.

(Decision at 36, Certified Record at 335).  Neither of the parties submitted such a detailed listing of the application of hand-over-hand interventions during the course of the proceedings, and, once again, we respectfully submit that no such listing could have been prepared without a thorough and careful review of the evidence submitted.

21

The Plaintiffs' Appeal Brief largely ignores the rule of deference to the findings of the trier

of fact.  Indeed, their only reference to this long-established element of the "due weight" standard

first articulated in *Rowley* is oblique at best:

> The ALJ made  few actual findings related to disputed facts.  In the "Findings of
> Fact" (Dec. 3-22), the ALJ recites testimony of witnesses without clear indication of
> whether the testimony was accepted as a fact.  *See CJN v. Minneapolis Public
> Schools*, 323 F.3d 630, 636 (8th Cir. 2003) (hearing officer's "findings of fact" were
> not facts actually found, but rather were statements of what witnesses testified to in
> the twelve days of hearing.)

(Plaintiffs' Appeal Brief at 4 & n.1).  There are at least three compelling answers to the Plaintiffs'

argument.

First, the decision rendered by ALJ Etscheidt is careful and thorough, and the portion of the

decision labeled "Findings of Fact" can and does contain numerous findings of fact.  Consider , for

example, the following illustrative paragraph concerning one of the behavioral interventions at issue

in the proceedings below::

> On 11/2/2005 from 12:10 to 12:18 the hand-over-hand intervention involved Ms.
> Brinkmeyer holding Isabel at her waist, an associate holding Isabel's legs, and
> teacher Heidi Town holding Isabel's hand to color.  On 11/3/2005, the hand-over-
> hand was attempted from 9:52 to 10:00 with associate Kendra Sweeney holding one
> arm with another arm on top of Isabel's leg while Ms. Brinkmeyer performing the
> hand-over-hand.  Isabel offered several times to color by herself.  On 11/10/2005, an
> extensive application of the hand-over-hand intervention occurred from 10:22-11:45
> and again from 3:15-3:52.  Both teachers and the associate switched responsibilities
> of restraint and hand-over-hand coloring throughout the session.  Similar hand-over-
> hand procedures, with Isabel insisting throughout that she could color by herself,
> were recorded for 11/5/2005 from 10:53-11:52, 11/22/2005 from 10:26 to 10:58,
> 11:01-12:05, and from 1:15 to 3:40, 11/23 from 10:15-11:45, with three adults
> holding and providing hand over hand coloring.

(Decision at 14-15, Certified Pleadings at 313-14) (numerous citations to the record omitted).  The

just-quoted paragraph and many other similar paragraphs in the Decision refute the Plaintiffs'

allegation that "[t]he ALJ made few actual findings related to disputed facts."

Second, while it is true that ALJ Etscheidt cites to the testimony of numerous witnesses, it is equally true that her very selection of testimony reflects obvious credibility determinations. For example, the School District and the AEA assert that the ALJ did not "give any credence to" the testimony elicited from the Plaintiffs' expert witness, Dr. Keith Allen, during the course of the Plaintiffs' direct examination of that witness. (Plaintiffs' Appeal Brief at 59-60). In fact, however, the Administrative Law Judge devoted considerable attention to Dr. Allen's testimony, as revealed in the following excerpt from the Decision:

> Dr. Allen stated that the hand-over-hand must be brief, around 30 seconds to 4 minutes, and that durations in excess of that duration would limit the potential for behavior reduction. When the intervention is contraindicated and not decreasing the targeted behavior, additional functional behavioral assessment should be conducted and alternative interventions considered. *He testified that physical guidance to avoid escape did not involve adults restraining, holding, or compelling action, and that guidance-induced aggression would be a serious concern. The implementation of physical guidance, or hand-over-hand assistance, with restraint as provided to Isabel would not conform with accepted practice of the intervention.*

(Decision at 9-10, Certified Pleadings at 308-09) (emphasis supplied).

On appeal, the Plaintiffs apparently assert that the trier of fact was obliged to credit Dr. Allen's testimony "as a whole." (Plaintiffs' Appeal Brief at 60 n.13). In fact, however, the trier of fact has every right to credit some portions of the testimony of a witness more than other portions, especially where, as here, critical concessions were made during the course of the cross-examination of the Plaintiffs' expert. Thus, it is black letter law that, "[i]n all judge-tried civil cases, the credibility of the witnesses and the weight to be given their testimony are matters for the trial court, which is free to believe, none, *part*, or all of the testimony." 5 C.J.S. *Appeal and Error* § 940 (2007) (emphasis supplied). Further, "[t]he credibility of witnesses, reconciliation of conflicting

23

statements, a determination of which should be accepted and which should be rejected, and the truthfulness and accuracy of testimony, whether contradictory or not, are issues for the trier of fact." *Id.* It is noteworthy, therefore, that, in selecting testimony for inclusion in the Findings of Fact, ALJ Etscheidt frequently emphasized concessions against interest by witnesses for the Plaintiffs, as illustrated by the following excerpt from her findings:

> Ann Hilliard testified that the hand-over-hand was only to be implemented for escape-based behaviors, and to use it following peer aggression would be inconsistent with the behavioral plan.  Barb Rankin, Coordinator of Autism and Challenging Behavior Services for Heartland, testified that the hand-over-hand "move into physical restraint" was not intended but "kind of evolved."

(Decision at 10, Certified Pleadings at 309) (citations to the record omitted).

A third answer to the Plaintiffs' arguments on appeal is that additional factual findings are set forth in that portion of the ALJ's opinion designated as "Conclusions of Law."  For example, the Decision states that "[t]he selection of 'break time . . . to calm her down when Isabel becomes non-compliant' would be contraindicated for the escape-based non-compliance. . . . Both experts testified that presenting hand-over-hand for behaviors assessed to be attention-based would be contraindicated."   (Decision at 35, Certified Pleadings at 334).  The ALJ then found that "[t]he implementation of these two reduction-oriented strategies identified in the 2004 behavior support plan would be inconsistent with the hypothesized function from the functional assessment data, inconsistent with research findings and appropriate educational practices, and contraindicated by the empirical research offered by the parties." (*Id.*) (citation to the Iowa Rules of Special Education omitted).

A highly persuasive, albeit non-binding, answer to the Plaintiffs' contention that ALJ Etscheidt "made  few actual findings related to disputed facts" is set forth in an unpublished per

curium decision rendered by the U.S. Court of Appeals for the D.C. Circuit in 1989.  *Dawkins ex*

*rel. Dawkins v. District of Columbia*, 872 F.2d 496, 1989 WL 40280 (D.C. Cir. 1989).  The decision

was rendered by three judges, including Circuit Judge (now Justice) Ruth B. Ginsburg.  There, as

here, it was argued that "the District Court owed no deference to the hearing officer's findings

because she 'did not make any substantive findings of fact.'" *Id.* at *2.  The Court of Appeals

reversed the ruling of the District Court because it "'gave no apparent deference to the decision of

the hearing officer.'" *Id.* (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 889 (D.C. Cir. 1988).  In so

doing, the Court of Appeals reasoned in relevant part as follows: "To say that the District Court did

not need to defer to the hearing officer because her relevant findings were labeled 'Determination

and Rational[e]' rather than 'Findings of Fact' elevates form over substance." *Id.*

The U.S. Court of Appeals for the Eighth Circuit has adopted a similar approach, as

evidenced by the case cited by the Plaintiffs, *CJN v. Minneapolis Public Schools*, 323 F.3d 630, 636

(8th Cir. 2003).  Minnesota has a two-tier due process procedure in IDEA cases, and, although the

parents prevailed at the first tier, "[o]n appeal a state hearing review officer (HRO) reversed the

HO's decision that CJN did not receive a FAPE . . . ." 323 F.3d at 635.  On further appeal to the

federal courts, the parents attempted to prove that the HRO had not given sufficient deference to the

findings of fact by the Hearing Officer.  *Id.* at 636.  In resolving this issue, the Eighth Circuit

emphasized the rule that "due weight" must be given to the trier of fact, which "'had an opportunity

to observe the demeanor of the witnesses.'" *Id.* (quoting *Strawn v. Missouri State Board of Educ.*,

210 F.3d 954, 958 (8th Cir. 2000)).

In *CJN*, the Eighth Circuit upheld the rule of deference to the trier of fact, but held that the

HRO had not violated the rule.  It reasoned in relevant part "that what the HO and the HRP actually

25

found as facts are located in their 'conclusions of law,' intermixed with their actual legal conclusions." 323 F.3d at 636.  The Eighth Circuit not only honored the rule of substance over form in addressing the findings of the HRO, but extended that rule to include "implicit" as well as express findings: "Heeding *Rowley's* warning that 'courts must be careful to avoid imposing their view of preferable educational methods upon the States,' *and giving "due weight' to the HRP's implicit decision of sufficiency*, we do not believe that the failure to develop a BIP could fairly be said to constitute a denial of a FAPE in these circumstances."  323 F.3d at 640 (emphasis supplied).

Before concluding this analysis of the deference due to the findings of the trier of fact in an IDEA due process proceeding, it should be noted that, while the IDEA mandates that each participating state provide the "opportunity for an impartial due process hearing," it gives each state the option of creating a one-tier or two-tier due process system.  20 U.S.C. § 1415(f).  In a two-tier system, such as that employed in Minnesota, the parties present their witnesses and other evidence at "an impartial due process hearing . . . conducted . . . by the local educational agency."  *Id.* at § 1415(f)(1)(A).  "If the hearing . . . is conducted by a local educational agency, any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency," which "shall conduct an impartial review" and "make an independent decision upon completion of such review."  20 U.S.C. § 1415(g) (1)&(2).

When an appeal is taken from the final decision in a two-tier state, and where there is a conflict between the decisions at each level of administrative review, the U.S. district court may face competing rules of deference.  To state the conflict succinctly, the rule of judicial deference to the trier of fact may conflict with the rule of judicial deference to the State educational agency

26

on questions involving educational expertise.[6]  The U.S. Court of Appeals for the Eighth Circuit has

addressed such a conflict arising out of the two-tier system in Missouri and has ruled that "[w]here

there is a conflict between the findings and conclusions of the hearing panel and the final reviewing

officer, a court may choose to credit the hearing panel's findings based on observation of the

witnesses . . . ."  *Fort Zumwalt School Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997); *see also*

*Independent School District No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996) ("Here, the

district court faced the task of choosing between conflicting finds and conclusions of the hearing

officer and the review officer.")

Unlike Minnesota and Missouri, Iowa is a one-tier state.  There is but one impartial due

process hearing, and the trier of fact is the Administrative Law Judge appointed by the State of Iowa

to represent the educational expertise of the agency.  *See* Iowa Administrative Rules of Special

Education, Division XI, Rules 281–41.112 *et seq.* (2000); *see also* Plaintiffs' Appeal Brief at 9

("The Iowa special education due process procedures do not have a second level of administrative

review, so this appeal to federal court is taken directly from the decision of the ALJ.")  Since Iowa

is a one-tier state, the Decision of ALJ Etscheidt is entitled to twofold deference on appeal to the

courts: the deference due to the factual findings of the trier of fact, and the deference due to the

educational expertise of the State  educational agency.

--------

[6] "The ramifications of *Rowley*'s injunction to give 'due weight' are unclear where a state creates a two-tiered administrative regime and each tier arrives at a different conclusion. The circuits have split on the question whether federal district courts acting pursuant to *Rowley* should accord due weight to the trial level hearing officer or to the appeals panel where the two bodies differ and where the appeals panel may not have properly deferred to the hearing officer's findings."  *Carlisle Area School v. Scott P.*, 62 F.3d 520, 527 (3rd Cir. 1995); *see also Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989) ("We do not address the issue of deference in cases involving one or more levels of post-hearing administrative appeal.")

**b.**      ***Reviewing courts must give due deference to the State's Administrative Law Judge on questions involving educational expertise.***

A second element of the U.S. Supreme Court's rule that "due weight" must be given to the outcome of the State's administrative proceedings is the rule of deference to the presumed educational expertise of the Administrative Law Judge appointed to conduct an impartial due process hearing by the Iowa Department of Education.  This element is firmly grounded in the language and rationale of the Supreme Court's decision in *Board of Educ. of Hendrick Hudson Central School Dist. v.  Rowley*, 458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).  As explained by the U.S. Court of Appeals for the D.C. Circuit,

> The Supreme Court . . . found that when considered in light of the Act as a whole, "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." 458 U.S. at 206, 102 S. Ct. at 3051.  The Court reasoned  that § 1415(e)'s requirement that the reviewing court receive the records of the administrative proceedings carried an implied duty to give "due weight" to that record.  It also argued that Congress's emphasis on fair procedures at the administrative level would be frustrated if courts could freely disregard the results.
>
> The procedures are spelled out in §1415 . . . and are substantial.  They include the rights to be accompanied by counsel and to "confront, cross-examine, and compel the attendance of witnesses."  The hearing is characterized by Congress as an "impartial due process hearing" . . . and is not to be conducted "by an employee of such agency or unit involved in the education or care of the child.". . .
>
> *Deference to the hearing officer makes sense in a proceeding under the Act for the same reasons that it makes sense in the review of any other agency action– agency expertise, the decision of the political branches . . . to vest the decision initially in the agency, and the costs imposed on all parties of having still another person redecide the matter from scratch.*

*Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989) (emphasis supplied); *see also Burilovich v. Board of Educ. of Lincoln Consol. Schools*, 208 F.3d 560, 566 & n.1 (6th Cir. 2000) (recognizing

"the expertise of the administrative agency" and ruling "that the weight due will vary, depending on . . . whether educational expertise is essential to the administrative findings"); 73A C.J.S. *Public Administrative Law and Procedure* § 238 (2007) ("A public administrative body is presumed to have special knowledge as to the matters within its province.")

On appeal to this U.S. District Court, the School District and the AEA acknowledge the rule of due deference to the presumed expertise of the "school authorities," but assert that the school authorities are "the District and AEA employees" and that the deference is due to them and not to the Administrative Law Judge appointed by the Iowa Department of Education. (Plaintiffs' Appeal Brief at 10 & n.2). In their words, "[t]he Administrative Law Judge in this case . . . is not a 'school authority' to whom deference must be given . . . ." (*Id.* at n.2). In reply, we respectfully submit that the Plaintiffs' assertion is wholly inconsistent with, and contrary to, the most fundamental principles of IDEA law.

The Plaintiffs' assertion is contrary to the IDEA because, as noted in cases such as *Kerkam v. McKenzie*, the rule of deference to school authorities is founded upon, and derived from, the Congressional mandate that the due process hearing conducted by the State's Department of Education be "impartial." *See* 20 U.S.C. § 1415(f)(1)(A) (stating that the party filing the complaint "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency.[7]") The governing federal statute also gives substance to the impartiality requirement by mandating that the hearing officer who conducts a due process hearing must not be

---

[7] In a two-tier state where the initial "impartial due process hearing" can be conducted by the local educational agency, Congress has mandated that "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency," which "shall conduct an impartial review."   20 U.S.C. § 1415(g)(1)&(2).

"an employee of the State educational agency or the local educational agency involved in the education or care of the child" or a "person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(f)(3)(A)(i)(I)&(II) (emphasis supplied).

The fact that a Professor of Special Education was appointed as the Administrative Law Judge to try the case in the proceedings below (rather than an employee of the State educational agency or the employee of a local educational agency) is a direct consequence of the Eighth Circuit's interpretation of the impartiality requirement mandated by the IDEA. Thus, in *Robert M. ex rel. Renee K. v. Benton*, 634 F.2d 1139 (8th Cir. 1980), the Eighth Circuit ruled that the Superintendent of Public Education in the State of Iowa was disqualified from serving as a hearing officer in due process hearings under the IDEA. The Eighth Circuit ruled that Dr. Benton was clearly "involved, although indirectly, in the education of Renee K." 634 F.2d at 1142.

In the arguments presented to this Court, the School District and the AEA insist that their witnesses and employees are the "school authorities entitled to deference" because they "worked directly with Isabel." (Plaintiffs' Appeal Brief at 46). As a corollary, they assert that ALJ Etscheidt "is not a 'school authority' to whom deference must be given . . . as she was not involved in Isabel's educational program." (*Id.* at 10 n.2). These assertions turn IDEA law on its head. Quite apart from upholding the mandate that the due process hearing must be impartial, the Plaintiff s would have this Court mandate partiality by mandating deference to the witnesses for, and employees of, the educational entities whose practices are being challenged.

Extracted from context, the phrase "educational authorities" could be given a variety of meanings, including the meaning preferred by the Plaintiffs. In context, however, the phrase

invariably refers to the educational authority or authorities appointed by the State's department of

education to conduct an impartial due process hearing.  Thus, when the U.S. Supreme Court first

used the phrase in its landmark *Rowley* decision,  its very next sentence made it clear that it was

referring to the weight owed to "state decisions." *Board of Educ. Of Hendrick Hudson Central*

*School Dist. v.  Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 3051, 73 L. Ed. 2d 690 (1982). The

deference due to the State on questions of educational policy is a frequently repeated theme in

*Rowley* decision:

> [C]ourts must be careful to avoid imposing their view of preferable educational
> methods upon the States. . . . The Act expressly charges States with the responsibility
> of "acquiring and disseminating to teachers and administrators of programs for
> handicapped children significant information derived from educational research,
> demonstration, and similar projects, and [of] adopting, where appropriate, promising
> educational practices and materials."  § 1413(a)(3).  In the face of such a clear
> statutory directive, it seems highly unlikely that Congress intended courts to overturn
> a State's choice of appropriate educational theories . . . .
>
> It is clear that Congress was aware of the State's traditional role in the formulation
> and execution of educational policy.  "Historically, the States have had the primary
> responsibility for the education of children at the elementary and secondary level."

458 U.S. at 207-08 & n.30, 102 S. Ct. at 3051 & n.30; *see also id.* at 211, 102 S. Ct. at 3053 ("I

believe that the District Court and the Court of Appeals should have given greater deference than

they did to the findings of the School District's impartial hearing officer and the State's

Commissioner of Education" (Blackmun, J., concurring).

Not surprisingly, the post-*Rowley* decisions consistently emphasize the rule of deference to

the presumed expertise of the hearing officer appointed by the State educational agency.  *See, e.g.,*

*Burilovich v. Board of Educ. of Lincoln Consol. Schools*, 208 F.3d 560, 566-67 (6th Cir. 2000)

(deferring to "the factfinding of a state agency, which is presumed to have expertise in the field,"

and ruling that "[m]ore weight is due to an agency's determinations on matters for which educational expertise would be relevant"); *N.C. ex rel. M.C. v. Bedford Central School Dist.*, 473 F. Supp. 2d 532, 542 (S.D.N.Y. 2007) (ruling that district courts "give 'substantial deference' to final administrative judgments implicating educational policies and practices"); *Mr. I. v. Maine School Administrative Dist. 35*, 416 F. Supp. 2d 147, 157 (D. Me. 2006) (citing *Rowley* for the proposition that, "[w]here the issue is one that implicates the educational expertise of the school district, more deference is due the administrative findings"); *Greenwood ex rel. Greenwood v. Wissahickon School Dist.*, 2006 WL 279085 at 3 (E.D. Pa. 2006) (emphasizing the "deference that courts must afford state officials that are better able to apply educational policy.")

The rule of deference to the presumed educational expertise of the neutral hearing officer appointed by the State educational agency is supported by a long and unbroken line of Eighth Circuit precedents. *See, e.g., Fort Zumwalt School Dist. v. Clynes*, 119 F.3d 607, 614 (8th Cir. 1997) (identifying the school authorities to whom deference is due on questions of educational policy as the "state educational experts on the hearing panel"); *Strawn v. Missouri State Board of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000) (identifying the school authorities to whom deference is due on questions of educational policy as "the administrative panel [that] had an opportunity to observe the demeanor of the witnesses"); *Gill ex rel. Gill v. Columbia 93 School Dist.*, 217 F.3d 1027, 1037 (8th Cir. 2000) (ruling that a "federal court should give 'due weight' to administrative proceedings and should not substitute its own notion of educational policy for that of the administrative panel"); *Independent School District No. 284 v. A.C. ex rel. C.C.*, 258 F.3d 769, 773 (8th Cir. 2001) (ruling that "[w]e must afford 'due weight' to the outcome of the state administrative proceedings, giving particular consideration to state officials' educational judgments").

Numerous additional precedents from the Eighth Circuit reinforce the rule of deference to the presumed educational expertise of the individual or individuals appointed by the State's educational agency to conduct a due process hearing. *See, e.g., Neosho R-V School Dist. v. Clark*, 315 F.3d 1022, 1030 (8th Cir. 2003) ( approving the district court's deference to the educational findings of the administrative panel that presided at the due process hearing, including a "determination that the materials attached to the IEPs did not constitute a proper behavior management plan"); *Missouri Department of Elementary and Secondary Educ. v. Springfield R-12 School Dist.*, 358 F.3d 992, 998 (8th Cir. 2004) (ruling that "we must give 'due weight' to the outcome of administrative proceedings, giving particular consideration to state officials' educational judgments"); *Bradley ex rel. Bradley v. Arkansas Dept. of Educ.*, 443 F.3d 965, 974 (8th Cir. 2006) (again ruling that "due weight" must be given to "'the outcome of administrative proceedings, giving particular consideration to state officials' educational judgments"); *Pachl v. Seagren*, 453 F.3d 1064, 1067 (8th Cir. 2006) (affirming the district court's decision to give "due weight to the results of [the due process] proceedings.")

As documented above, the educational expertise of the Administrative Law Judge appointed by the Iowa Department of Education is presumed as a matter of law.  In this case at least, the presumption is fully justified.  Thus, when the Plaintiffs argue that the ALJ is a "professor at the University of Northern Iowa" and that she "is not a 'school authority' to whom deference must be given" (Plaintiffs Appeal Brief at 10 n.2), they omit several inconvenient truths.  First, Dr. Susan K. Larson Etscheidt is not merely a professor at the University of Northern Iowa, but a professor in the Department of Special Education, and her responsibilities include "teaching undergraduate and graduate special education courses, supervision of practicum trainees in classrooms for students

33

ac

with behavioral disorders, . . . and [serving as] coordinator of [the] departmental behavioral disorders training program." (Supplement to Certified Record at 17a).[8]  She has served as an Administrative Law Judge in special education cases in Iowa since 1990, and she has numerous publications in the peer-reviewed literature on the substantive issues addressed in the proceedings below. (*Id.* at 17a-17b).  To cite but two examples, her adjudicated work on "Reducing Aggressive Behavior and Improving Self-Control: A Cognitive-behavioral Training Program for Behaviorally Disordered Adolescents" was published in the journal *Behavioral Disorders* in 1991, and her adjudicated work entitled "Behavioral Intervention Plans: A Pedagogical and Legal Analysis of Issues" was published in the same journal in 2006.  (*Id.* at 17b).

In summary, although the School District and the AEA would obviously prefer that the U.S. District Court defer to the testimony of their own witnesses, the law requires deference to the outcome of the administrative proceedings.  The law specifically requires that, with respect to questions involving educational expertise, deference be given to the findings of the hearing officer appointed by the State educational agency.  Administrative expertise is presumed, and, in this case at least, that presumption is fully justified by the facts.

> **c.** ***Reviewing courts must give due deference to the state educational standards that are an integral part of the federal guarantee of a free appropriate public education***.

A third element of the *Rowley* rule that "due weight" must be given to the outcome of the State's administrative proceedings concerns the vital role of state educational standards in protecting

---

[8] The School District and the AEA received the cited "description of the qualifications of this individual for appointment as Administrative Law Judge" at the time Dr. Etscheidt's appointment.  (Appointment of Administrative Law Judge, Certified Pleadings at 17).  Significantly, they made no objections to her appointment at any time in the proceedings below.

the rights of children with disabilities.  In enacting the IDEA, the U.S. Congress created a guarantee

that every eligible child with disabilities within a state would be entitled to the benefit of that state's

educational standards.   Indeed, this federal guarantee under the IDEA is part of the statutory

definition of a free appropriate public education:

> The term "free appropriate public education" means special education and related
> services that–
> (A) have been provided at public expense, under public supervision and direction,
> and without charge;
> (B) *meet the standards of the State educational agency* . . . .

20 U.S.C. § 1402(9) (emphasis supplied).

As a direct consequence of this plain statutory language,  state standards are an integral part

of an entitled child's procedural and substantive rights under the IDEA. As the U.S. Court of

Appeals for the Fourth Circuit has recently ruled,

> [T]he definition of a FAPE under the IDEA requires that educational services "meet
> the standards of the State educational agency."  A school run by a state or political
> subdivision of a state, then, must meet the standards established by the governing
> state educational agency, which in turn must meet or exceed the IDEA's minimum
> requirement.

*G ex rel. RG v. Fort Bragg Dependent Schools*, 343 F.3d 295, 304 (4th Cir. 2003) (citation omitted);

*see also Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 658 (8th Cir.

1999) (ruling that "the IDEA defines the 'free appropriate public education' that a school district

must provide to include instruction and services that meet state educational standards" and that "the

state standards are thus enforceable through the IDEA"); *CJN  v. Minneapolis Public Schools*, 323

F.3d 630, 639 (8th Cir. 2003) (ruling that, "under the IDEA a disabled student's IEP must 'meet the

standards of the State educational agency' and that "the state standards are . . . enforceable through

the IDEA.")

35

The statutory definition of FAPE gives rise to a third element of *Rowley*'s rule that "due weight" must be given to the decision rendered by the hearing officer appointed by the State educational agency: "Where a state administrative decision rules a proposed IEP invalid because it has not met the state's substantive or procedural requirements pertaining to a free appropriate public education for a particular disabled child, *a federal court should accord the findings deference*." *Hiller ex rel. Hiller v. Board of Educ. of Brunswick Cent. School Dist.*, 743 F. Supp. 958, 968 (S.D.N.Y. 1990) (emphasis supplied); *see also* 20 U.S.C. §1412(11)(A)(ii)(II) (stating that "[t]he State educational agency is responsible for ensuring that . . . all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency, . . . meet the educational standards of the State educational agency.")

The cited element of the rule of due deference is codified and explained in a landmark decision by the U.S. Court of Appeals for the First Circuit, a decision that was subsequently affirmed by a unanimous Supreme Court opinion rendered by Chief Justice Rehnquist. The decision states, in relevant part, as follows:

> Where a state administrative decision rules a proposed IEP invalid because it has not met the state's substantive or procedural requirements pertaining to a free appropriate public education for a particular disabled child, a federal court should accord the findings deference. In such a situation, as here, a federal court . . . should be more circumspect about its intrusion. *It is hard to locate a significant federal interest in displacing a state agency's supportable ruling that one of its school systems has not complied with state standards. . . .*

> This . . . approach is based upon the principles and policy of federalism which ground the Act, and more specifically, on the pivotal role of the state– historically and as expressly recognized in the Act– in setting and enforcing the educational standards for its citizens. *The local education agencies are subject to the state's legal authority, both as a general matter and per the operation of the federal Act.*

*Town of Burlington v. Department of Educ. for Com. of Mass.*, 736 F.2d 773, 792 (1st Cir. 1984),

*aff'd sub nom.*, *School Committee of Town of Burlington v. Department of Education of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985) (emphasis supplied); *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005) (ruling that the IDEA is "frequently described as a model of 'cooperative federalism,'" and that it "'leaves to the States the primary responsibility for developing and executing educational programs for handicapped children'") (citations omitted).

The just-cited precedents are important to the instant case because the School District and the AEA have consistently attempted to ignore or escape state standards that directly impact upon their treatment of Isabel L.   For example, Mr. and Mrs. L. introduced into evidence a 2003 publication by the Iowa Department of Education entitled "Using Timeout in an Effective and Ethical Manner."   (Appellants' Records at 3784-3813).   We also introduced into evidence an Affidavit from the Iowa Department of Education indicating that this "publication was written and published for the purpose of providing guidance to parents, schools, and area education agencies in Iowa regarding the effective and ethical use of timeout." (*Id.* at 3783).   The affidavit verifies that the cited publication "represents the most recent guidance on the subject published by the Iowa Department of Education." (*Id.*)   In the proceedings below, however, the School District and the AEA did not even pretend that the behavioral interventions used on Isabel complied with the guidance provided by the Iowa Department of Education.   Instead, they argued that the Department's publication is "mere guidance.  It did not go through [the rule-making] process and it does not have the force and effect of law." (Transcript at 55).[9]

---

[9] The published guidance that the Iowa Department of Education provided to the School District and the AEA on the subject of timeouts would appear to comply with a "clear statutory directive" emphasized by Justice Rehnquist in the landmark *Rowley* decision: "The Act

As a second example, in the proceedings below, the School District and the AEA argued that they were not bound by prior decisions of Administrative Law Judges appointed by the Iowa Department of Education, even a decision rendered in a case where the Heartland Area Education Agency was a party.  Thus, they denied that a prior Iowa decision by Dr. Carl Smith "has any precedential value" and asserted that decisions by  "another ALJ" were not binding upon them. (Appellees' Brief at 92 n.10, Certified Record at 231 n.10).  The Plaintiffs' arguments on this score would appear to conflict with the Eighth Circuit's implicit holding that state standards can be articulated through the State's due process decisions.  *See CJN v. Minneapolis Public Schools*, 323 F.3d 630, 640 (8th Cir. 2003)(addressing the argument that certain timeouts violated state standards *per se* based on a prior state administrative decision[10]).

The School District and the AEA have denied any obligation to conform their conduct to the Iowa Department of Education's published guidance on the subject of the ethical and effective use of timeout, even though that guidance codifies the most relevant research and reflects the State administrative agency's expertise.  The School District and the AEA have denied any obligation to conform their conduct to the prior rulings of the Administrative Law Judges appointed by the Iowa Department of Education, even though the U.S. Court of Appeals for the Eighth Circuit has

---

expressly charges States with the responsibility of 'acquiring and disseminating to teachers and administrators of programs for handicapped children significant information derived from educational research, demonstration, and similar projects, and [of] adopting, where appropriate, promising educational practices and materials.'"  *Board of Educ. Of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 207, 102 S. Ct. 3034, 3051, 73 L. Ed. 2d 690 (1982) (quoting the statutory provision then codified at 20 U.S.C. §1413(a)(3)).

[10] The Eighth Circuit determined that the prior administrative decision was not factually analogous, but implicitly adopted the principle that state standards can be established by reference to the decisions rendered in a prior administrative proceeding under the IDEA.  *See* 323 F.3d at 640-41.

38

implicitly recognized the precedential force of those rulings on local educational agencies.  Most important, however, the School District and the AEA have effectively asserted the right to pick and choose among the rules promulgated by the Iowa Department of Education and to discuss those rules they wish to follow and to ignore those rules they do not wish to follow.

To document this contention, we start with the fundamental proposition that the duly promulgated rules of the Iowa Department of Education constitute "standards of the State educational agency" and that compliance with those rules is therefore an integral part of the federal definition of FAPE, as set forth in 20 U.S.C. § 1402(9).  *See, e.g., School Board of Independent School Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1012 (8th Cir. 2006) (recognizing that Minnesota's special education regulations are "state standards" that are "enforceable under the IDEA"); *CJN v. Minneapolis Public School*s, 323 F.3d 630, 639-640 (8th Cir. 2003) (also recognizing that administrative rules promulgated by the State educational agency in constitute "standards of the State educational agency" within the meaning of the IDEA).

The School District and the AEA apparently recognize the binding force of standards adopted by the Iowa Department of Education in the form of duly promulgated rules.  (*See, e.g.*, Plaintiffs' Appeal Brief at 96) (correctly stating that "Administrative law judges do not have authority through an administrative hearing decision to over-ride properly promulgated rules.") Despite this recognition, however, the Plaintiffs have effectively asserted the right to pick and choose among the rules promulgated by the Iowa Department of Education, stressing a very limited number of  rules they wish to follow and ignoring many other rules they apparently do not wish to follow.

The Decision of ALJ Etscheidt cites multiple provisions of the Iowa Rules of Special

Education in support of her rulings.  (*See, e.g.*, Decision at 33, 35, 39, & 46 (citing Iowa Rule

281–41.36(b) on the subject of what constitutes an appropriate education); *id.* at 24 (citing Iowa

Rule 281--41.37(2) on mandated documentation requirements); *id.* at 33, 40, & 42 (citing Iowa Rule

281–41.67(5)(b)(1) on the subject of positive behavioral interventions, strategies, and supports); *id.*

at 29  (citing Iowa Rule 281–4.67(6) on mandated considerations in the development of an IEP).

The Plaintiffs' Appeal Brief does not address any of the just-cited rules, much less refute ALJ

Etscheidt's interpretation and application of those rules.[11]

The Plaintiffs' omissions are highly material.  For example, the School District and the AEA

now assert that "[t]here was no finding by the ALJ of any violation of the Iowa rules."  (Plaintiffs'

Appeal Brief at 70).  They also castigate ALJ Etscheidt for invoking applicable research findings

and appropriate educational practices, arguing that "'evidence-based practices' are not mandated."

 (*See, e.g., id.* at 40).  The Plaintiffs' arguments are undermined by a duly promulgated provision

of the Iowa Rules of Special Education, a provision invoked by the ALJ in her decision, but

completely ignored by the School District and the AEA on appeal.  Thus, Rule 281–41.3(6)of the

Iowa Rules of Special Education sets forth the following plainly worded mandate: **"An appropriate**

**program shall be consistent with applicable research findings and appropriate educational**

**practices."**  (Emphasis supplied).

---

[11] The Plaintiffs' Appeal Brief has but two references to the Iowa Rules of Special
Education.  (*See* Plaintiffs' Appeal Brief at 9 and 12).  The first is a reference to Iowa Rule
281–41.124, which is cited to establish that the final decision of the ALJ is ripe for judicial
review, and the second is a cursory reference to Iowa Rule 281–41.3(5).  The Plaintiffs' Appeal
Brief also cites two provisions of the Iowa Rules governing general education issues.  (*See id.* at
30 (invoking Iowa Rule 282–14.142(1)) and *id.* at 6, 70, & 96 (invoking Iowa Rule 281–103)).
Each of the rules invoked by the Plaintiffs will be discussed in connection with the substantive
issue to which it relates.  (*See* Part II of this Defendants' Appeal Brief, *infra.*)

The provisions of the Iowa Rules of Special Education will be discussed at greater length in connection with the substantive issues to which they relate. (*See* Part II, *infra*.)  At this juncture, however, three material points should be emphasized: First, as documented above, state educational standards are an integral part of the federal guarantee of an appropriate education.  Second, the School District and the AEA cannot pick and chose from among the governing state rules. *Cf. Yankton School District v. Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996) (ruling that "the school district is not free to choose which statute it prefers.")  Third, the School District and the AEA cannot use this federal forum to escape compliance with the Iowa Rules of Special Education.  As the First Circuit has ruled, "We do not believe the Act envisions federal courts releasing school systems from their state-mandated responsibilities. . . ." *Town of Burlington v. Department of Educ. for Com. of Mass.*, 736 F.2d 773, 792 n.24 (1st Cir. 1984), *aff'd sub nom.*, *School Committee of Town of Burlington v. Department of Education of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985).

2.     SINCE DUE DEFERENCE MUST BE GIVEN TO THE OUTCOME OF THE STATE ADMINISTRATIVE PROCEEDINGS, THE PARTY OR PARTIES CHALLENGING THAT OUTCOME MUST BEAR THE BURDEN OF PERSUASION ON APPEAL TO THE U.S. DISTRICT COURT.

The School District and the AEA have brought an action challenging the outcome of the proceedings conducted by the Iowa Department of Education.  Even so, they have denied any obligation to sustain any burden of persuasion or production with respect to that challenge.  In the Plaintiffs' words, even though Isabel and her parents were the prevailing parties in the proceeding below, they "continue to bear the burden." (Plaintiffs' Appeal Brief at 10).  Lest there be any mistake regarding the Plaintiffs' contention, the brief filed with this court concludes with the

opening statement that "[t]he Parents bear the entire burden of proof (both the burden of production and the burden of persuasion) in this appeal . . . ." (*Id.* at 102).

If the burden of proof remained on Isabel and her parents upon appeal to the U.S. District Court, we respectfully submit that the evidence produced in the proceedings below would fully sustain that burden, especially if due weight is given to the determinations of the trier of fact regarding the weight and credibility of that evidence. On behalf of Isabel and her parents, however, we submit that the Plaintiffs' attempt to escape the burden of proof on appeal is a serious distortion of the law and should not be sustained. This is so for each of three reasons: First, the Plaintiffs' attempt to escape the burden of persuasion on appeal is contrary to Eighth Circuit precedent and, indeed, contrary to the burden of proof articulated by the vast majority of courts from other jurisdictions. Second, the Plaintiffs' attempt to escape the burden of persuasion on appeal is contrary to the default rule articulated by the U.S. Supreme Court in *Schaffer v. Weast*. Finally, and perhaps most important, the Plaintiffs' attempt to escape the burden of persuasion on appeal is contrary to the well-established rule that due deference must be given to the State's due process proceedings.

The first reason why the Plaintiffs' attempt to escape the burden of proof on appeal is in error is that it is contrary to Eighth Circuit precedent. In *E..S. v. Independent School Dist., No. 196*, 135 F.3d 566, 569 (8th Cir. 1998), the Court ruled that "judicial review under the IDEA is limited . . . . *On appeal, the party challenging the outcome of state administrative hearings has the burden of proof.*" (Emphasis supplied). In *Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 658 (8th Cir. 1999), the Eighth Circuit again ruled that the burden of proof is placed on the parties who "are challenging the outcome of the administrative hearing panel's decision."

42

Similarly, in an opinion subsequently affirmed by the Eighth Circuit, the U.S. District Court for the District of South Dakota placed the burden of proof squarely on the party challenging the outcome of the State proceedings: "The burden of proof rests with Yankton School District as the party challenging the administrative determination." *Yankton School Dist. v. Schramm*, 900 F. Supp. 1182, 1186 (D.S.D. 1995), *aff'd,* 93 F.3d 1369, 1377 (8th Cir. 1996). Most recently, the U.S. District Court for the Eastern District of Missouri has summarized the Eighth Circuit rule as follows: "In challenging the state administrative decision, the plainitffs have the burden of proof." *O'Dell v. Special School District of St. Louis County*, 503 F. Supp. 2d, 1206, 1208 (E.D. Mo. 2007) (citing *E.S. v. Independent School District No. 196*, 135 F.3d 566, 569 (8th Cir. 1998)).

The decisions of the U.S. Court of Appeals for the Eighth Circuit in *E.S. v. Independent School District No. 196* and *Blackmon ex rel. Blackmon v. Springfield R-XII School District* are binding in this circuit, regardless of the position taken in other jurisdictions. It is worthy of note, however, that the vast majority of U.S. courts have adopted the same rule by imposing the burden of proof on the party challenging the decision rendered following an IDEA due process hearing. *See, e.g., Andrew M. v. Delaware County Office of Mental Health and Mental Retardation*, 490 F.3d 337, 345 (3rd Cir. 2007) (analyzing the holding in *Schaffer v. Weast* and ruling that, "[i]n addition to bearing the burden of persuasion, the party challenging an administrative decision faces the additional hurdle of overcoming a presumption that the Hearing Officer's findings were correct"); *Hester v. District of Columbia*, 433 F. Supp. 2d 71, 76 (D.D.C. 2006) (ruling that "[t]he party challenging a hearing officer's decision in federal court . . . carries the burden of proof"); *Clyde K. v. Puyallup School Dist. No. 3*, 35 F.3d 1396-1398-99 (9th Cir. 1994) (cited with approval by the Eighth Circuit in *E.S.*, 135 F.3d at 569); *Barnett ex rel. Barnett v. Fairfax County School Bd.*, 927

F.2d 146, 152 (4ᵗʰ Cir. 1991) (ruling that the burden of proof "is properly allocated to the party challenging the administrative decision below"); *Board of Educ. of Community Consolidated School Dist. No. 21 v. Illinois State Board of Educ.*, 938 F.2d 712, 716 (7ᵗʰ Cir. 1991) (cited with approval by the Eighth Circuit in *E.S.*, 135 F.3d at 569); *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988) (ruling that "we think it clear that a party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong.")

Although this list of supporting cases from other jurisdictions could be extended at length, one important fact should be noted: We can find no Eighth Circuit precedent allocating the burden of proof on appeal to the prevailing party in the proceedings below, and the Plaintiffs have cited none. Indeed, the *only* opinion cited by the School District and the AEA on the specific question of the allocation of the burden of proof on appeal to the U.S. District Court is *Brett S. ex rel. Charles S. v. West Chester Area School Dist.*, 2006 WL 680936 (E.D. Pa. 2006). (*See* Plaintiffs' Appeal Brief at 10-11). The Plaintiffs claim that the opinion in *Brett S.* stands for the proposition that "the burden of proof on the party challenging an action remains with that party on appeal." (*Id.* at 11). In fact, however, the *Brett S.* opinion states something materially different from what the Plaintiffs have suggested; it states that the same *rule* applies "to both the administrative hearing process and to the district court appeal." 2006 WL 680936 at 3. According to *Brett S.*, that rule is derived from *Schaffer*, and it is the rule that "the burden of proof is on the party seeking relief." Applying this rule to the circumstances of the instant case, the School District and the AEA bear the burden of persuasion because they are the parties seeking relief from the decision rendered by ALJ

Etscheidt.[12]

There is a second reason why the Plaintiffs' attempt to escape the burden of proof on appeal to the U.S. District Court is contrary to the basic principles of IDEA law: The federal statute does not specify the burden of proof on appeal to the U.S. District Court, and the U.S. Supreme Court has ruled that, where the statute is silent on the subject of the burden of proof, the ordinary default rule applies:

> The plain text of IDEA is silent on the allocation of the burden of persuasion. We therefore begin with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims. . . . C. Mueller & L. Kirkpatrick, Evidence §3.1, p. 104 (3d ed. 2003) ("Perhaps the broadest and most accepted idea is that the person who seeks court action should justify the request, which means theat the plaintiffs bear the burdens on the elements in their claims"). . . .

> Absent some reason to believe that Congress intended otherwise, therefore, we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58, 126 S. Ct. 528, 534-35, 163 L. Ed. 2d 387 (2005). The *Schaffer* opinion addressed the burden of persuasion in the proceedings before the Administrative Law Judge, and not the burden of persuasion on appeal to the U.S. District Court. Even so, the Supreme Court's reasoning and its discussion of the governing principles involved is highly material to the instant issue. *See, e.g., Miener ex rel. Miener v. State of Missouri*, 800 F.2d

---

[12] Even if the language used in the *Brett S.* opinion could be interpreted in the manner the Plaintiffs suggest, that language would be mere dicta, as the burden of proof was placed on the parties who lost in the proceedings below. 2006 WL 680936 at 1 ("The administrative hearing officer denied Brett's parents' request for tuition reimbursement, and this decision was upheld by the Pennsylvania Special Education Appeals Panel. Brett's parents have appealed that decision to this court . . . . ") There is nothing in the language or logic of the *Brett S.* opinion that justifies placing the burden of proof on the prevailing party in the proceedings below–and nothing that could possibly justify a disregard of controlling Eighth Circuit precedent on the subject.

749, 753 (8th Cir. 1986) (emphasizing the importance of adhering to the Supreme Court's discussion

of the reasons for an IDEA principle).

In the case of judicial review of an administrative decision, the "ordinary default rule" places

the burden of persuasion squarely and fairly on the party or parties challenging the decision. This

allocation of the burden of proof is a well-established principle of administrative law:

> **As a general rule, the burden of proof is on the party challenging an agency's action, and such party must establish error in the administrative action and his or her own right to procure relief.**
>
> As a general rule, the burden of proof is on the party challenging an agency's action. Specifically, the burden of proof is on the party attacking the validity of, or the evidentiary support for, an administrative act or determination, and such party must establish error in the administrative action . . . .

73A C.J.S. *Public Administrative Law and Procedure* § 412 (2007) (bolded typeface in original).

Given the fact that the ordinary default rule is black letter law, it is not surprising that virtually every

court to address the issue in the post-*Schaffer* era has placed the burden of persuasion on the party

or parties challenging the outcome of an administrative proceeding under the IDEA.[13]  *See Andrew*

*M. v. Delaware County Office of Mental Health and Mental Retardation*, 490 F.3d 337, 345 (3rd Cir.

2007) (analyzing the holding in *Schaffer v. Weast* and ruling that the party challenging an

administrative decision bears the burden of persuasion on appeal); *N.C. ex rel. M.C. v. Bedford*

*Cent. School Dist.*, 473 F. Supp. 2d 532, 541 (S.D.N.Y. 2007) (citing *Schaffer* for the proposition

---

[13]  The only discovered opinion that constitutes an even arguable exception to this summary of the relevant case law was rendered by the U.S. Court of Appeals for the Northern District of Texas.  *Richardson Independent School Dist. v. Michael Z.*, 2007 WL 2381250 (N.D. 2007).  Unlike district courts in the Eighth and most other circuits, the *Michael Z.* Court was bound by a pre-*Schaffer* Fifth Circuit ruling that impliedly placed the burden of persuasion on the parents.  *Id.* at 9-10.  The *Michael Z.* Court deferred to the Fifth Circuit to "overturn the implicit holding" in the prior case.  The Court expressly recognized, however, "that the logic of *Schaffer* may extend to placing the burden in this proceeding upon the District."  *Id.* at 10.

that "[t]he party seeking relief has the burden of proof when challenging an administrative decision"); *Hester v. District of Columbia*, 433 F. Supp. 2d 71, 76 (D.D.C. 2006) (citing *Schaffer* and then ruling that "[t]he party challenging a hearing officer's decision in federal court . . . carries the burden of proof.")

There is a third and final reason why the Plaintiffs' attempt to escape the burden of proof on appeal to the U.S. District Court is contrary to well-established principles of IDEA law: It is logically and legally impossible to accord "due weight" to the administrative proceedings conducted pursuant to the IDEA if the burden of proof is placed on the party defending the outcome of those proceedings on appeal to the U.S. District Court. The reason is that the failure to allocate the burden of proof to the challenging party, and the imposition of that burden on the defending party, creates an assumption that the challenged decision is "invalid." *Cf. Schaffer v. Weast*, 546 U.S. at 59, 126 S. Ct. at 536 (ruling that placing the burden of persuasion on the party defending an IEP creates a presumption that the IEP is invalid until proven otherwise). Clearly, it would not be possible to claim that any weight at all has been give to the outcome of the state proceedings, much less due weight, if the prevailing party were required to assume and sustain the burden of proving that the challenged decision was correctly decided.

The case law firmly supports the Defendants' contention. Thus, in a landmark opinion subsequently affirmed by a unanimous Supreme Court, the U.S. Court of Appeals for the First Cricuit ruled that, in IDEA appeals, "the burden of proof is on the party who seeks to overturn the findings and decision of the agency." *Town of Burlington v. Department of Educ. for Com. of Mass.*, 736 F.2d 773, 794 (1st Cir. 1984), *aff'd sub nom.*, *School Committee of Town of Burlington v. Department of Education of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d

385 (1985).  In support of this ruling, the Burlington Court reasoned as follows:

> This allocation [of the burden] of proof is justified because it structurally assists
> courts in according the administrative agency's expertise the respect it is owed,
> an approach *Rowley* implicitly encourages.

736 F.2d at 794; *see also, e.g.,Tice v. Botetourt County School Board*, 908 F.2d 1200, 1206 n.5 (4th

Cir. 1990) (reasoning that the "deference due the decision of the underlying state administrative

process requires that the party challenging the administrative decision bear the burden of proof");

*Tracey T. v. McDaniel*, 610 F. Supp. 947, 948 (D.C. Ga. 1985) (ruling that "[a]ny other allocation

of the burden of proof would make the administrative process essentially a meaningless exercise.")

 In summary, the U.S. Supreme Court has mandated that district courts give due weight to

administrative decisions rendered at the state level pursuant to the IDEA.  Due weight includes

deference to the trier of fact with respect to credibility determinations and the weight of the

evidence, deference to the ALJ appointed by the State educational agency with respect to questions

involving educational expertise, and deference to the state administrative standards that are an

integral part of the federal guarantee of a free appropriate public education.  Moreover, if due

weight is given to the outcome of the administrative proceedings, the party challenging the outcome

of those proceedings must bear the burden of persuading the U.S. District Court that its challenge

is justified.  As the remaining pages of this Defendants' Appeal Brief will demonstrate, the School

District and the AEA have not sustained that burden.

B.  THE STANDARD OF REVIEW
BEFORE THE ADMINISTRATIVE LAW JUDGE

On appeal to the U.S. District Court, the School District and the AEA assert two separate and distinct arguments with respect to the standard of review and the burden of proof in the proceedings below.  First, they assert that their witnesses were the "school authorities," and that the Administrative Law Judge erred as a matter of law by failing to defer to them.  Second, they assert that, notwithstanding the ALJ's clear statements that Isabel and her parents bore the burden of proof, she erred as a matter of law by allegedly imposing that burden on the School District and the AEA. This brief will address each of these arguments in turn, and it will establish that neither of the Plaintiffs' assertions has merit.

1.      CONTRARY TO THE PLAINTIFFS' ASSERTIONS ON APPEAL, ALJ ETSCHEIDT WAS BOUND BY A RULE OF IMPARTIAL DECISION-MAKING AND WAS NOT OBLIGED TO DEFER TO THE TESTIMONY OF WITNESSES FOR THE SCHOOL DISTRICT AND THE AEA.

The most frequently repeated theory in the Plaintiffs' Appeal Brief is an argument that was not presented in the proceedings below.  The theory is that the State's Administrative Law Judge erred as a matter of law by failing to defer to the testimony of their witnesses and by substituting her judgment for that of the "school authorities."  (*See, e.g.*, Plaintiffs' Appeal Brief at 4 (alleging that the ALJ "substituted her judgment as to the efficacy of interventions and placement, without giving sufficient deference to the school authorities"); *id.* at 34 (asserting that the individuals who wrote, implemented, and reviewed the behavioral plans for Isabel were "the 'school authorities' to whom the ALJ was to give deference"); *id.* at 36 (arguing that the ALJ "substituted her judgment for that of the school authorities"); *id.* at 42 (asserting that the ALJ failed to resist any impulse to

substitute her own notions of sound educational policy for those of the school authorities); *id.* at 53 (arguing that the "ALJ improperly ignored the sound educational policy decisions of the school authorities.") The School District and the AEA not only repeat this theory throughout their brief, but describe it as the primary reason why they are challenging the outcome of the State administrative proceedings. (Plaintiffs' Appeal Brief at 40).

The Defendants' response to the Plaintiffs' legal theory is twofold. First, Section (a) of this brief point will document the fact that the School District and the AEA waived any argument that the ALJ was obliged to defer to the testimony of their witnesses by failing to preserve that argument for appeal; indeed, they asserted a dramatically different theory in the proceedings below. Second, and more important, Section (b) of this brief point will establish that the Plaintiffs' theory casts no shadow. It is without substance in the law, without precedent, and inconsistent with three of the most fundamental principles of IDEA law.

Before documenting our two responses to the Plaintiffs' legal theory, however, it should be noted that, in many if not most cases, the Plaintiff's invocation of that theory is a thinly disguised attempt to escape the rule that deference must be given to the trier of fact on questions relating to the credibility of the witnesses and the weight of the evidence. (*See* the authorities and analysis set forth in Part A, Section 1, *supra*.) Consider, for example, the Plaintiffs' allegation that the ALJ erred by failing to defer to all of the direct examination testimony of Dr. Keith Allen, an expert witness retained by the School District and the AEA after the filing of the request for due process hearing. In discussing Dr. Allen's testimony on appeal, the Plaintiffs are clearly attempting to re-litigate credibility questions by asserting that his "thorough review" of the record included "all of the 'material that had been pulled together'" and that his testimony was "particularly compelling"

because he was allegedly "completely free to form his own independent judgment as to the suitability and efficacy of the behavior interventions used with Isabel." (Plaintiffs' Appeal Brief at 50-51).

With due respect to the Plaintiffs, an impartial trier of fact could have found that Dr. Allen's review of the record was less "thorough" than they have represented on appeal. For example, Dr. Allen was not aware of the School District's use of mats to impose a timeout. Under this intervention, four, five, or more adults would hold a gym mat around Isabel (and other children with disabilities) and then either use the mat as a temporary timeout area or move the child to another area by gradually moving the mat enclosure forward.[14]  Dr. Allen testified that he had "never heard [the use of a gym mat to create a timeout room] described," either at Waukee or elsewhere. (Transcript at 2024).  Similarly, Dr. Allen was not able to testify regarding the antecedents to particular behavioral interventions, testifying that he " would not have been aware" of whether Isabel had been subjected to timeout for an extended period on that very morning.  (*Id.* at 2025). Since Dr. Allen had never so much as seen Isabel, the trier of fact clearly had license to discount his conclusory testimony that the behavioral interventions used on Isabel were acceptable under state and federal law.

Consider, as a second example, the Plaintiffs' pending argument that the ALJ erred by failing

---

[14] At the due process hearing, the counsel for the AEA described the procedure as "using a portable mat to create a little timeout room." (Transcript at 2023). Dr. Rankin, another witness for the AEA, testified that she had learned that mats were used to create a timeout room for Isabel, but she had learned this only after reading through the records. (*Id.* at 2239). Patti Brinkmeyer, a witness for the School District, described the use of mats as follows: "Q.[P]hysically, do all five people hold the mat or is there more than one mat?  How does that work just physically?  A. There were a few people who would be holding the mat.  One person would be documenting." (Transcript at 1506). She also testified that, on one occasion at least, seven adults were involved in implementing the mat intervention on Isabel. (*Id.* at 1506-07).

to defer to the testimony of Monica McKevitt regarding the integrity with which Isabel's strategy

and plan were implemented:

> Following the escalations in September and October of 2005, AEA school
> psychologist Monica McKevitt became more involved and also requested that John
> Drinnin, a consultant from the AEA Autism team, become involved.  (Rec. 671).
> John Drinnin and Monica McKevitt made observations both in the general education
> and special education rooms, reviewed the IEP and November 2004 Plan, and
> checked to insure that the setting and reinforcing strategies were in place.  They
> noted the strategies and plan were implemented with integrity.  (Tr. 1691-94).
> Despite this uncontested testimony, the ALJ concluded that Isabel's IEP was not
> being followed.

(Plaintiffs' Appeal Brief at 78).  As we noted in our arguments before the ALJ,[15] it is true that John

Drinnin observed Isabel in the classroom on the morning of October 3, 2005.  Thus, Monica

McKevitt wrote that Isabel "had a really great morning.  Kindra [Sweeney] told John [Drinin] that

you could almost predict [her behavior] by how she is when she comes in.  I think there are some

things we could have done to set her off, but I'm not sure doing that in the morning on a day when

there were so many staff changes would have been a good idea."  (Appellees' Records in SE-320

at 672).  Even if the morning of October 3 had provided an opportunity for observing the staffs'

responses to Isabel's behaviors, however, there is no evidence that even the most rudimentary

integrity checklist was employed.  To the contrary, in a contemporaneous e-mail, Monica McKevitt

advised Patti Brinkmeyer that, on the morning of October 3, "I told [John Drinnin] that we'll

probably want to refine the time out procedures" (*Id.* at 671.)  Since the behavior plan then in effect

did not contain timeout procedures,[16] it cannot be pretended that John Drinnin had secured the plan-

---

[15] Appellants' Reply Brief in SE-320 at 30-31, Certified Pleadings at 277-78.

[16] "Q.  Was timeout any part of Isabel's plan on October 3rd?  A.  No."  (Transcript at 1846) (testimony of Monica McKevitt).

specific knowledge necessary to verify that "the strategies and plan were implemented with integrity," as the Appellees now allege.

Although these supporting examples could be multiplied many times over, they should suffice to establish that one solid answer can be given to each of the allegations set forth in the Plaintiffs' Appeal Brief regarding the alleged credibility of the witnesses for the School District and the AEA:  The allegations do not present questions of law for de novo resolution by this court, but, rather, questions of the credibility of the witnesses and the weight of the evidence.  These questions were properly resolved by the Administrative Law Judge as the trier of fact.  At the U.S. Court of Appeals for the Third Circuit has summarized the general rule, "credibility-based findings deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirely would compel a contrary conclusion." *Carlisle Area School v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 528 (3rd Cir. 1995); *see also Mr. I. ex rel. L.I. v. Maine School Admin. Dist. No. 55*, 480 F.3d 1, 10 (1st Cir. 2007) ("Mixed questions generally 'fall along a degree-of-deference continuum, ranging from non-deferential plenary review for law-dominated questions, to deferential review for fact-dominated questions'")

This being said, there are two additional answers to the Plaintiffs' theory on appeal:

>   a.      *The School District and the AEA waived any argument that the ALJ was obliged to defer to the testimony of their witnesses by asserting a dramatically different theory in the proceedings below.*

In the proceedings before the State's Administrative Law Judge, the Plaintiffs did not assert any theory that the impartial hearing officer appointed pursuant to the provisions of the IDEA was legally obliged to defer to the expertise of the employees of the School District and the AEA.

Indeed, quite the opposite position was advanced.  Thus, in their arguments below, the School

District and the AEA stated as follows:

> *A judge or a hearing panel is "uniquely situated to pass on the credibility of the various witnesses at the hearing."  Fort Zumwalt Sch. Dist. v. Clynes,* 119 F.3d 607, 610 (8th Cir. 1997), *cert. denied,* 523 U.S. 1137, 118 S. Ct. 1840 (1998); *Independent Sch. Dist. No. 283 s. S.D.*, 88 F.3d 556, 561 (8th Cir. 1996).  *In assessing credibility of the testimony of witnesses, a fact finder should consider:*
>
> 1.  *the interest of the witness in the result of the hearing,*
> 2.  *the witness' relation to any party in interest,*
> 3.  the witness' demeanor of manner while testifying,
> 4.  the witness' tendency to speak truthfully or falsely, including the probability or improbability of the testimony given,
> 5.  the witness' situation to see and observe,
> 6.  the witness' apparent capacity and willingness to tell truthfully and accurately what he or she saw or observed, and
> 7.  whether the witness' testimony is supported or contradicted by other evidence.
>
> *Kaydon Acquisition Corp. V v. America Central Industries, Inc.,* 179 F. Supp. 2d 1022, 1035 (N.D. Iowa 2001).

(Appellees' Brief in SE-320 at 12, Certified Pleadings at 151) (emphasis supplied).  The School

District and the AEA have apparently abandoned this argument on appeal to the U.S. District Court,

as it is not so much as mentioned in more than one hundred pages of argument.  We respectfully

submit, however, that the abandoned argument was a true and accurate statement of the governing

law, as will be further documented in the next section of this brief.  In this section, we document

our contention that the Plaintiffs' current arguments constitute an impermissible shift in theory and

that the Plaintiffs waived those arguments by failing to assert them in the proceedings below.

The foundation for this contention is black letter law:

> *In the absence of a statute providing otherwise, courts generally consider only such questions, issues, or theories that were raised and reserved before the administrative agency or body whose determination is sought to be reviewed,* and, ordinarily,

54

objections or questions which were not raised in the administrative proceedings are precluded from consideration on review. . . .

Orderly procedure and good administration require that for purposes of judicial review, objections to proceedings before an agency must be made while the agency has an opportunity for correction, and courts should not overrule administrative decisions unless the administrative body not only has erred but has erred against an objection made at the time appropriate under its practice.

73A C.J.S. *Public Administrative Law and Procedure* § 341 (2007) (emphasis supplied); *see also, e.g.*, *National Ass'n of Clear Air Agencies v. E.P.A.*, 489 F.3d 1221, 1231 (D.C. Cir. 2007) (ruling that "'[i]t is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review'"); *Central South Dakota Cooperative Grazing Dist. v. Secretary of U.S. Dept. of Agriculture*, 266 F.3d 889, 901 (8th Cir. 2001) (ruling that "[w]e need not consider arguments a party failed to raise before the agency"); *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979) (ruling that, "absent exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative proceeding at the appropriate time"); *Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 655 (8th Cir. 1999) (ruling that, "under well-established judicial interpretations of the IDEA Grace had an obligation to exhaust her administrative remedies with regard to the issues upon which she seeks judicial review"); *Sawyer Property Management of Maryland, Inc. v. District of Columbia Rental Housing Commission*, 877 A.2d 96, 105 (D.C. 2005) (ruling that "'contentions not urged at the administrative level may not form the basis for overturning the decision on review'"); *Brotherhood of Locomotive Engineers Int'l Union v. Union Pacific Railroad*, 134 F.3d 1325, 1331 (8th Cir. 1998) (ruling that a party had waived an issue because "orderly procedure and good administration require that objections to the

proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.")

In short, the Plaintiffs waived any theory that the State's Administrative Law Judge was legally obligated to defer to the expertise of the witnesses for the School District and the AEA. The Plaintiffs not only failed to assert any such theory in the proceedings below, but set forth, instead, a diametrically opposed position, *to wit*, that the ALJ was "uniquely situated" to gauge the credibility of the witnesses and that, among the many factors she should consider were the "interest of the witness in the result of he hearing" and "the witness' relation to any party in interest." (Appellees' Brief in SE-320 at 12, Certified Pleadings at 151) (quoting *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997) & *Kaydon Acquisition Corp V v. America Central Industries, Inc.,* 179 F. Supp. 2d 1022, 1035 n.9 (N.D. Iowa 2001). We respectfully submit, moreover, that the contention that the Plaintiffs documented in the proceedings below was legally sound; the contrary theory that they have asserted on appeal is not.

  b.  The Plaintiffs' theory that the ALJ was obliged to defer to their witnesses is contrary to precedent and inconsistent with three fundamental principles of IDEA law–the rule against imposing new substantive standards on the states, the emphasis on the primacy of the state on questions of educational policy, and, most important, the principle that due process hearings must be impartial.

The Plaintiffs' new theory on appeal is that, as a matter of law, the ALJ was obliged to defer to the testimony of the witnesses for the School District and the AEA. In their words, their witnesses were "the 'school authorities' to whom the ALJ was to give deference." (Plaintiffs' Appeal Brief at 34). The Plaintiffs' alleged support for this theory is a sentence extracted from the U.S. Supreme Court's opinion in *Rowley*: "[T]he provision [in the federal statute] that a reviewing

court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. Of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 3051, 73 L. Ed. 2d 690 (1982). The flaw in the Plaintiffs' analysis is that the Supreme Court was referring to the deference due to the "state decisions" rendered by the State educational agency in the due process proceedings mandated by the Act, as it made clear in the very next sentences of its decision.. *Id.* In the words of the *Rowley* Court, "due weight shall be given to these proceedings." *Id.*

As noted above, the rule of deference to the presumed educational expertise of the neutral hearing officer appointed by the State educational agency to conduct the impartial due process hearing is supported by a long and unbroken line of Eighth Circuit precedents. *See, e.g., Fort Zumwalt School Dist. v. Clynes*, 119 F.3d 607, 615 (8th Cir. 1997) (identifying the school authorities to whom deference is due on questions of educational policy as the "state educational experts on the hearing panel"); *Strawn v. Missouri State Board of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000) (identifying the school authorities to whom deference is due on questions of educational policy as "the administrative panel [that] had an opportunity to observe the demeanor of the witnesses"); *Gill ex rel. Gill v. Columbia 93 School Dist.*, 217 F.3d 1027, 1037 (8th Cir. 2000) (ruling that a "federal court should give 'due weight' to administrative proceedings and should not substitute its own notion of educational policy for that of the administrative panel"); *Independent School District No. 284 v. A.C. ex rel. C.C.*, 258 F.3d 769, 773 (8th Cir. 2001) (ruling that "[w]e must afford 'due weight' to the outcome of the state administrative proceedings, giving particular consideration to state officials' educational judgments").

As also noted above, numerous additional precedents from the Eighth Circuit reinforce the rule of deference to the presumed educational expertise of the individual or individuals appointed by the State's educational agency to conduct a due process hearing. *See, e.g., Neosho R-V School Dist. v. Clark*, 315 F.3d 1022, 1028 (8th Cir. 2003) ( approving the district court's deference to the educational findings of the administrative panel that presided at the due process hearing, including a "determination that the materials attached to the IEPs did not constitute a proper behavior management plan"); *Missouri Department of Elementary and Secondary Educ. v. Springfield R-12 School Dist.*, 358 F.3d 992, 998 (8th Cir. 2004) (ruling that "we must give 'due weight' to the outcome of administrative proceedings, giving particular consideration to state officials' educational judgments"); *Bradley ex rel. Bradley v. Arkansas Dept. of Educ.*, 443 F.3d 965, 974 (8th Cir. 2006) (again ruling that "due weight" must be given to "'the outcome of administrative proceedings, giving particular consideration to state officials' educational judgments'"); *Pachl v. Seagren*, 453 F.3d 1064, 1067 (8th Cir. 2006) (affirming the district court's decision to give "due weight to the results of [the due process] proceedings.")

The Plaintiffs on appeal appear to place particular emphasis on the case of *CJN v. Minneapolis Public Schools*, 323 F.3d 630, 639 (8th Cir. 2003). (*See* Plaintiffs' Appeal Brief at 7). *CJN*, however, involved a two-tier state,[17] and the question presented was whether a "state hearing review officer" (or HRO) erred by allegedly failing to give due deference to the findings of fact by

---

[17] As documented at greater length above, a two-tier state review system creates complications not present in a one-tier system. In Iowa, a one-tier state, the deference due to the trier of fact and the deference due to the expertise of the State administrative agency are merged into a single rule of deference–deference due to the decision rendered by the Administrative Law Judge duly appointed by the Iowa Department of Education to conduct the due process hearing and to render the Department's decision. *See* Subpart A, *supra*.

an "independent hearing officer" (or HO), who was also appointed by the State educational agency. 323 F.3d at 635-36.  Notwithstanding the complications created by conflicting opinions in a two-tier system, however,  the *CJN* opinion does not provide the slightest scintilla of support for the proposition that the trier of fact in a state due process proceeding under the IDEA must defer to the testimony of the witnesses for the local educational agency whose actions are being challenged.

*Indeed, there is no case in the extended annals of IDEA jurisprudence–from the Eighth Circuit or from any other circuit–in which a U.S. District Court has reversed the final outcome of any State administrative proceeding on the grounds that the trier of fact was legally obligated to defer the expertise of the local educational agencies whose actions were being challenged*.  In a word, the Plaintiffs' theory is unprecedented.  Moreover, there are at least three reasons why that unprecedented theory is contrary to the fundamental principles of IDEA law.

The first reason why the Plaintiffs' new theory is contrary to the principles of the IDEA is that, if accepted, it would impose upon State educational agencies a new substantive standard, a rule of deference to the opinions of local educational agencies.  458 U.S. at 206, 102 S. Ct. at 3051 (bracketed material in original).  As Justice Rehnquist observed in his landmark opinion for the majority in *Rowley*,  "we find nothing in the Act to suggest" that Congress "intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself."  *Rowley*, 458 U.S. at 206, 102 S. Ct. at 3051.  As the Plaintiffs admitted in another context, "[a]s legislation enacted pursuant to the Spending Clause, the [IDEA] must clearly set forth all requirements that states must meet."  (Plaintiffs' Appeal Brief at 37) (citing *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287, 118 S. Ct. 1989, 1998 (1998) & *Penhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 1539-540 (1981)).  A rule

of State deference to the alleged expertise of local educational agencies is not a requirement set forth in the IDEA, and acceptance of the Plaintiffs' new theory on appeal would therefore constitute an impermissible creation of a substantive standard of review which cannot be derived from the Act itself.

The second reason why the Plaintiffs' new theory is contrary to the principles of the IDEA is that, if sustained, the theory would undermine the primacy of the States on questions of educational policy. Thus, the U.S. Supreme Court has ruled as follows:

> [C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States. . . . The Act expressly charges States with the responsibility of "acquiring and disseminating to teachers and administrators of programs for handicapped children significant information derived from educational research, demonstration, and similar projects, and [of] adopting, where appropriate, promising educational practices and materials." § 1413(a)(3). In the face of such a clear statutory directive, it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories . . . .

> It is clear that Congress was aware of the State's traditional role in the formulation and execution of educational policy. "Historically, the States have had the primary responsibility for the education of children at the elementary and secondary level."

*Rowley,* 458 U.S. at 207-08 & n.30, 102 S. Ct. at 3051 & n.30. Significantly, 20 U.S.C. §1412(11)(A)(ii)(II) provides that "[t]he State educational agency is responsible for ensuring that . . . all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency, . . . meet the educational standards of the State educational agency." In short, the applicable principle of law can be stated as follows: "The local education agencies are subject to the state's legal authority, both as a general matter and per the operation of the federal Act." *Town of Burlington v. Department of Educ. for Com. of Mass.,* 736 F.2d 773, 792 (1ˢᵗ Cir. 1984), *aff'd sub nom., School Committee of Town of Burlington v.*

*Department of Education of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985); *see also*

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005) (ruling that

the IDEA"'leaves to the States the primary responsibility for developing and executing educational

programs for handicapped children.'")

     The third and perhaps the most important reason why the Plaintiffs' new theory is contrary

to the principles of the IDEA is that the governing federal statute mandates an "impartial" due

process hearing that is conducted by a person who is not "an employee of the State educational

agency or the local educational agency involved in the education or care of the child."  20 U.S.C.

§§ 1415(f)(1)(A) & 1415(f)(3)(A). The importance of the impartiality requirements cannot be

questioned.  Indeed, the "due weight" requirement articulated in *Rowley* was grounded, at least in

part, on the Congressional "emphasis on fair procedures at the administrative level."  *Kerkam v.*

*McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989); *see also Robert M. ex rel. Renee K. v. Benton*, 634

F.2d 1139, 1142 (8th Cir. 1980) (ruling that the Superintendent of Public Education in the State of

Iowa was disqualified from serving as a hearing officer in due process hearings under the IDEA);

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60, 126 S. Ct. 528, 536, 163 L. Ed. 2d 387 (2005)

(ruling that "Congress appears to have presumed . . . that, if the Act's procedural requirements are

respected, parents will prevail when they have legitimate grievances.") Mandated partiality is the

witnesses for the local educational agency, therefore, would stab at the very heart of the principle

that due process proceedings will be fair and that parents will prevail when they have legitimate

grievances.

     In summary, the Plaintiffs' new theory on appeal is without precedent: No court has ever

reversed the final outcome of a due process proceeding under the IDEA on the grounds that the

State's hearing officer failed to defer to the testimony of the witnesses for the local educational agencies.   Moreover, if any such theory were accepted, it would undermine three of the most fundamental principles of IDEA law– (1) the principle that no substantive standard can be imposed upon the States unless firmly grounded in the language of the Act, (2) the principle that local educational agencies are subordinate to the States on questions of educational policies and standards, and (3) the principle that due process proceedings will be impartial.  For each and all of these reasons, the Plaintiffs' theory should be rejected.

       c.      Contrary to the Plaintiffs' assertions, each of the ALJ's key findings on questions of educational policy are carefully and thoroughly documented by reference to state and federal standards and by research-based evidence duly introduced into the record.

As a corollary to their theory that their witnesses were the school authorities entitled to deference under the IDEA, the School District and the AEA assert that the Administrative Law Judge appointed by the Iowa Department of Education exceeded her authority by (1) substituting her judgment for the testimony of their witnesses and (2) allegedly conducting "independent educational research after the fact" to discredit that testimony.  In their words,

> [The ALJ] substituted her judgment for numerous school authorities who assessed Isabel, who wrote the plans for Isabel, who implemented the plans for Isabel, and who reviewed the plans–i.e., the "school authorities" to whom the ALJ was to give deference.  The ALJ did independent educational research after the fact to arrive at her conclusion that the interventions did not comply with the best and most effective practices.

(Plaintiffs' Appeal Brief at 34) (internal cross-reference omitted); *see also id.* at 27, 36, 40, 41, 42, 46, 50, 53, 59, & 89 (repeatedly asserting that the ALJ substituted her judgment for that of the "school authorities," who are almost invariably defined to mean the witnesses for the school district and the AEA).

On behalf of Isabel and her parents, we respectfully submit three answers to the Plaintiffs'

argument on appeal.  First, as documented at length above, the long-standing IDEA rule is that due

weight must be accorded to the outcome of the administrative proceedings; as part of the rule of due

weight, deference must be given to the factual findings of the impartial trier of fact, and deference

must be given to the educational expertise of the neutral hearing officer appointed by the State

educational agency, which has the primary responsibility for interpreting the State's educational

policies.  If sustained, the Plaintiffs' contrary theory would violate the basic principles of IDEA law

by (1) imposing a new substantive standard on the States, a standard without foundation in the

statute, by (2) undermining the primacy of the States on questions of educational policy, and by (3)

seriously impairing the impartiality of the due process proceedings mandated by the Act.  *(See*

*generally* Subpart A, *supra*.)

The second answer to the Plaintiffs' current theory concerns the allegation that "[t]he ALJ

did independent educational research after the fact to arrive at her conclusion that the interventions

did not comply with the best and most effective practices."  (Plaintiffs' Appeal Brief at 34).  The

Plaintiffs assert that "the ALJ went beyond the more than 1500 pages of submitted research articles

to cite numerous articles that were not submitted into the record by the parties."  (*Id.* at 42).  The

answer to these assertions is that the Plaintiffs have not read the ALJ's decision with sufficient care,

and there is no evidence whatsoever that she did "independent educational research after the fact."

It is true, of course, that the challenged decision cites educational research that was not

introduced into evidence by the parties.  For example, footnote 1 to the decision summarizes seven

articles on the subject of sensory integration.  (Decision at 43 n.1, Certified Pleadings at 342 n.1).

Although these articles were not introduced into evidence by the parties, they relate to a subject that

was tangential to the issues presented. Although they provide guidance consistent with the Iowa Department of Education's mission in the State of Iowa, they form no part of any holding against the School District and the AEA, and no party was prejudiced by their use.

As a general rule, "[a] public administrative body is presumed to have special knowledge as to the matters within its province . . . ." 73A C.J.S. *Public Administrative Law and Procedure* § 238 (2007). In this case at least, the presumption was fully justified, as evidenced by the credentials distributed to the parties at the time that Dr. Etscheidt was appointed by the Iowa Department of Education. (*See* Certified Pleadings at 17). There is no reason to believe that, given her credentials and experience, ALJ Etscheidt found it necessary to do "independent research after the fact," and the Plaintiffs' assertion to the contrary is just that–an assertion.

Again as a general rule, "[a]n administrative body may use its expert knowledge and experience in the evaluation of evidence, but may not utilize such knowledge and experience as a substitute for evidence." 73A C.J.S. *Public Administrative Law and Procedure* § 238 (2007). It is critical to note, therefore, that, *on each and every occasion where ALJ Etscheidt rendered a ruling adverse to the School District and the AEA based on the educational research, she cited the page and verse of that research from the evidence introduced into the record by the parties.* (*See, e.g.,* Decision at 53-56 nn.33-36 & 38, Certified Pleadings at 352-355 nn. 33-36 & 38).

It is a fundamental maxim of judicial review under the IDEA that parties claiming error must show that they were prejudiced by the alleged error. *See, e.g., West Platte R-II School Dist. v. Wilson*, 439 F.3d 782, 785 (8th Cir. 2006) (ruling that it must be determined whether the error was immaterial or prejudicial); *Drew P. v. Clarke County School Dist.*, 877 F.2d 927, 931-32 (11th Cir. 1989) (ruling that the erroneous admission of cumulative evidence was harmless error); *Muth ex rel.*

*Muth v. Central Bucks School Dist.*, 839 F.2d 113, 120 (3rd Cir. 1988) (ruling that an alleged error was harmless); *Jones ex rel. Jones v. Astrue*, 2008 WL 227949 (S.D. Ala. 2008) (ruling that an alleged error in the findings of the ALJ was harmless).

As documented at greater length in Part II of this brief, the School District and the AEA have ignored the vast bulk of the research-based evidence cited in the challenged decision.  Since each and every ruling adverse to the School District and the AEA is supported, page and verse, by the evidence introduced into the record, the Plaintiffs' current contention is without merit.

The third answer to the Plaintiffs' current contention is that ALJ Etscheidt did not substitute personal perceptions of best policy for the judgments of the witnesses for the School District and the AEA.  To the contrary, and as was her responsibility, she weighed the evidence presented and reached carefully documented conclusions on the questions presented for decision.  She enforced the educational policies of the U.S. Congress and the Iowa Department of Education, not her own.  *Cf. Independent School Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996) ("In reversing the review officer's decision, the district court enforced the statute's educational policies, not its own.")

At the core of the Plaintiffs' current contention is the underlying assertion that the ALJ had no right to invoke or apply applicable research findings or appropriate educational practices.  *(See, e.g.*, Plaintiffs' Appeal Brief at 34-42).  In fact, however, as the Administrative Law Judge duly appointed by the Iowa Department of Education, Dr. Etscheidt had the duty to interpret and apply the state standards that are an integral part of the federal guarantee of a free appropriate public

education.[18]  Those standards included Rule 281–41.3(6)of the Iowa Rules of Special Education, which sets forth the following plainly worded mandate: "An appropriate program shall be consistent with applicable research findings and appropriate educational practices."  Since the Plaintiffs' Appeal Brief systematically ignores this rule, it is fair to invoke the ruling in a First Circuit opinion subsequently affirmed by a unanimous Supreme Court:  "We do not believe the Act envisions federal courts releasing school systems from their state-mandated responsibilities. . . ."  *Town of Burlington v. Department of Educ. for Com. of Mass.*, 736 F.2d 773, 792 n.24 (1st Cir. 1984), *aff'd sub nom.*, *School Committee of Town of Burlington v. Department of Education of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985).

2.     THE STATE'S ADMINISTRATIVE LAW JUDGE CORRECTLY PLACED THE
        BURDEN OF PROOF ON ISABEL AND HER PARENTS, AS THE PARTIES
        SEEKING RELIEF IN THE PROCEEDINGS BELOW.

        In their arguments on appeal, the School District and the AEA assert that ALJ Etscheidt did not assign the burden of proof on the party seeking relief, as required by the U.S. Supreme Court's opinion in *Schaffer v. Weast*.  In their words, "[t]he Decision erroneously placed the burden of proof on the District and the AEA to prove that Isabel could not have been educated in a less restrictive setting and to prove the efficacy and research basis of its behavioral interventions."  (Plaintiffs' Appeal Brief at 5).  This assertion frequently punctuates the Plaintiffs' arguments on appeal.  (*See, e.g., id.* at 11 (stating that the ALJ "improperly assigned the burden of proof to the school" and that

---

[18] As will be documented at length in Part II of this brief, the ALJ also had the duty to interpret and apply the "peer-reviewed research" requirement added by the U.S. Congress in 2004.  This requirement is more rigorous than Iowa's previously existing requirements, and the ALJ properly applied that standard to behavioral interventions that were devised and implemented after its effective date.  *See* Part II, Subpart B, *infra*.

the ALJ "did not assign the burden of proof to the Parents"); *id.* at 20 (asserting that the ALJ "inappropriately placed the burden of proof on the District and AEA"); *id.* at 34 (asserting that "the ALJ improperly placed the burden of proof upon the District and the AEA"); *id.* at 40 (asserting that the ALJ "erroneously assigned the burden of proof to the District and the AEA"); *id.* at 89 (stating that the ALJ required "the District and the AEA to bear the burden of proof."))

The mere repetition of an assertion does not enhance its merits. Notwithstanding their frequent repetition of the contention that the ALJ improperly allocated the burden of proof, the Plaintiffs cannot prevail. This is because the decision by ALJ Etscheidt not only demonstrated a clear understanding of the rule of *Schaffer v. Weast*, but unmistakably placed the burden of proof on Isabel and her parents, as the parties seeking relief in the proceedings below:

> In *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528, 535 (2005), the Supreme Court held that the burden of persuasion in a due process action under the IDEA lies with the party seeking relief. . . . The burden of persuasion requires that the party bringing the action must prove their claim by a preponderance of the evidence. The preponderance is established by the greater weight of reliable, probative and substantial evidence. . . . *The [parents] bear the burden of proof.*

(Decision at 23-24, Certified Pleadings at 322-23) (emphasis supplied).

Moreover, in addressing each of the two substantive issues presented for adjudication, the State's Administrative Law Judge clearly stated that she had assigned the burden of proof to Isabel and her parents. With respect to the least restrictive environment (or "LRE") issue, she concluded as follows: "*For the LRE issue, the [parents] have met their burden of proving that insufficient effort was given to the consideration of supplemental aids and services to support Isabel's inclusion in regular education*." (Decision at 33, Certified Pleadings at 332) (emphasis supplied). Similarly, with respect to the second substantive issue presented for adjudication, ALJ Etscheidt clearly held

67

that Isabel and her parents had sustained their burden of proving that the use of behavioral

interventions by the School District and the AEA violated the IDEA:

> For Issue #2, *the [parents] have met their burden of showing that WCSD and Heartland AEA implemented behavioral interventions with Isabel that were inconsistent with substantive and procedural rights under the IDEA.* The behavior support plan was not implemented in a manner consistent with applicable research and appropriate educational practices, was not individualized to address the behaviors of concern, was not adequately monitored, and was inconsistent with the positive behavioral supports mandated by the IDEA in violation of 20 U.S.C. § 1414(d)93)(B)(i) and the Iowa Administrative Rules of Special Education, 281–41.67(5)(b)(1) I.A.C.

(Decision at 42, Certified Pleadings at 341) (emphasis supplied).

In the light of the foregoing excerpts from ALJ Etscheidt's decision, the instant case stands

in sharp contrast to those cases where the final decision in the proceedings conducted by the State

educational agency was reversed and remanded for failure to place the burden of persuasion on the

party seeking relief. In the *West Platte* case, for example, the Eighth Circuit reversed and remanded

a State Hearing Panel's final decision because "the Panel stated that the "burden of proving

compliance with the IDEA is on the school district.'" *West Platte R-II School Dist. V. Wilson ex rel.

L.W.*, 439 F.3d 782, 784 (8th Cir. 2006) (quoting from the record); *see also M.M. ex rel. L.R. v.

Special School District No. 1*, 512 F.3d 455, 458 (8th Cir. 2008) (where "the ALJ ruled that the

District must prove, 'by a preponderance of the evidence, that is complying with the law and offered

or provided a [FAPE] to the child in the least restrictive environment'"); *Greenwood ex rel.

Greenwood v. Wissahickon School Dist.*, 2006 WL 279085 at 2 (E.D. Pa. 2006) (reversing and

remanding in a case where "[t]he hearing officer's decision and the Appeals Panel's decision [were]

replete with references to the burden having been on the district.")

As documented above, the Plaintiffs' Appeal Brief is punctuated with the repeated assertion

that the ALJ did not do what she expressly stated that she did do, *to wit*, place the burden of persuasion on the School District and the AEA.  In almost every instance, however, the Plaintiffs' claim is a bald assertion made without supporting references to the language of the challenged decision that allegedly justifies the claim.  The sole discovered exception is found on page 89 of the Plaintiffs' Appeal Brief, where the School District and the AEA quote a paragraph from the ALJ's decision and apparently challenge the following sentence from that paragraph: "No literature was offered by [the District and the AEA] to support the rationale for or efficacy of two contingent tasks prior to release."  (Decision at 38, Certified Pleadings at 337).

There are at least three compelling answers to the Plaintiffs' argument.  First, on its face, the cited sentence from the ALJ's decision is not an allocation of the burden of persuasion, but a statement of fact.  It is, moreover, a fact whose accuracy is not disputed and cannot be disputed within the boundaries of the evidence set forth in this record.

Second, the Plaintiffs have erroneously extracted the challenged sentence from the context of the arguments to which it relates.  Thus, the issue before the ALJ was not the use of contingent release procedures *per se*, but, rather, the parental allegation that the School District and the AEA had "implemented seclusionary time-out and other behavioral interventions that were excessive in length."  (Request for Due Process Hearing at 10, ¶ 33(b), Certified Pleadings at 10, ¶ 33(b)).  The ALJ found that "[t]he empirical literature describes timeout as an option for reducing inappropriate behavior, but consistently indicates that timeout durations should be short . . . ."  (Decision at 38, Certified Pleadings at 337).  The ALJ cites no fewer than five articles from the evidence, including four articles introduced by the School District and the AEA, in support of this finding of fact; she also quoted the following excerpt from work by Wolf, McLaughlin, & Williams, as introduced into

evidence by Isabel and her parents as part of sustaining their burden of proof on the question:

> Intended only as a temporary measure, timeout quickly becomes ineffective, even dangerous, when children are placed in small, isolated places for long periods of time.

(Decision at 52-53 n.29, Certified Pleadings at 351-52, n.29) (quoting Tera L. Wold, T. F. McLaughlin, & Randy Lee Williams, *Timeout Interventions and Strategies: A Brief Review and Recommendations*, 21 International Journal of Special Education 5026, 5031 (2006) (reproduced in the Appellants' Record in Docket No. SE-310 at 5026-5933). Significantly, the Plaintiffs' Appeal Brief does not so much as mention, much less refute the applicability of, the evidence cited by ALJ Etscheidt in support of her conclusion that "a preponderance of the evidence reveals that the excessive durations of the timeout interventions were 'not consistent with applicable research findings and appropriate educational practices'" and that, therefore, Isabel and her parents "have met their burden of showing that WCSD and Heartland AEA implemented behavioral interventions with Isabel that were inconsistent with substantive and procedural rights under the IDEA." (Decision at 38-39 & 42, Certified Pleadings at 337-38 & 341).

The argument concerning the double contingent release requirement[19] that was imposed on Isabel by the School District and the AEA was in the nature of an affirmative defense, *i.e.*, an alleged answer to the parental contention that the length of the timeouts imposed upon Isabel

---

[19] As documented by abundant evidence in the record, including the videotape of the December 7, 2005 timeout, the double contingent release requirement can be succinctly summarized: Isabel could not be released from timeout until she satisfied a first contingent requirement–sitting in body basics posture on the floor for a specified period of time–and then satisfied a second contingent requirement–completing an arbitrary compliance task. The consequence of the use of these contingent release requirements was that the timeout was extended in time as the timer was repeatedly turned off and started again. (*See, e.g.,* Appellants' Record in SE-320 at 567 (December 7, 2005), 571 (December 8, 2005), 583 (December 13, 2005), & 597 (December 15, 2005)).

drastically exceeded the short timeouts recommended in the research literature.  A singular fallacy in the Plaintiffs' argument on appeal, therefore, is the assumption that *Schaffer v. Weast* released them from the burden of producing evidence to sustain their alleged defense to a documented allegation of a violation of the IDEA.  That assumption is in error.[20]

There is additional proof that the Plaintiffs' pending argument is a distortion of the context in which the challenged statement was made.  Thus, when the ALJ ruled that "[t]he addition of a contingent release requirement to [the] timeout procedure is controversial" (Decision at 38), she did not use the word "controversial" in the sense of being fairly debatable, but, rather, in the sense of being beyond the pale of accepted educational practices, at least in cases where the use of the requirement prolongs the timeout beyond accepted parameters.  This meaning is made perfectly clear by the authorities cited in footnotes 29, 34, 35, and 36 of the decision.  (Decision at 52 & 54, Certified Pleadings at 351 & 353).  To cite but one example, Dr. Allen, the Plaintiffs' expert in the proceedings below, had written that "[s]hort durations of time-out (30 sec-4 min) are preferable," and the ALJ cites Dr. Allen's article, as duly introduced into evidence, in support of the proposition

---

[20] The School District and the AEA cite *Schaffer v. Weast* for the proposition that the parents bear "both the burden of production and the burden of persuasion." (Plaintiffs' Appeal Brief at 5).  In fact, however, the landmark opinion in *Schaffer* did not allocate the burden of production, much less relieve any party from the duty of producing evidence to support an argument in the nature of an affirmative defense.  Thus, the majority opinion carefully distinguishes between the burden of production and the burden of persuasion and expressly states as follows: "We note at the outset that this case concerns only the burden of persuasion . . . and when we speak of burden of proof in this opinion, it is this to which we refer."  546 U.S. at 56, 126 S. Ct. at 534.  As the U.S. Court of Appeals for the Third Circuit has recently observed, "[t]he Supreme Court made very clear that it was speaking only of the burden of persuasion–in other words which party loses if the evidence is closely balanced–and not of the burden of production–which party bears the obligation to come forward with the evidence at different points in the proceedings."  *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation*, 490 F.3d 337, 345 (3rd Cir. 2007).

that, "[i]f the teacher wishes to teach quiet behavior in time-out, the teacher may use a modified quiet contingency in which the student is released *sooner* than the predetermined time contingent upon quiet or calm behavior." ( Appellees' Records in SE-320 at 2212) (emphasis in original) (cited in Decision at 54 n.36, Certified Pleadings at 353 n.36).[21]

The substantive merits of the Plaintiffs' arguments on their extended use of timeout on Isabel are discussed at greater length in Part II of this brief. At this juncture, however, it is fair to conclude that the ALJ's statement that the School District did not offer literature "to support the rationale for or efficacy of two contingent tasks prior to release" from timeout was not only factual, but consistent with abundant evidence that contingent release requirements should not be used to significantly extend the duration of timeout. In context, the statement answered the Plaintiffs' assertion that extended periods of timeout were justified because of the alleged value of using the contingent release requirements.

The Plaintiffs's argument on appeal implies that a single sentence extracted from context undermines the ALJ's plain and repeated statements that she placed the burden of proof on Isabel and her parents. The third answer to this assertion is that due deference requires a much more balanced reading of the ALJ's decision. Thus, the First Circuit Court of Appeals addressed a

---

[21] Even though he was the expert witness for the School District and the AEA, Dr. Allen conceded a number of important points regarding the use of contingent release requirements during the course of cross-examination. He confirmed that follow-up research to the Hobbs article introduced by the School District and the AEA "concluded that there was no relative value to the contingent release procedure." (Transcript at 2019). He also conceded that, according to the later work by Dr. Mace, *et al.*, there was "a danger of getting into a control/counter-control struggle" if a contingent release procedure were utilized. (*Id.*) He also conceded that the method he had recommended in his article with Dr. Shriver was "very clearly to let the child out [of timeout] in fairly short order with just a small demonstration of compliance." (*Id.* at 2022-23).

singularly analogous issue in *Lenn v. Portland School Committee*, 998 F.2d 1083 (1st Cir. 1993).

In *Lenn*, the parties who had lost in IDEA review proceedings before a U.S. District Court for the

District of Maine urged on appeal that a sentence extracted from the judge's decision revealed that

he had applied the wrong standard of review, notwithstanding the judge's clear articulation of the

appropriate standard of review at many points in his decision.  998 F.2d at 1087-88.  The Court of

Appeals rejected this argument, reasoning in relevant part as follows:

> [W]hen, as here, a trial court delineates the proper rule of decision, citing book
> and verse, the burden of demonstrating that the court is merely mouthing empty
> platitudes rests with the party who mounts the accusation.   This is a heavy
> burden; it cannot be carried by perfervid rhetoric or glib wordplay.  To prevail on
> such a theory, the accuser must offer solid indications that the district court in
> fact strayed from the straight and narrow. . . .
>
> [A]ppellants invite us to disregard the court's professed allegiance to the correct
> standard of review.  We decline the invitation.  First and foremost, we simply
> cannot credit appellants' argument that this isolated reference indicates a
> wholesale abandonment of the principles of independent review. . . .

*Lenn*, 998 F.2d at 1087-88; *see also, e.g.*, *CJN v. Minneapolis Public Schools*, 323 F.3d 630, 640

(8th Cir. 2003) (reading a decision by Minnesota's State administrative agency in a due process

proceeding broadly so as to include "implicit" rulings); *Roland M. v. Concord School Committee*,

910 F.2d 983, 991 n.4 (1st Cir. 1990) (disregarding district court's "infelicitous" choice of

terminology where "the context, and other statements in the court's memorandum" made plain that

the court fully understood the operative legal principle); *Hampton School Dist. v. Dobrowolski*, 976

F.2d 48, 54 (1st Cir. 1992) (rejecting, on a burden of proof issue, appellants' "contention that the

district court actually did something other than that which it said it was doing.")

    In summary, ALJ Etscheidt's decision clearly recognizes and plainly articulates the rule of

*Schaffer v. Weast* imposing the burden of persuasion on the party seeking relief.  In no uncertain

73

terms, she ruled that "[t]he [parents] bear the burden of proof." (Decision at 23-24, Certified Pleadings at 322-23). In equally plain and unambiguous language, she also ruled that Isabel and her parents sustained that burden of proof with respect to each of the two substantive issues presented for review. (Decision at 33 & 42, Certified Pleadings at 332 & 341). Accordingly, and for each of the three reasons documented above, the Plaintiffs' argument that the State's Administrative Law Judge did not apply the appropriate burden of persuasion should be firmly and unequivocally rejected.

## II.  THE SUBSTANTIVE ISSUES ON APPEAL

On August 21, 2006, Isabel and her parents filed a Request for Due Process Hearing with the Iowa Department of Education. (Certified Pleadings at 1-16). The Request set forth two carefully defined issues. (*See id.* at ¶¶ 32 & 33). On November 28, 2006, at the commencement of the due process hearing, ALJ Etscheidt reiterated the two issues to be adjudicated. (Transcript at 4). On February 2, 2007, Isabel and her parents filed a post-hearing Appellants' Brief in which they advanced arguments and authorities on the two issues identified in the Request for Due Process Hearing; the arguments and authorities were defined by, and carefully confined to, the duly pleaded allegations.[22] (*See, e.g.*, Appellants' Brief in SE-320 at 36, Certified Pleadings at 97) (citing and quoting the specific subparagraph of the Request for Due Process Hearing which articulated the first reason why the behavioral interventions used by the School District and the AEA were contrary to

---

[22] In 2004, the U.S. Congress significantly altered the pleadings requirements in due process actions under the IDEA by adding the following new requirement: "The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [Request for Due Process Hearing]." 20 U.S.C. § 1415 (f)(3)(B) (under the statutory caption "Limitations on Hearing.")

the IDEA).  On March 29, 2007, ALJ Etscheidt rendered her decision in the State proceedings, and

she specifically identified and addressed each of the two issues presented for adjudication.  (*See*

Decision at 1-2, 23-33, & 33-42, Certified Pleadings at 300-01, 322-332, & 332-341).

On appeal, the School District and the AEA also address two issues.  (*See* Plaintiffs' Appeal

Brief at 4).   The two issues articulated by the Plaintiffs on appeal, however, are not the issues

asserted below, they are not the issues litigated below, and they are not the issues decided below.

Accordingly, Isabel and her parents respectfully submit that the vast bulk of the Plaintiffs' Appeal

Brief is devoted to attacks upon straw men arguments.  In other words, the difference between the

issues articulated by the Plaintiffs and the issues actually adjudicated in the proceedings below are

both material and critical.  This is true with respect to each and both issues presented.

First, in restating the least restrictive environment (or LRE) issue, the School District and

the AEA claim that the question is whether a local educational agency has "to demonstrate that it

has considered and discarded *every possible supplementary service* before it can determine that a

child is appropriately educated in a classroom away from the general education classroom . . . ."

(Plaintiffs' Appeal Brief at 4) (emphasis supplied).  In fact, however, Isabel and her parents have

never argued for so onerous a standard, and the ALJ did not embrace any such standard in any part

of her decision.  To the contrary, and as documented at length in Part A, *infra*, the ALJ's ruling is

based on far less onerous LRE standards that are firmly grounded in express statutory mandates and

a long line of supporting Eighth Circuit precedents.

Second, in restating the behavioral interventions issue, the School District and the AEA

claim that the question presented is whether a school is "allowed to utilize a variety of behavioral

interventions," and, more particularly, whether a school may use "breaks, planned hand-over-hand

(guided) activities, supervised time-out, and physical restraints that prevent a child from hurting herself and others?" (Plaintiffs' Appeal Brief at 4). The issue actually presented for adjudication in the proceedings below, however, did not challenge the utilization of the cited behavioral interventions *per se*, but, rather, the extreme forms of intervention utilized by the School District and the AEA on Isabel.

As we stated in our primary brief in the proceedings below, "with respect to the nature of the challenged interventions, Mr. and Mrs. L. have not challenged the use of graduated guidance, time-out from positive reinforcement, or other reduction oriented consequences strategies. To the contrary, we have challenged extreme forms of those interventions, extreme forms which change the character of the interventions." (Appellants' Brief in SE-320 at 34, Certified Pleadings at 95). As we further explained in our opening statement at the due process hearing,

> we are not opposing graduated guidance in appropriate circumstances. We are not opposing timeout as a concept in and of itself. *We are no more opposing them than we oppose salt in a recipe, but if you add a whole cup of salt, it's an entirely different matter.*

(Transcript at 34) (emphasis supplied).

The materiality of the distinction between the issue restated by the Plaintiffs and the issue actually adjudicated in the proceedings below is explained in the evidence duly introduced into the record. Thus, as the expert witness for the School District and the AEA admitted under oath, "you get beyond 20 to 30 minutes, and you're really pushing the benefits of [the timeout] procedure as a behavior reduction technique. It's starting to become something else." (Transcript at 2045) (testimony of Dr. Keith Allen). As Kathleen Delaney summarized research by Landau & Macleish, "[w]hen the time-out turns aversive, due either to its length or its location, *the nature of the*

*intervention is altered completely.*"  (Appellants' Records in SE-320 at 4257) (emphasis supplied). In other words, expert opinion confirms the common sense proposition that there is a material difference between the  therapeutic use of timeout for short durations of time and retaining a child in a room without furniture for hours at a time--just as there is a material difference between the use of the gentle prompting procedure known as graduated guidance and the practice of having multiple adults holding a small child in a chair and forcing her to color against her will for extended periods of time.  In failing to recognize this difference, the Plaintiffs' Appeal Brief attacks a straw man argument–and not the issue adjudicated in the proceedings below.

There is another and equally important dimension to the Plaintiffs' misstatement of the issue on appeal.  In emphasizing "physical restraints that prevent a child from hurting herself and others," the Plaintiffs would have this Court believe that the issue is whether a school district can use timeout or restraints in response to emergency situations, such as when a child poses a threat to himself or others.  (Plaintiffs' Appeal Brief at 4).  In fact, however, the Request for Due Process Hearing did not raise the issue of when and how a school district should respond to emergency situations.  To the contrary, Mr. and Mrs. L. challenged the use of extreme forms of behavioral intervention as part of a program allegedly designed to teach Isabel to comply with adult demands. As ALJ Etscheidt properly ruled, there is a difference between "temporary removals [that] may be necessary and appropriate" and "the consistent and continued use of such measures as an intervention to manage behavior."  (Decision at 38, Certified Pleadings at 337).  In failing to recognize this difference, the Plaintiffs' Appeal Brief attacks a straw man argument–and not the issue adjudicated in the proceedings below.

The Plaintiffs' failure on appeal to address the issues actually adjudicated in the proceedings

below is a serious legal flaw that infects their entire brief.  *See, e.g., Hanna v. Price*, 245 Fed. Appx. 538, 545-46 (6th Cir. 2007) (ruling that a party's analysis was "legally flawed" and that it had advanced a "straw-man argument" because "it failed accurately to characterize . . . the nature of Hanna's claim"); *Wachovia Securities, LLC v. Barnes*, 2006 WL 1371449 at *7 (N.D. Ill. 2006) (ruling that a party's "entire argument boils down to a straw man argument" because "it interprets the [challenged arbitration decision] to say something it does not really say and then accuses the arbitrators of being unfair for saying it"); *Nippon Steel Corp. v. United States*, 223 F. Supp. 2d 1349, 1363 (Ct. Int'l Trade 2002) (holding that the challenging party had "mischaracterized the court's instructions, creating a straw-man argument that is easily refuted"; *A-1 Cigarette Vending, Inc. v. United States*, 49 Fed. Cl. 345, 361 (Fed. Cl. 2001) (ruling that the Government's argument "misses the point" raised by the Plaintiff and that its attempt to "obfuscate" the real issue was a "straw man" argument)*; Miller v. Pfizer, Inc*., 2000 WL 968792 at *2 (D. Kan. 2000) (ruling that an argument based on a position never taken was a "straw man argument.")

In this Part II of the Defendants' Appeal Brief, Isabel and her parents will address the two issues actually asserted and adjudicated in the proceedings below.  Subpart A will address the least restrictive environment issue as consistently asserted from and after the filing of the Request for Due Process Hearing.   Subpart B will address the issue of the excessive use of highly intrusive behavioral interventions, again as consistently asserted from and  after the filing of the Request for Due Process Hearing.  We will set forth and document the multiple reasons why the decision of the State's Administrative Law Judge, ruling for  Isabel and her parents on each and both issues, should be sustained on appeal.

A.     FOR EACH OF TWO REASONS, THE STATE'S ADMINISTRATIVE LAW JUDGE
       CORRECTLY RULED THAT ISABEL AND HER PARENTS SUSTAINED THEIR
       BURDEN OF PROVING THAT THE SCHOOL DISTRICT AND THE AEA VIOLATED
       THE LRE PROVISIONS OF THE IDEA.

The challenges faced by children with emotional
and behavioral disorders "emphasize the need for enriched opportunities
for normal social interaction and positive social experiences.
This assertion can raise questions about the tradition of educating
many children with [emotional and behavioral disorders]
in specialized and self-contained programs
that may restrict opportunities for typical social interactions and relationships."

–L. Panacek & G. Dunlap[23]

"[C]hildren who can be mainstreamed should be mainstreamed . . . ."

–U.S. Court of Appeals for the Eighth Circuit[24]

In their Request for Due Process Hearing, Mr. and Mrs. L. alleged that, while she was
attending school in the Waukee Community School District, Isabel L. "had unduly limited
interaction with peers without disabilities." (Request for Due Process Hearing at ¶ 2). The first
issue they asserted, therefore, was that "[t]he Waukee Community School District and the Heartland
Area Education Agency have violated the IDEA by failing to provide an education to Isabel L. in
the least restrictive appropriate environment." (*Id.* at ¶ 32). As sustained by the Administrative Law
Judge, this allegation has two key factual components. First, in the fall of 2004, the School District
educated Isabel pursuant to an interim IEP pending the results of a full and individual evaluation

---

[23] Luanne J. Panacek & Glen Dunlap, *The Social Lives of Children with Emotion and
Behavioral Disorders in Self-Contained Classrooms: A Descriptive Analysis*, 69 Exceptional
Children 333, 333 (2003). This article was introduced into evidence without objection and is
found at pages 4796 *et seq.* in the Appellants' Records.

[24] *Evans v. District No. 17 of Douglas County*, 841 F.2d 824, 832 (8th Cir. 1988).

of her needs.  The full-year IEP was developed on November 22, 2004, and, as the ALJ found, "that IEP indicated that Isabel would be removed from general education 70.71% of the day and served in a 'Level 3' special education program."  (Decision at 7, Certified Pleadings at 306).  Second, on December 7, 2005, the Appellees implemented a strategy included in a behavioral support plan first proposed on November 18, 2005 and finalized on December 2, 2005, namely, that "Isabel will be instructed in a 1:1 setting (away from other students) until she is able to work through each portion of the day."  (Appellants' Records in SE-320 at 3651).

Focusing on the placement decisions made on November 22, 2004 and December 2, 2005, the State's Administrative Law Judge ruled that the School District and the AEA violated the LRE provisions of the IDEA for each of two independently sufficient reasons:  First, enforcing a substantive right under the IDEA, she ruled that Isabel and her parents "have met their burden of showing that insufficient effort was given to the consideration of supplemental aids and services to support Isabel's inclusion in regular education."  (Decision at 33, Certified Pleadings at 332).  Second, enforcing a procedural right under the IDEA, she ruled that the School District's and the AEA's failure to involve Isabel's general education teacher in the cited "placement decisions and in the determination of appropriate positive behavioral interventions and supports" was a violation of the IDEA and the Iowa Rules of Special Education and, further, that this violation could not be dismissed as harmless error.  (Decision at 32, Certified Pleadings at 331).

This Defendants' Appeal Brief will give separate consideration to each of the ALJ's two grounds for ruling that Isabel and her parents had met their burden of persuasion on the question of whether Isabel was educated in the least restrictive appropriate environment.  In doing so, we note that either ground constitutes a full and sufficient foundation for the ALJ's ultimate ruling.

1.     FIRST, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE LRE PROVISIONS
       OF THE IDEA BY GIVING INSUFFICIENT CONSIDERATION TO SUPPLEMENTAL
       AIDS AND SERVICES TO SUPPORT ISABEL'S EDUCATION IN THE GENERAL
       EDUCATION CLASSROOM.

As the Plaintiffs on appeal, the School District and the AEA have attacked the ALJ's rulings

on the LRE issue on both legal and evidentiary fronts.  Accordingly, this analysis of the issue will

be divided into two sections.   Section (a) will consider the relevant law governing the

mainstreaming issue, and it will document the fact that the ALJ's decision fully, fairly, and carefully

adheres to the governing Eighth Circuit precedents. Section (b) will address the Plaintiffs' assertions

that, for academic or behavioral reasons, Isabel could not have been benefitted from greater

inclusion  in the general education classroom.  Finally, Section ( c) will address the factual

foundation for the Court's ultimate ruling, and it will establish that her ruling was fully supported

by a preponderance of the credible evidence.

      a.     The Eighth Circuit recognizes a statutory presumption in favor of  a child's
       education in the general education classroom, and, while this presumption is not
       absolute, the ALJ correctly ruled that the IEP team must give reasonable
       consideration to the provision of supplemental aids and services that would permit
       the child to be educated with her peers without disabilities.

In mounting their attack upon the decision of the State's Administrative Law Judge on the

LRE issue, the School District and the AEA begin by asserting that ALJ Etscheidt "is not a lawyer

and does not have any formal legal training." (Plaintiffs' Appeal Brief at 10 n.2).  They then claim

that she has "failed to follow" the relevant Eighth Circuit precedents on the LRE issue. (*Id.* at 16).

Our answer to the Plaintiffs' assertions begins with the observation that the IDEA does not require

that the hearing officers appointed by the States to conduct due process hearings be lawyers.  As

documented at length above, it is presumed that the hearing officer will have specialized expertise

on questions of educational policy and state educational standards. (*See* Part I, Subpart A, Section 1, *supra*.)  In addition, the IDEA requires that the hearing officer "possess knowledge of, and the ability to understand, the provisions of this title, Federal and State regulations pertaining to this title, and legal interpretations of this title by Federal and State courts." 20 U.S.C. § 1415((3)(A)(ii).

As a review of the challenged decision will quickly reveal, this is not a case where an uninformed layman has wandered aimlessly into the alien territory of IDEA law.  To the contrary, Susan K. Larson Etscheidt is not only an expert in the field of behavioral interventions, but she has served as an Administrative Law Judge in IDEA cases in Iowa since 1990. (Supplement to Certified Pleadings at 17a).  She has a significant number of published articles on the application of IDEA principles in the classroom, and she is one of three co-authors of a forthcoming text to be published by Prentice Hall entitled *Special Education Law & Practice in Public Schools*. (*Id.*)  While the courts remain the ultimate arbiters regarding the meaning of IDEA law, therefore, the Plaintiffs are not justified in their implicit attacks on the ALJ's lack of formal legal credentials.

This section will defend the ALJ's careful and thorough analysis of the legal principles that govern the substantive LRE issue, and it will do so by systematically answering the Plaintiffs' primary arguments on appeal: (1) the Plaintiffs' claim that there is no legal presumption in favor of an education in the general education classroom, especially in the case of children whose disabilities cause behavioral problems (Plaintiffs' Appeal Brief at 12-13), (2) the Plaintiffs' claim that the Eighth Circuit has rejected "parallel instruction" as an accommodation to permit a child to be educated with her peers in the regular classroom (*id.* at 14), and (3) the Plaintiffs' claim that the ALJ improperly required them to demonstrate that they had "considered and discarded every possible supplementary service" before placing Isabel in a special classroom for children with behavioral

82

disabilities and before later placing her in a room without any peers at all (*id.* at 4).

**Answer to the Plaintiffs' argument that there is no statutory presumption in favor of mainstreaming**. On appeal, the School District and the AEA contend that, as a matter of law, "[a] student's participation in the mainstream environment is not to be presumed, but must be established in the evidence based upon the child's particular needs." (Plaintiffs' Appeal Brief at 12-13). In the proceedings below, however, they admitted that "[t]he IDEA provides that there is a rebuttable 'presumption' that students will be educated in a public school," but asserted that the IDEA provides " only a 'preference' that the child will be included in classes with nondisabled peers." (Appellees' Brief in SE-320 at 3, Certified Pleadings at 142).[25] In response, the ALJ ruled that "there is a presumption in favor of mainstreaming," a presumption "which may not be interpreted as applicable only to a segregated school analysis." (Decision at 24, Certified Pleadings at 323). The ALJ's ruling is a correct statement of the governing law, as can be established by reference to the plain wording of the statute, to the provisions of the governing federal regulations, to the provisions of the Iowa Rules of Special Education, and to a long line of Eighth Circuit precedents.

*The Federal Statute*. Consider, first, the governing federal statute: The IDEA provides that each participating state must insure that, to "the maximum extent appropriate, children with

---

[25] In the proceedings below, the School District and the AEA also argued as follows:

The IDEA contains a rebuttable "presumption" that students will not be educated in segregated *schools* with only disabled students. . . . The IDEA, on the other hand, merely gives a "preference" that the child will be included in *classes* with nondisabled peers.

(Appellees' Brief in SE-320 at 7, Certified Pleadings at 146) (emphasis in original).

disabilities . . . are educated with children who are not disabled." 20 U.S.C. §1412(a)(5) (main ed. and Supp. 2005). Critically, the IDEA further provides that "*special classes, separate schooling, or other removal of children with disabilities from the regular educational environment*" shall occur "*only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily*." *Id.* (emphasis supplied). The cited language from the governing federal statute is critical because a cardinal rule in statutory construction is that the first step in interpreting a statute is to look at the words of the statute itself. *See, e.g., Arlington School District v. Murphy*, 548 U.S. 291, ___, 126 S. Ct. 2455, 2459, 165 L. Ed. 2d 526 (2006) (ruling that "[w]e have 'stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'") The plain words of the IDEA are dispositive of the instant issue because the statutory language that governs "special schools" is *the same language* that governs "special classes."

        In other words, the language that removal from " the regular educational environment [should] occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily" applies to *both* "special classes" and "separate schooling." Under some circumstances, similar language might be interpreted to convey two different meanings, and even identical language might conceivably be interpreted differently in different contexts. The *same* language in the same context, however, can have only one meaning. Accordingly, if the statutory language in Section 1412(a)(5) creates a rebuttable presumption against "special schools," as the School District and the AEA conceded in the proceedings below, then, both logically and legally, it also creates a rebuttable

presumption against "special classes."

*The Iowa Rules*.  The requirements set forth in the governing federal statute are reinforced by the relevant provisions of the Iowa Rules of Special Education:

> Least Restrictive Environment (LRE).  Each agency shall ensure that, to the maximum extent appropriate, children requiring special education are educated with individuals who do not require special education and that special classes, separate schooling or removal of children requiring special education from the general education environment occurs only if the nature or severity of the individual's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily . . . .

Iowa Administrative Rules of Special Education, r. 281-41.3(5) (Feb. 2000).  This requirement is re-emphasized in Iowa Rule 281–41.37(2)(b), which states that "[e]ach agency shall ensure and maintain adequate documentation" of compliance with the LRE requirement.  The cited rule contains the following additional provision:

> *Whenever possible*, hindrances to learning and to the normal functioning of eligible individuals within the general school environment shall be overcome by the provision of special aids and services rather than by separate programs for those in need of special education.

(Emphasis supplied).  The Iowa Rules also state that "[e]ach agency shall ensure that . . . . [a]n eligible individual is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum."  *Id.* at R. 281-41.39(5).  The Iowa Rules further facilitate the implementation of the LRE requirements by stating that "the IEP team shall consider the following questions regarding the provision of special education and related services:"

> a. What accommodations, modifications, and adaptations does the individual require to be successful in a general education environment?
> b. Why can't these accommodations, modifications and adaptations be provided within the general education environment?

85

R. 281–41.67(6).

***The Judicial Precedents***.   The U.S. Supreme Court has not yet interpreted the least restrictive environment requirements of the IDEA, but there are long-standing interpretations of the LRE provisions from the U.S. Courts of Appeal, including the U.S. Court of Appeal for the Eighth Circuit.  A brief review of those opinions is apropos.  The first U.S. Court of Appeal to address the LRE issue was the Sixth Circuit.  *Roncker v. Walter*, 700 F.2d 1058 (6th Cir. 1983).  In *Roncker*, the Sixth Circuit declined to follow the tests articulated in *Board of Educ. v. Rowley*, 458 U.S. 176 (1982), explaining that, while the segregation of a student may meet the educational benefit part of IDEA's FAPE mandate, more analysis is required to address the LRE issue.  700 F.2d at 1062.  In *Roncker*, the Sixth Circuit Court observed that the IDEA "does not require mainstreaming in every case but its requirement that mainstreaming be provided to the maximum extent appropriate indicates *a very strong congressional preference*."  700 F.2d at 1063 (emphasis supplied).  The Court further observed that the perception that a segregated placement "is academically superior for a handicapped child may reflect no more than a basic disagreement  with the mainstreaming concept.  Such a disagreement is not, of course, any  basis for not following the Act's mandate."  *Id.*

Other Courts of Appeals have adopted variant articulations of the legal standard to be enforced in LRE cases, but all articulations of the rule emphasize the congressional presumption that a child with disabilities should be educated with children without disabilities–and that there should be no removal from that environment without a showing that a satisfactory education cannot be obtained in the regular classroom through the use of supplementary aids and services.  Thus, the Fifth Circuit adopted a two-pronged test:

> First, we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*Daniel R.R. v. State Board of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989). The Third Circuit Court of Appeals adopted or adapted the *Daniel RR.* test in *Oberti v. Board of Education*, 995 F.2d 1204 (3d Cir. 1993). The *Oberti* Court is believed to have been the first to expressly state that students without disabilities may receive their own social benefits through inclusion, such as learning to interact with students with disabilities. 995 F.2d at 1216.

The Ninth Circuit adopted a variation of the *Daniel R.R.* and *Roncker* articulations of the LRE rule in *Sacramento City Unified School District v. Rachel H.*, 14 F.3d 1398 (9th Cir. 1994). The *Rachel H.* test consisted of four factors, including the non-academic benefits of interaction between students with and without disabilities. 14 F.3d at 1401-02. The Seventh Circuit Court of Appeals has emphasized the IDEA's express wording, namely, whether or not a "satisfactory" education could be achieved in the less restrictive environment through the use of supplemental aids and services. *Beth B. v. Van Clay*, 282 F.3d 493, 499 (7th Cir. 2002). In synthesizing the various articulations of the substantive LRE standard, one legal commentator has emphasized the threshold question, "Has the school district taken steps to educate the student in a regular education classroom with supplementary aids and services?" Sarah E. Farley, Comment, *Least Restrictive Environments: Assessing Classroom Placement of Students with Disabilities under the IDEA*, 77 Wash. L. Rev. 809, 836 (2002).

Eighth Circuit law is in full accord. Indeed, the U.S. Court of Appeals for the Eighth Circuit

first adopted the Sixth Circuit's *Roncker* test in *A.W. ex rel. N.W. v. Northwest R-1 School District*, 813 F.2d 158 (8th Cir. 1987). In subsequent opinions, the Eighth Circuit repeatedly emphasized the statutory presumption in favor of the least restrictive educational environment. In 1988, for example, the Eighth Circuit Court observed that "the Act requires placement of a handicapped child 'in the least restrictive environment.' *In other words, children who can be mainstreamed should be mainstreamed, if not for the entire day, then for part of the day . . . ." Evans v. District No. 17 of Douglas County*, 841 F.2d 824, 832 (8th Cir. 1988) (citations omitted and emphasis supplied). In 1994, the Eighth Circuit expressly approved the *Oberti* Court's statement that there is a strong congressional preference in favor of integrating children with disabilities: "As the Third Circuit has recently reiterated, '[the LRE provision of the IDEA] sets forth *a strong congressional preference for integrating children with disabilities in regular classrooms.'" Light v. Parkway C-2 School Dist*., 41F.3d 1223, 1227 (8th Cir. 1994) (quoting *Oberti v. Board of Educ*., 995 F.2d 1204, 1213-14 (3rd Cir. 1993)).

The Eighth Circuit's opinion in *Light* warrants further attention. As the Plaintiffs properly note, the case involved a middle school student whose aggressive behaviors were extreme; she "kicked, hit, and bit her teacher . . . at least several times a week," and she "hit, kicked and slapped other disabled and non-disabled students." *Light*, 41 F.3d at 1229 (quoted in the Plaintiffs' Appeal Brief at 15). Her daily log "recorded a mean incidence of fifteen aggressive acts per week." (*Id.*) In citing the *Light* precedent, however, the School District and the AEA neglect to mention one of the key holdings expressly set forth in that opinion:

> *[W]e hold today that there is an essential second test which must be met by a school district seeking judicial sanction for the removal of a dangerous disabled child*: The school district must show that it has made reasonable efforts to accommodate the

88

child's disabilities so as to minimize the likelihood that the child will injure herself or others.  This second inquiry is necessary to ensure that the school district fulfills its responsibility under the IDEA . . . .

41 F.3d at 1228 (emphasis supplied).  The Eighth Circuit ruled, moreover, that *the mandated inquiry "should focus on whether the school district has done all it reasonably can to minimize the risk of resulting injury through the use of 'supplementary aids and services*."  41 F.3d at 1230 (emphasis supplied).

Since its holding in *Light*, the Eighth Circuit has repeatedly emphasized the statutory presumption against the removal of a child with disabilities from the regular education environment. *See, e.g., Gill v. Columbia 93 School Dist.*, 217 F.3d 1027, 1038 (8th Cir. 2000) (ruling that federal courts must defer to the judgment of education experts "*so long as the child . . . is educated alongside his non-disabled classmates to the maximum extent possible*") (emphasis supplied); *Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 661 (8th Cir. 1999) (ruling that a child's "instruction through the Institutes fails to satisfy one of the primary objectives set forth in the IDEA, namely, to educate disabled children in a classroom along with children who are not disabled to the maximum extent possible"); *Fort Zumwalt School Dist. v. Clynes*, 119 F.3d 607, 612 (8th Cir. 1997) (stating that the "IDEA requires disabled students to be educated with non-disabled students whenever possible.")

Notwithstanding the Eighth Circuit's long-standing position that there is a strong presumption in favor of placing children with disabilities in the mainstream classroom, the School District and the AEA apparently contend that the Eighth Circuit's position on the LRE issue has somehow been  altered or diminished in force by the Supreme Court's opinion  in  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528 (2005).  (*See* Transcript at 51 & 52) (opening

89

arguments).  There are two compelling answers to any such suggestion.  First, the wording of the

LRE requirement currently set forth in 20 U.S.C. § 1412(a)(5) was re-promulgated without change

in 1997 and again in 2004, even though the U.S. Congress was fully aware of the interpretation that

the federal courts had given to that language.  *See, e.g.,* 143 Cong. Rec. E072-01, 972 (1997)

(Representative Matthew G. Martinez of California, stating that inclusion and integration were

fundamental to the1997 amendments re-promulgating the IDEA, underscoring "the strong

presumption in the law recognized by innumerable courts, that children with disabilities should be

educated with children without disabilities in the general . . . classroom.")  There is no evidence

whatsoever that the U.S. Congress intended to alter the LRE principles articulated in cases such as

*Roncker* and *Oberti*, either in 1997 or in 2004.  To the contrary, there is evidence of an intent to

*strengthen* those protections.  As one legal commentator has noted,

> The primary goals of the 1997 amendment were to "strengthen the least restrictive
> environment requirement" and "increase participation of children with disabilities
> in the general curriculum and regular . . . classroom."  In doing so, Congress
> responded to circuit cases interpreting the LRE provision by recognizing the
> importance of inclusion of students with disabilities in the regular classroom.

Sarah E. Farley, Comment, *Least Restrictive Environments: Assessing Classroom Placement of*

*Students with Disabilities under the IDEA*, 77 Wash. L. Rev. 809, 836 (2002) (quoting 143 Cong.

Rec. E951-01, 951 (1997) (statement of Rep. George Miller of California)).

There is a second and equally compelling  answer to the Plaintiffs' apparent assertion that

the Eighth Circuit has retreated from its prior rulings on the LRE issue.  That answer is *Pachl ex rel.*

*Pachl v. Seagren*, a decision rendered by the U.S. Court of Appeals for the Eighth Circuit after the

Supreme Court's opinion in *Schaffer v. Weast*.  *Pachl ex rel. Pachl v. Seagren*, 453 F.3d 1064 (8th

Cir. 2006).  In that case, the parents were the appealing party, and they argued that the district court

had applied the wrong legal standards on the LRE issue.  The Eighth Circuit disagreed, observing that "[t]he district court described the correct legal standard in detail and discussed the appropriate governing cases, including *Roncker*." *Pachl*, 453 F.3d at 1068.

Since the Eighth Circuit in *Pachl* expressly held that the district court "described the correct legal standard" and "discussed the appropriate governing cases," careful consideration should be given to the standard and cases thus approved.  *See Pachl ex rel. Pachl v. Seagren*, 2005 WL 1140618 (D. Minn.), *aff'd*, 453 F.3d 1064 (8th Cir. 2006).  Writing for the U.S. District Court for the District of Minnesota, Judge Magnuson emphasized three governing cases:  the Sixth Circuit's opinion in *Roncker*, the Fifth Circuit's opinion in *Daniel R.R.*, and the Eighth Circuit's opinion in *A.W. ex rel. N.W. v. Northwest R-1 School District*. 2005 WL 1140618 at *5 & *6.

In short. the Eighth Circuit's *Pachl* opinion does not reference or introduce a new, post-*Schaffer* interpretation of the LRE provisions of the IDEA.  To the contrary, the opinion expressly relies upon–and authorizes a lower tribunal to rely  upon–the principles and precedents that have been the mainstay of LRE law under the IDEA since the Eighth Circuit first adopted or adapted the Sixth Circuit's *Roncker* test nearly two decades ago.  *A.W. ex rel. N.W. v. Northwest R-1 School District*, 813 F.2d 158, 163  (8th Cir. 1987).  Accordingly, the State's Administrative Law Judge ruled correctly when she concluded that, "[c]learly, the provision of adequate supplementary aids and services is critical to Eighth Circuit LRE analysis.  While inclusion may not be appropriate in all settings, the Eighth Circuit requires considerable effort and discussion concerning the feasibility of an inclusive placement with supplementary aids and services."  (Decision at 28, Certified Pleadings at 327).

**Answer to the Plaintiffs' assertion that the Eighth Circuit has rejected the use of a parallel curriculum**.  On appeal, the Plaintiffs assert that "the Eighth Circuit has rejected the concept of 'parallel instruction.'"   (Plaintiffs' Appeal Brief at 14).  They then define this concept as "greatly modified" assignments, but cite no authority or testimony whatsoever for this definition. (*Id.*)  They further assert that "LRE does not require 'parallel instruction,' and a student need not participate in regular education classes when the student is not capable of performing the typical regular education work . . . ."  (*Id.* at 15). The Plaintiffs' argument is a drastic distortion of the holding in *Pachl ex rel. Pachl v. Seagren*, 453 F.3d 1064 (8th Cir. 2006).

The Eighth Circuit's *Pachl* decision includes the following passage, which contains its one and only reference to  a parallel curriculum:

> Sarah's service providers also believed that the functional skills that Sarah would need to develop personal independence could not be fully addressed in the mainstream environment, since many of the functional skills that Sarah should learn cannot be performed in the natural setting of the mainstream with enough frequency to provide her the needed practice."  Dr. Miller similarly opined that while certain courses like choir and adaptive physical education, and even facts-based courses like health, might be appropriate with a parallel curriculum, additional mainstreaming would not benefit Sarah.

*Pachl*, 453 F.3d at 1069 (citations to record omitted).  In short, the Eighth Circuit's sole reference to the concept of a parallel curriculum is its statement that one expert believed that a specific middle school student with severe functional needs would not benefit from greater than 70% integration into the general education classroom, even with the use of a parallel curriculum.

The State's ALJ answered the Plaintiffs' current arguments in her decision:

> While described as "parallel instruction" by the [School District and the AEA], the supplementary aids considered by the school district [in *Pachl*] were recommendations from the parent's expert which included multi-level curriculum and materials, individualized instruction, and collaboration between special

education personnel and the classroom teacher. The only reference to parallel curriculum is from the district's experts, who opined that fact-based courses might be appropriate with a parallel curriculum, but that additional mainstreaming would not benefit the student. To conclude that this Eighth Circuit decision rejected parallel instruction or confirmed an "on par" standard for inclusion would be an inaccurate proposition.

(Decision at 28, Certified Pleadings at 327). On appeal, the Plaintiffs repeat the arguments that they presented below, but they do not directly address the ALJ's carefully reasoned answer to those arguments.

A second consideration reinforces the conclusion that the Plaintiffs' instant argument should be rejected: In *Pachl*, the Eighth Circuit deferred to the State's finding that a particular child could not benefit from greater mainstreaming. *See* 453 F.3d at 1067 (affirming the district court's decision to give "due weight to the results of [the due process] proceedings.") The Plaintiffs would have this Court interpret a case of deference as a warrant for overturning a decision duly rendered by the State's Administrative Law Judge. Equally important, the Plaintiffs would construe deference to a factual finding in a particular case as a ruling that no child could benefit from the possible modifications discussed by one witness in that case. If the Plaintiffs' logic were accepted, the deference due to a State decision that a particular child could not benefit from being taught in braille would be interpreted as a ruling that no child could benefit from being taught in braille. Deferring to a State decision that a particular child could not be successfully mainstreamed by using a hearing interpreter would be interpreted as a ruling that no child could be successfully mainstreamed through the use of a hearing interpreter. The Plaintiffs' logic cannot be accepted, and, on behalf of Isabel and her Parents, we respectfully request that the Court reject the Plaintiffs' distortion of the *Pachl* decision.

93

**Answer to the Plaintiffs' argument that the ALJ improperly allocated the burden of proof**. The School District and the AEA assert on appeal that "the ALJ improperly allocated the burden of proof" because she allegedly required them "to establish that supplementary aids and services were considered and rejected by the IEP team." (Plaintiffs' Appeal Brief at 11). This assertion is answered in Part I of this Defendants' Appeal Brief, *supra*, and the arguments and authorities set forth above will not be repeated here. Even so, two additional observations underscore the reasons why the Plaintiffs' argument must be rejected.

First, the School District and the AEA have confused an alleged burden of production with the burden of persuasion. Their assertion that the burden of production was addressed by the U.S. Supreme Court in *Schaffer* is directly refuted by Justice O'Connor's express statement in the majority opinion:

> [H]istorically, the concept [of burden of proof] encompassed two distinct burdens: the "burden of persuasion," *i.e.*, which party loses if the evidence is closely balanced, and the "burden of production," *i.e.*, which party bears the obligation to come forward with the evidence at different points in the proceeding. *We note at the outset that this case concerns only the burden of persuasion . . . , and when we speak of burden of proof in this opinion, it is this to which we refer.*

*Schaffer*, 126 S. Ct. at 533-34 (emphasis supplied & citations omitted). Second, and equally important, there is no indication whatsoever that the ALJ permitted the statutory presumption in favor of mainstreaming to alter the burden of persuasion in any way. To the contrary, the Decision directly refutes the Plaintiffs' current allegation:

> While there is a presumption in favor of mainstreaming–which may not be interpreted as applicable only to a segregated school analysis–the [parents] may not lighten their burden of proving their claims by reliance on this presumption. The presumption requires the school district and AEA to forward a response to the claims, which they have done. The [parents] bear the burden of proof.

(Decision at 24, Certified Pleadings at 323).  In short, although the Plaintiffs claim that the adverse ruling on the LRE issue can be attributed to an improperly allocated burden of proof, that claim is utterly inconsistent with the ALJ's decision.

        b.       A preponderance of the evidence fully supports the State's finding that Isabel was fully capable of benefitting from greater integration with children without disabilities.

On appeal, the School District and the AEA assert that "[n]either the Parents nor the ALJ, despite referring to numerous educational articles and arguing strenuously for the use of supplementary strategies that are research-based, referred to any research to show the benefits or advantages of a greater level of mainstreaming." (Plaintiffs' Appeal Brief at 25).  We reply that the Plaintiffs' assertion is both irrelevant and erroneous.  The assertion is irrelevant because the presumption in favor of mainstreaming is set forth in the governing federal statute, the Iowa Rules of Special Education, and a long line of Eighth Circuit precedents.  As the Eighth Circuit ruled in 1994, "[t]he school district must show that it has made reasonable efforts to accommodate the child's disabilities so as to minimize the likelihood that the child will injure herself or others.  This . . . inquiry is necessary to ensure that the school district fulfills its responsibility under the IDEA." *Light v. Parkway C-2 School Dist*., 41F.3d 1223, 1230 (8th Cir. 1994).  In short, as the Eighth Circuit ruled in 1988, "children who *can be* mainstreamed *should be* mainstreamed . . . . *Evans v. District No. 17 of Douglas County*, 841 F.2d 824, 832 (8th Cir. 1988) (emphasis supplied).

The Plaintiffs' assertion that Isabel and her parents failed to produce articles proving the value of mainstreaming is irrelevant because the preference for mainstreaming  is a fundamental principle of IDEA law.   The assertion is also erroneous.   For example, the articles that we

95

introduced into evidence in the proceedings below included a peer reviewed research article by

Panacek and Dunlap which begins with the following statement:

> To a very great degree, the social lives of children define their worlds and are essential to their healthy development. This may be especially true for children with emotional and behavioral disorders (E/BD) who, by definition, have significant challenges in the area of social adaptation. These challenges emphasize the need for enriched opportunities for normal social interaction and positive social experiences. This assertion can raise questions about the tradition of educating many children with E/BD in specialized and self-contained programs that may restrict opportunities for typical social interactions and relationships.

Luanne J. Panacek & Glen Dunlap, *The Social Lives of Children with Emotion and Behavioral*

*Disorders in Self-Contained Classrooms: A Descriptive Analysis*, 69 Exceptional Children 333, 333

(2003) (Appellants' Records in SE-320 at 4796).

In the proceedings below, we also introduced child-specific evidence that Isabel prospered,

both behaviorally and academically, when she had the opportunity to be educated with her regular

education peers. Thus, during the 2003-04 academic year, Isabel was educated in the general

education classroom for a substantial portion of her school day, and this education was facilitated

by the use of special accommodations and supports. As Ann Folan testified, Isabel needed an

instructional aide to "help her in the [general education] classroom socially" and to help her "keep

up with the demands of the classroom." (Transcript at 75).

Q. And what special education services did she receive in the regular classroom?

A. She had everything–modification and adaptations of the regular education curriculum, and then she had the assistance of a one-on-one aide.

(*Id.* at 78) (testimony of Ann Folan). With the use of supplemental aids and services, Isabel's

education in the general education classroom was more than sufficient to satisfy the "satisfactory"

standard set forth in the governing statute. *See* 20 U.S.C. §1412(a)(5) (providing that "special

classes, separate schooling, or other removal of children with disabilities from the regular educational environment" shall occur "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

Indeed, as noted in her last IEP from Colorado, "Isabel has made HUGE academic gains this year." (Appellants' Records in SE-320 at 3044). In reading, her progress was described as "AMAZING!!! Isabel has taken off with reading! She is up to Lesson 65 in the Edmark reading program." (*Id.* at 3566). She had also made "nice progress" in specifically identified math skills. (*Id.* at 3567). Isabel also made social and behavioral progress in the general education classroom. She "improved interactions with peers in her classroom." (*Id.* at 3567). She also learned to "work independently at her desk for extended periods of time with familiar work." (*Id.*) Her progress was such that her IEP team was considering reducing the level of support services. "We were thinking about cutting back on some of our one-on-one services because she was doing pretty well." (Transcript at 113) (testimony of Ann Folan).[26]

The experience in the general education classroom in Colorado also improved Isabel's self-confidence and performance. As her father testified, "We believed and our discussions with the school staff had indicated that her participation . . . with general education peers, her ability to feel a part of it, her ability to feel successful were critical to her self-confidence. She loved sharing

---

[26] As we noted in the proceedings below, Ann Folan's testimony regarding Isabel's successes in the general education classroom was highly credible. She was the only witness at the hearing who was not a party in interest or who did not have a past or present financial relationship to a party in interest. She was well situated to closely observe and monitor Isabel's progress during second grade in Colorado, and her testimony is supported by contemporaneous written evidence, as cited in small part above.

things.  She loved doing things." (Transcript at 143-44) (testimony of Doug L.)

> There was a child in her classroom who could not speak and who was in a wheelchair.  One of her favorite jobs was pushing him around, being a helper.  She loved being able to do that.

> We had seen such great progress because of her  integration in the classroom, we wanted that to continue, and we assumed that that would continue.

(*Id.* at 144) .  This testimony was confirmed by Isabel's mother, who also testified that Isabel  still remembers her general education classroom in Colorado and Mrs. Lang, her general education teacher in Colorado; indeed, she "talks about it all the time."  (Transcript at 686) (testimony of Eva L.)  Recently,  Isabel was able to state that there are fifty states, and, when she was asked how she knew, she answered "I learned that in Mrs. Lang's class."  (*Id.* at 32-33 & 686-87).

As we noted in our arguments before the ALJ (Appellants' Brief in SE-320 at 19, Certified Pleadings at 80), the motivating power of placement in the general education classroom, and the sometimes debilitating effect of placement in a specialized classroom, is supported by peer-reviewed literature.  As Panacek and Dunlap have found, "[i]n aggregate, the picture presented by these findings is one in which children in the E/BD Group have very restricted social networks in school, and very limited opportunities to establish supportive relationships with school friends who are unencumbered by the challenges and boundaries associated with special education." (Appellants' Records in SE-320 at 4807; *see also* Appellees' Records in SE–320 at 2033 (citing "some evidence that both typical and disabled students rank academic work with peers very highly.))

Substantial portions of the Plaintiffs' arguments on appeal are devoted to the factual assertion that "it would not have been appropriate or beneficial for Isabel to have had greater academic inclusion in the general education setting." (Plaintiffs' Appeal Brief at 27. *See generally*

*id.* at 16-28). The Plaintiffs' alleged support for this assertion, however, includes a highly selective recitation of parts of the record, a recitation that greatly infringes on the deference due to the trier of fact. Thus, the School District and the AEA have selectively disregarded compelling testimony and other records inconsistent with their theory of the facts.

Before documenting the Plaintiffs' distortions of the records, it should be noted that Mr. and Mrs. L. have never denied that Isabel has behavioral needs. To the contrary, the record plainly demonstrates a long and consistent history of parental efforts to address those needs–from early efforts to secure expert advice in Colorado (*see, e.g.,* Appellants' Records in SE-320 at 3554-59), to working with the behavioral team at Buffalo Ridge to develop an appropriate behavior plan (*see, e.g., id.* 3563-65 & 3069-073), to sharing information regarding Isabel's behavioral needs with the Appellees prior to Isabel's first day at Waukee (*see, e.g.,* Appellees' Records in SE-320 at 16-18), to securing advice from the State's behavioral and autism experts (*see, e.g.,* Appellants' Records in SE-320 at 3002-028, 3584, & 3637), to repeatedly attempting to persuade the staff at Waukee to secure expert behavioral assistance (*see, e.g., id.* at 3212 & R323). The question is not whether Isabel had behavioral needs, however, but rather whether the School District and the AEA satisfied the mandates of the IDEA by addressing those needs in the least restrictive appropriate environment.

During her attendance at Waukee, Isabel was removed from the general education setting 70.71% of the time from and after her November 22, 2004, IEP. (*See* Appellees' Records in SE-320 at 142) (box for "removal from GE" under "required system data.") On December 7, 2005, the School District and the AEA implemented a strategy included in a behavioral support plan first proposed on November 18, 2005 and finalized on December 2, 2005, namely, that "Isabel will be instructed in a 1:1 setting (away from other students) until she is able to work through each portion

of the day." (Appellants' Records in SE-320 at 3651.). On appeal, the Plaintiffs' efforts to reconcile this extreme removal from the general education environment are based on a serious distortion of the record and an equally serious lack of deference to the trier of fact. This is true in each of three areas.

First, the Plaintiffs exaggerate Isabel's behavioral difficulties in the general education classroom in Colorado. For example, they claim that she was then engaged in "aggressive" behavior on a "daily" basis. (*See, e.g.,* Plaintiffs' Appeal Brief at 17). This claim is based on a misreading of the document set forth on page 3069 of the Appellants' Records in the proceedings below. Indeed, the ALJ sustained an objection to that misreading. (See Transcript at 1124). The School District and the AEA acquiesced to that objection in the proceedings below. (*See id.*) Even so, they now resurrect their original misreading of the Colorado records as though the objection had never been made and sustained.

Even more important, however, is the fact that, on May 4, 2004, her IEP team in Colorado said that "Isabel doesn't use physical gestures to hurt peers, rather to socially interact." (Appellees' Records in SE-320 at 29). Moreover, her last report card from Colorado stated that she had "improved interactions with peers in her classroom" (*id.* at 14), and Isabel's special education teacher from Colorado testified that "[w]e were thinking about cutting back on some of our one-on-one services because she was doing pretty well" (Transcript at 113) (testimony of Ann Folan). She also testified that it was never necessary to physically move the child (see *id.* at 83) or physically restrain her in any way. (*See id.* at 93-94) ("She was never a danger to herself or others . . . to that

point where she needed to be restrained.")[27]

The Plaintiffs' second distortion of the record on this issue is their claim that Isabel was removed from the general education classroom for up to 60% of her school day in Colorado. (*See, e.g.,* Plaintiffs' Appeal Brief at 17). As we noted in the proceedings below (*see, e.g.,* Appellees' Reply Brief in SE-320 at 2, Certified pleadings at 249), the claim that "Isabel was with students with disabilities up to 60% of the day" in Colorado is a misleading conclusion extrapolated from the data collection categories used in her prior school. It appears that Colorado, or at least the Douglas County School District in Colorado, recorded data on individuals who were pulled out of the general education classroom for a period of "21%-60% of the day." (Appellees' Records in SE-320 at 60a). Although this procedure undoubtedly had some significance to the people who were administering the Colorado program, it cannot be permitted to obfuscate the fact that, *on the very next line of the IEP form*, the IEP team indicated that Isabel was placed in her "Home School/General Classroom with Support" and that the period of time she would spend in the general classroom would be "*>60% of the day*"–or greater than 60 percent of the day. (*Id.)* (emphasis supplied). Both the "21%-60%" removal category and the ">60%" general classroom placement category are consistent with Ann Folan's unequivocal testimony that Isabel "was in the regular

---

[27] In the proceedings below, the School District and the AEA have devoted substantial attention to the proposition that the educational program in Colorado could or should have been better. (*See, e.g.,* Appellees' Brief in SE-320 at 65-69, Certified Pleadings at 204-08). It should be noted, therefore, that any actual proof that the Colorado program was programmatically deficient would strengthen the parents' contentions with respect to each and both of the issues in this case. Thus, notwithstanding any of its alleged shortcomings, the school in Colorado was able to educate Isabel in the general education classroom for a majority of her day, to secure significant academic and behavioral progress in that setting, and to do so without the use of restraints or other intrusive behavioral interventions. In short, Isabel prospered in that program, and, presumably, she would have prospered even more if the program had been better.

education classroom for all other hours except for the half-hour in the morning with me and the hour in the afternoon with me." (Transcript at 78).  They are also consistent with Isabel's daily schedule from Colorado, indicating that she was in the general education classroom 70-75% of the day. (Appellants' Records in SE-320 at 3560).  On appeal, the Plaintiffs have repeated their original claim, but have not addressed the arguments and citations that were submitted to refute that claim in the proceedings below.

The Plaintiffs' third distortion of the record on this issue is the claim that Isabel made progress when they removed her from the general education classroom.  (*See, e.g.,* Plaintiffs' Appeal Brief at 8).  In fact, however, Isabel did not make significant progress, either academically[28] or behaviorally.  For example, on November 2, 2004, the Adapted Physical Education Consultant stated that Isabel was doing well in physical education class, but would benefit from a peer helper.  "It would be a less restrictive setting for Isabel to have a peer that can give her verbal cues as well as model the motor skill."  (Appellees' Records in SE-320 at 129).  By December 1, 2005, however, Isabel's behaviors had deteriorated to the point where her special education teacher concluded that "peer helpers are not appropriate due to possible aggressive behavior."  (*Id.* at 758b).  On January 12, 2006, the school psychologist observed that "the number of aggressions has increased" (*id.* at 837), and this observation is verified by the data that the School District and the AEA collected on the Structured ABC Analysis Form (*see* Addendum No. 2 to the Appellants' Brief in SE 3-20 at xvii & xxii-xxiii, Certified Pleadings at 133 & 138-39).  Isabel's instances of non-compliance and verbal

---

[28] For example, although Isabel had progressed through Lesson 65 in the Edmark Reading Program in Colorado, she spent her first year at Waukee repeating the same work.  (*See* Appellants' Records in SE-320 at 3436-3452).  After her removal from Waukee, she again made remarkable progress.  (*See id.* at 3455-3489).

aggression had also increased.  (*See id.* at xviii-xxi, Certified Pleadings at 134-37).  As the ALJ ruled, "the two month data reveal an increase in non-compliance and aggression . . . ." (Decision at 39, Certified Pleadings at 338).

In short, a preponderance of the evidence submitted to the State's Administrative Law Judge was inconsistent with the Plaintiffs' theory that Isabel could not be educated successfully if she were given greater opportunities to participate in the general education environment.  To the extent that there were conflicting opinions on this issue, the question was one of the credibility of the testimony and the weight of the evidence.  Deference is due to the trier of fact on those issues.  *See, e.g., Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 654-55 (8th Cir. 1999) (ruling that "a district court must give consideration 'to the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses'"); *Strawn v. Missouri State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000) (ruling that "[t]he district court must give 'due weight' [to the administrative decision] because the administrative panel had an opportunity to observe the demeanor of the witnesses"); *School Board of Independent School Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1010 (8th Cir. 2006) (repeating the rule that the "district court must give 'due weight' because the administrative panel had an opportunity to observe the demeanor of the witnesses.")

      c.     A preponderance of the evidence fully supports the State's finding that the School District and the AEA did not give adequate consideration to the provision of the aids and services necessary for Isabel to be educated with her peers.

The Administrative Law Judge ruled that Mr. and Mrs. L. had "met their burden of showing that insufficient effort was given to the consideration of supplemental aids and services to support Isabel's inclusion in regular education."  (Decision at 33, Certified Pleadings at 332).

> She had the "typical" inclusion for all students in the functional skills classroom, which she eventually lost due to behavioral difficulties and was required to "earn" back. Isabel's placement in the functional skills classroom since she would not "count" in general education and her consequent removal from her "typical" integration due to behavioral difficulties was a violation of the LRE mandate . . . and the Iowa Administrative Rules of Special Education . . . .

(*Id.*) The ALJ's ruling is supported by abundant evidence in the record, including the testimony of their own witnesses.

For example, at the due process hearing, witnesses for the School District and the AEA testified that Isabel's placement in the functional skills classroom was based upon a specific method of calculating integration. For example, Ann Hilliard testified as follows:

> Q. Based on these assessments, do you believe she could have been adequately taught reading in the regular second grade classroom?
>
> A. No.
>
> Q. Ann, at this point I want to ask you about *how we calculate integration*. If we had had the work basket system of having reading up in a regular education room working on materials different from other second graders.
>
> A. Right.
>
> Q. Would you have been able to count that as integration?
>
> A. No.
>
> Q. Why not?
>
> A. *To be considered integration you need to have at least two general education peers working in that same group with that student and that instruction has to be open to general education peers in that classroom.*
>
> Q. *So you would have had to have two other general education peers doing exactly the same reading activities as Isabel?*
>
> A. *Yes.*

(T1095-96) (testimony of Ann Hilliard) (emphasis supplied).

In each of the functional skills classroom placements, Isabel apparently received what Patti Brinkmeyer described as "the typical integration . . . that we have for our students." (Transcript at 1255). This meant that she "was involved in the morning routine in the general ed classroom, lunch and recess, discovery museum, which was a science class." (*Id.*) She was also integrated for "specials." (*Id.* at 1256). It affirmatively appears that Isabel sometimes lost her integration time in the general education classroom owing to her behaviors in the special education classroom:

> Q.  In this same time frame, in the time after Thanksgiving [of 2004] before the move to Patti Brinkmeyer's room [on December 14, 2004], was Isabel's behavior affecting her ability to integrate successfully in the school?
>
> A.  Yes.
>
> Q.  How so?
>
> A.  The behaviors were occurring more frequently, so oftentimes we would miss some of the general education activities because she wasn't able to have appropriate behavior to put into a larger group setting because she was not appropriately being successful in a small group setting at that time.
>
> Q.  So as I understand you, you were concerned about taking her into the larger general ed setting because she was not having success in the smaller setting, is that correct?
>
> A.  Correct.
>
> Q.  She would have missed, then, quite a bit of her integration in those last couple of weeks in your classroom?
>
> A.  Very possible.

(Transcript at 1001-02) (testimony of Mirranda Krohn).

On appeal, the School District and the AEA acknowledge this and other testimony supporting the ALJ's ruling, but argue as follows: "This testimony was not offered as the

justification for the IEP team's decision concerning Isabel's level of inclusion . . . ."  (Plaintiffs'

Appeal Brief at 23).   There are three answers to this argument.  First, the weight and credibility of

the evidence does not depend upon the motives of the party who produced it.   Thus, "[a]n

administrative hearing officer, like the trier of fact in judicial proceedings, must weigh and interpret

the evidence and ultimately make a finding, even if the finding is adverse to the proferring party."

*Roark ex rel. Roark v. District of Columbia*, 460 F. Supp. 2d 32, 40 (D. D.C. 2006) (invoking the

rule that a party is entitled to benefit from all evidence that favors her whether she produced it or

her adversary produced it).

The second answer to the Plaintiffs' argument is that, in the proceedings below, the School

District and the AEA argued that the cited "both Ms. Brinkmeyer and Ms. Hillard" supported the

placement decisions made. (Appellees' Brief in SE-320 at 44-45, Certified Pleadings at 183-84).

They argued that a student "is not receiving true 'integration' in the general education environment"

if that student's work is "significantly different from the work of the other students."  (*Id.* at 45,

Certified Pleadings at 184).   The third and final answer to the Plaintiffs' argument is that the

question of the weight and credibility to be attached to specific testimony is very clearly a question

for the trier of fact.  *See, e.g., Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.*, 198 F.3d

648, 654-55 (8th Cir. 1999) (ruling that "a district court must give consideration 'to the fact that the

state hearing panel has had the opportunity to observe the demeanor of the witnesses.'")

In summary, the IDEA provides that each participating state must insure that, to "the

maximum extent appropriate, children with disabilities . . . are educated with children who are not

disabled."  20 U.S.C. §1412(a)(5).   Critically, the IDEA further provides that "*special classes,*

*separate schooling, or other removal of children with disabilities from the regular educational*

environment" shall occur "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* (emphasis supplied). The ALJ ruled that Mr. and Mrs. L. Sustained their burden of proving that the School District and the AEA violated this provision by failing to give adequate consideration to the provision of aids and services that might have enabled Isabel to be educated in the general education classroom to a greater extent. Her ruling is supported by a preponderance of the credible evidence. For this first and independently sufficient reason, we request that the ALJ's ruling on the LRE issue be upheld.

2.  SECOND, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE LRE PROVISIONS OF THE IDEA BY FAILING TO ENSURE THE PRESENCE OF ISABEL'S GENERAL EDUCATION TEACHER DURING THE IEP TEAM'S CRITICAL DISCUSSIONS OF THE AIDS AND SERVICES NECESSARY FOR HER INCLUSION IN THE GENERAL EDUCATION CLASSROOM.

In initiating the proceedings below, Isabel and her parents alleged that the School District and the AEA "failed to include general education teachers during that part of the IEP team meetings that addressed the placement issue." (Request for Due Process Hearing at ¶ 32(b), Certified Pleadings at 9). After reviewing the testimony, the exhibits, and the briefs, the Administrative Law Judge appointed by the Iowa Department of Education sustained the parents' allegation. She ruled that "[t]he involvement of regular educators in IEP and placement decisions and in the determination of appropriate positive behavioral interventions and supports is critical to ensuring appropriate placements and services. In this case, the absence or limited involvement of the regular educator cannot be dismissed as harmless error. The absence was a violation of 20 U.S.C. § 1414(d)(3)( C) and Iowa Administrative Rules of Special Education, 281–41.62(1)(b)." (Decision

at 32, Certified Pleadings at 331).  The ALJ's ruling is supported by fundamental IDEA law and by a preponderance of the credible evidence.

**The Legal Foundation for the ALJ's Ruling**.  The legal foundation for the ruling of the Administrative Law Judge is the mandate that "each public agency shall ensure that the placement decision is made by a group of persons, including the parents and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options."  Iowa Administrative Rules of Special Education, r. 281-41.50(5) (Feb. 2000)[29]; *see also* 20 U.S.C. § 1414(e).  In the Heartland AEA, and in Iowa generally, the placement team is the IEP team.  Accordingly, pursuant to the terms of the governing federal statute, the team must include, not only the parents, but "at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment."  20 U.S.C. §1414(d)(1)(B)(ii).[30]  The Iowa Rules of Special Education also state that a public agency "shall ensure that each IEP meeting includes . . . "[a]t least one general education teacher of the eligible individual (if the eligible individual is, or may be, participating in the general education environment)."  R. 281–41.62(1)(b).

Both the IDEA and the Iowa Rules of Special Education specify that the role of the general education teacher extends to the determination of supplementary aids and services and related

---

[29] The Iowa Rules limit the circumstances in which a placement decision can be made without parental participation in the group making the decision: "A placement decision may be made by a group without the involvement of the parents if the public agency is unable to obtain the parents' participation in the decision . . . ."  *Id.* at R. 41-102(3).  In such a case, moreover, "the public agency must have a record of its attempt to ensure their involvement . . . ."  *Id.*

[30] Pursuant to the terms of the Individuals with Disabilities Education Improvement Act of 2004, and effective June 1, 2005, the quoted language was revised to read, "not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment)."

modifications and supports, including, by definition, the supplementary aids and supports necessary

to comply with the LRE requirements set forth in 20 U.S.C. § 1412(a)(5):

> As a member of the IEP team, the general education teacher of an eligible individual shall, to the extent appropriate, participate in the development, review, and revision of the eligible individual's IEP, *including* assisting in the determination of appropriative positive behavioral interventions and strategies for the eligible individual and determination of supplementary aids and services, program modifications, or supports for school personnel that will be provided . . . .

*Id.* (emphasis supplied); *see also* 20 U.S.C. § 1414(d)(3)(C).

Because the requirements set forth above are procedural protections, the Appellants' instant

issue is subject to the following rule: "An IEP should be set aside only if procedural inadequacies

compromised the pupil's right to an appropriate education, seriously hampered the parents'

opportunity to participate in the formulation process, or caused a deprivation of educational

benefits."  See, e.g., *Independent School Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996)

(internal quotations omitted).  The "harmless error" rule  adopted by the Eighth Circuit is derived

from the Ninth Circuit's formulation in *W.G. v. Board of Trustees of Target Range School Dist. No.

23*, 960 F.2d 1479, 1484 (9th Cir. 1992).  In turn, the Ninth Circuit has ruled that the failure to

include the child's general education teacher on the IEP team can be an actionable violation of the

IDEA, especially in a case where LRE questions are at issue; as Circuit Judge Gould wrote in a

pivotal concurring opinion:

> *The statutory requirement that an IEP team for a disabled child who is or may be in regular education must include a regular education teacher is not merely technical. A regular education teacher may have insights or perspectives that aid the process of IEP formation.*  We need not say that error in composition of an IEP team is always prejudicial and invariably results in the denial of a FAPE.  Rather, we should assess the circumstances of each case, and here the record demonstrates that the failure to include [the] regular education teacher on the participating IEP team deprived M.L. of an educational opportunity.

> *This conclusion is unmistakable for several reasons.  First, there is the IDEA's statutory preference for mainstreaming. . . .* When mainstreaming is pursued with a disabled child . . . , the crucial purposes and requirements of IDEA are realized: The disabled child receives the benefit of observing and working with those who are not disabled, which can provide the disabled child with both educational and non-academic benefits.  Children who are not disabled are given the opportunity to become better acquainted with their disabled peers, which may help avoid stereotyping, lessen prejudice, and prepare all students to work together in society.

*M.L. ex rel. S.L. v. Federal Way School District*, 394 F.2d 634, 656 (9th Cir. 2005) (Gould, C.J., concurring) (emphasis supplied and supporting citations omitted).

On appeal, the School District and the AEA have asserted two arguments against the legal principles that provide the foundation for the ALJ's ruling.  First, they claim that individuals other than the general education teacher were present who were "very capable of expressing concerns from a regular education teacher's perspective."  (Plaintiffs' Appeal Brief at 31).  Second, they claim that an entitled child's "regular education teacher does not need to be present throughout the entire IEP meeting."  (*Id.* at 32).  Each of these claims will now be answered.

The Plaintiffs' first claim is set forth in its entirety as follows:

> There were other individuals present capable of providing perspectives on the regular education program.  As building administrators, Randy Nemitz and Peg Erke would have had at least three years of experience as classroom teachers, *see* Iowa Admin. Code 282-14.142(1), and were very familiar with the regular education classroom settings and curriculum in the building.  They were very capable of expressing concerns from a regular education teacher's perspective.

(*Id.* at 31).  There are at least two solid answers to this claim.  First, the Plaintiffs' claim is without evidentiary foundation.  Even though they are both School District employees, neither Randy Nemitz nor Peg Erke was called to testify, and the Plaintiffs' argument is therefore dependent upon the factually unproven assertion that they "would have had" the necessary classroom experience to substitute for the teacher who actually knew and taught the child.

110

Second, and of critical importance, accepting the Plaintiffs' claim would require this District Court to re-write the governing statute and regulations. For example, 20 U.S.C. § 1414(d)(3) ( C) states that "*the* general education teacher of an eligible individual shall . . . assist[] in the determination of appropriative positive behavioral interventions and strategies for the eligible individual." (Emphasis supplied). The statute does *not* refer to "the general education teacher *or an administrator who has had prior classroom experience*." The statute should be interpreted as it is written–and not as the Plaintiffs would have preferred it to be written. *See, e.g., Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S. Ct. 941, 950, 151 L. Ed. 2d 908 (2002) ("The inquiry ceases 'if the statutory language is unambiguous'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)).

The Plaintiffs' second claim is set forth in their brief as follows: "The United States Department of Education has recognized that a regular education teacher does not need to be present throughout the entire IEP meeting. *See* 64 Fed. Reg. 12477 (March 12, 1999) (Appendix A, Question 24)." (Plaintiffs' Appeal Brief at 32). The answer to this claim

> 24.  What is the role of a regular education teacher in the development, review and revision of the IEP for a child who is, or may be, participating in the regular education environment?
>
> As required by § 300.344(a)(2), the IEP team for a child with a disability must include at least one regular education teacher of the child if the child is, or may be, participating in the regular education environment. Section 300.346(d) further specifies that the regular education teacher of a child with a disability, as a member of the IEP team, must, to the extent appropriate, participate in the development, review, and revision of the child's IEP, including assisting in–(1) the determination of appropriate positive behavioral interventions and strategies for the child; and (2) the determination of supplementary aids and services, program modifications, and supports for school personnel that will be provided for the child, consistent with 300.347(a)(3) (§300.344(d)).

>Thus, while a regular education teacher must be a member of the IEP team if the child is, or may be, participating in the regular education environment, the teacher need not (*depending on the child's needs and the purpose of the specific IEP team meeting*) be required to participate in all decisions made as part of the meeting or to be present throughout the entire meeting or attend every meeting. *For example, the regular education teacher who is a member of the IEP team must participate in discussions and decisions about how to modify the general curriculum and participation in the regular education environment.*

U.S. Department of Education, 64 Fed. Reg. 12477 (March 12, 1999) (emphasis supplied). As the full passage paraphrased by the Plaintiffs unambiguously reveals, the instant attack upon the legal foundation for the ALJ' ruling is without merit.

   **The Factual Foundation for the ALJ's Ruling**. The Administrative Law Judge based her ruling on the question of the involvement of the general education teacher on two critical factual findings. First, she ruled that '[t]he general education teacher was not present for the November 22, [2004] IEP meeting to finalize Isabel's IEP" for the 2004-2005 academic year. (Decision at 31, Certified Pleadings at 330) (obvious scriveners' error corrected). She recognized that a general education teacher had been present at the September 15, 2004 IEP meeting, which developed an interim IEP, but noted that "Isabel experienced significant behavioral problems in the interim" and that "a behavior support plan was added to the November IEP." (*Id.*) She concluded that "[t]he attendance of the regular educator to discuss the behavioral concerns and to plan appropriate behavioral supports for integration would be critically important." (*Id.*)

   Second, the ALJ ruled that, although a regular educator "was present for part of the meeting on November 18, 2005," he was "not present for the continuation meeting December 2, 2004, to discuss modifications to the behavior support plan. (*Id.*) She ruled that, "[s]ince the teacher had reported to Mrs. L. That Isabel had been 'out of control' and since the behavior plan addressed

consequences for inappropriate behavior during integration in regular education, the attendance of the regular educator would be important." (*Id.*)   Based on these supporting factual findings, she ruled that "[t]he involvement of regular educators in IEP and placement decision and in the determination of appropriate positive behavioral interventions and supports is critical to ensuring appropriate placements and services." (*Id.* at 32, Certified Pleadings at 331).  She concluded that, "[i]n this case, the absence or limited involvement of the regular educator cannot be dismissed as harmless error." (*Id.*)

Since due deference must be given to the factual findings of the trier of fact, Isabel and her parents respectfully submit that the Plaintiffs' failure to include the child's regular education teacher in critical discussions affecting her placement and participation in the general education teacher was a violation of the IDEA.  As the U.S. Department of Education has stated, " the regular education teacher who is a member of the IEP team *must* participate in discussions and decisions about how to modify the general curriculum and participation in the regular education environment." 64 Fed. Reg. 12477 (March 12, 1999) (emphasis supplied).  For this second and independently sufficient reason, therefore, we ask that the ALJ's ruling on the LRE issue be sustained on appeal.  That ruling is firmly grounded in the law and is supported by a preponderance of the credible evidence.

B.     FOR EACH OF FIVE REASONS, THE STATE'S ALJ CORRECTLY RULED THAT
ISABEL AND HER PARENTS SUSTAINED THEIR BURDEN OF PROVING THAT THE
SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY THEIR EXCESSIVE
USE OF HIGHLY INTRUSIVE BEHAVIORAL INTERVENTIONS.

"I have such a difficult time reading
the [parents' description of their daughter's experience]
and thinking that this kind of treatment exists today."

–Suzann Baker-O'Brian ,
Autism Consultant,
Iowa Department of Education[31]

"[I]t is time to bring the practice of restraints and seclusion into the 21st century."

–David M. Day[32]

In the Request for Due Process Hearing that initiated the proceedings below, Mr. and Mrs.

L. alleged that the School District and the AEA subjected their daughter to "highly intrusive

interventions to teach or compel compliance with adult demands." (Request for Due Process Hearing

at 4, Certified Pleadings at 4).   The second issue presented for adjudication, therefore, was the

parental allegation that the "Waukee Community School District and the Heartland Area Education

Agency have implemented seclusionary time-out and other intrusive behavioral interventions with

Isabel that are inconsistent with substantive and procedural rights under the IDEA."   (*Id.* at ¶ 33,

Certified Pleadings at 10).   Mr. and Mrs. L. set forth five independently sufficient reasons why the

---

[31] (Appellants' Records in SE-320 at 3684).

[32] David M. Day, *Examining the Therapeutic Utility of Restraints and Seclusion with Children and Youth: The Role of Theory and Research in Practice*, 72 American Journal of Orthopsychiatry 266, 275 (2002) (Appellants' Records in SE-320 at 4201, 4210).

114

behavioral interventions used on Isabel violated the IDEA,[33] the Administrative Law Judge sustained each of those reasons, and this Defendants' Appeal Brief will give separate consideration to each.

The five independently sufficient reasons why the Plaintiffs' use of behavioral interventions violated the IDEA are succinctly summarized as follows: First, the School District and the AEA violated the IDEA by implementing intrusive behavioral interventions that were not consistent with Isabel's IEP. Second, they violated the IDEA by implementing intrusive behavioral interventions that were excessive in length and otherwise inconsistent with Isabel's individual needs. Third, they violated the IDEA by implementing intrusive behavioral interventions that were not supported by their functional assessments of the child. Fourth, they violated the IDEA by implementing intrusive behavioral interventions that were inconsistent with the positive behavioral supports mandated by the U.S. Congress. Fifth and finally, they violated the IDEA by implementing intrusive behavioral interventions without providing prior written notice to the parents and/or by providing false or misleading notice to the parents.

On behalf of Isabel and her parents, we respectfully submit that any one of these reasons, standing alone, would fully and independently justify the ultimate conclusion of the Administrative Law Judge appointed by the Iowa Department of Education, *to wit,* that the L.s "have met their burden of showing that [the School District] and Heartland AEA implemented behavioral interventions with Isabel that were inconsistent with substantive and procedural rights under the IDEA." (Decision at 2, Certified Pleadings at 341).

---

[33] The Request for Due Process Hearing set forth six reasons why the challenged interventions violated the IDEA. (*See* Request for Due Process Hearing at ¶ 33, Certified Pleadings at 10-11). The fifth and sixth reasons were consolidated during the course of written arguments. (*See* Appellants' Brief in SE–320 at 50, Certified Pleadings at 111) ("The two issues are consolidated here to avoid redundancy.")

1.    FIRST, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS THAT WERE NOT CONSISTENT WITH ISABEL'S IEP.

To promote clarity, this analysis of the first and independently sufficient reason why the Plaintiffs' use of behavioral interventions on Isabel violated the IDEA will be divided into two sections. Section (a) will address the governing legal standard and will document the fundamental principle that significant or substantial failures to follow the provisions of an individualized education plan (or IEP) constitute a serious violation of the governing law. Section (b) will address the abundant evidentiary support for the ALJ's finding that the School District and the AEA not only violated the fundamental mandate that the IEP must be implemented as written, but that this violation was highly prejudicial to Isabel and her parents.

a.    Contrary to the Plaintiffs' implied assertions, the rule that a school district's implementation of an IEP need not be perfect does not sanction serious and substantial failures to follow the provisions of Isabel's IEP.

A behavior plan can look good on paper, but the paper is meaningless unless the plan is followed in practice. Accordingly, the first independently sufficient reason why Mr. and Mrs. L. alleged that use of intrusive behavioral interventions violated the IDEA is that the School District and the AEA " implemented intrusive behavioral interventions that were not consistent with the provisions of her IEP." (Request for Due Process Hearing at ¶ 33(a), Certified Pleadings at 10). The legal foundation for this issue is the IDEA's definition of a FAPE: "The term 'free appropriate public education' means special education and related services that . . . are provided *in conformity with the individualized education program* . . . ." 20 U.S.C. § 1402(9)(D) (emphasis supplied). Similarly, the definition of an "appropriate" program in the Iowa rules contains the following provision: "The

116

responsible agency shall provide special education and related services *in accord with the individual's IEP . . . .*" Iowa Administrative Rules of Special Education, Rule 281-41.3(6)(d) (Feb. 2000) (emphasis supplied).  As the U.S. Supreme Court ruled in the landmark *Rowley* opinion, a primary focus of the IDEA is on "the development of the IEP," which will "in most cases assure much if not all of what Congress wished."  *Board of Education v. Rowley*, 458 U.S. 176, 206 (1982).

The Administrative Law Judge appointed by the Iowa Department of Education recognized and enforced the governing federal statute and state regulation:

> The IDEA requires that an individual's educational program be "provided in conformity with the individualized education program" and Iowa law requires that special education and related services be "in accord with the individual's IEP."  The behavioral interventions provided to Isabel were not in conformity with the IEP and were in violation of these requirements.

(Decision at 37, Certified Pleadings at 336) (citations omitted).  In attacking this ruling on appeal, the School District and the AEA claim that the ALJ "departed from . . . binding precedent." (Plaintiffs' Appeal Brief at 8).  They further claim that, "[m]erely because . . . there may have been times that [Isabel's] educational program could have been implemented more perfectly does not arise to the level of a denial of FAPE."  (*Id.*)

The Plaintiffs' challenge to the ALJ's statement of the governing law is without merit, and their reliance on *Bradley ex rel. Bradley v. Arkansas Dept. of Educ.,* 443 F.3d 965 (8th Cir. 2006), is misplaced.[34]  This is so for three reasons.  First, the Administrative Law Judge expressly recognized

---

[34] As Isabel and her parents argued in the proceedings below, we " do not expect, and the IDEA does not require, that a school's implementation of an IEP  be 'perfect.'  *Bradley ex rel. Bradley v. Arkansas Dept. of Educ.*, 443 F.3d 965, 975 (8th Cir. 2006).  As in all areas of law, there is a rule of reason and a point where technical violations must be regarded as inconsequential or  *de minimis*.  Both logically and legally, however, any substantial failure to implement the provisions of a child's IEP is, in and of itself,  a denial of FAPE that will sustain a claim for appropriate relief."  (Appellants' Brief in SE-320 at 37, Certified Pleadings at 98).

that "a 'perfect' implementation [of a child's IEP] is not required."  (Decision at 36, Certified

Pleadings) (citing *Bradley*, 443 F.3d 965, 975 (8th Cir. 2006)).  Second, the *Bradley* Court sustained

the ruling of the State's hearing officer on the question of adequate compliance with the IEP and, in

doing so, emphasized (1) the deference due "'to the outcome of administrative proceedings, giving

particular consideration to state officials' educational judgments'" and (2) the deference due to due

process hearing officers who "'had an opportunity to observe the demeanor of the witnesses.'"  443

F.3d at 974.  Accordingly, the Plaintiffs' current efforts to use *Bradley* to undermine the deference

due to the state proceedings is inconsistent with the plain language of the precedent cited.

Third, and most important, as the Eighth Circuit Court expressly stated, "[t]he record [in

*Bradley*] reveals that the persons responsible for implementing David's IEPs . . . made *every effort*

to provide the services called for."  443 F.3d at 975 (emphasis supplied).  Moreover, as the U.S.

Court of Appeals for the Fifth Circuit has ruled,

> [W]e conclude that to prevail on a claim under the IDEA, a party challenging the
> implementation of an IEP must show more than a *de minimis* failure to implement all
> elements of that IEP, and, instead, must demonstrate that the school board or other
> authorities failed to implement substantial or significant provisions of the IEP.  This
> approach affords local agencies some flexibility in implementing IEPs, but it still
> holds those agencies accountable for material failures . . . .

*Houston Independent School Dist. v. Bobby R*, 200 F.3d 341, 349 (5th Cir.2000).  Significantly, the

U.S. Court of Appeals for the Eighth Circuit has expressly approved the *Bobby R.* analysis in cases

where the allegations include a failure to implement the provisions of the IEP.  See *Neosho R-V*

*School Dist. v. Clark*, 315 F.3d 1022, 1027 n.3  (8th Cir. 2003).

As the next section will document at length, a preponderance of the evidence establishes that

the School District and the AEA did not make "every effort" to implement Isabel's IEP with integrity.  To the contrary, they disregarded "substantial or significant provisions of the IEP." Accordingly, the failure of the School District and the AEA to follow the provisions of Isabel's IEP constitutes a full and sufficient support for the conclusion that Isabel and her parents sustained their burden of proving that the use of intrusive behavioral interventions violated the IDEA.

> b.      As the trier of fact properly found, the credible evidence established that the School District and the AEA failed to implement "substantial and significant" provisions of Isabel's IEP, including but not limited to the failure to implement prescribed antecedent strategies and the use of physical force to implement the hand-over-hand intervention.

As Mr. and Mrs. L. observed in the proceeding below, the testimony and exhibits introduced in this case document numerous substantial deviations from Isabel's November 22, 2004 IEP, deviations which led to the utilization of intrusive behavioral interventions and otherwise adversely affected the child.  In the proceedings below, Isabel and her parents emphasized two primary violations of the requirement that the provision of special education conform to Isabel's IEP: (1) the failure to implement antecedent strategies with integrity and (2) the utilization of physical force to implement hand-over hand interventions.  (*See* Appellants' Brief in SE-320 at 37-40, Certified Pleadings at 98-101, & Appellants' Reply Brief in SE-320 at 30-36, Certified Pleadings at 277-283). We will now set forth the reasons why the ALJ's rulings on each of these questions were fully supported by a preponderance of the credible evidence.

***The failure to implement antecedent strategies with integrity***.  After reviewing the evidence, the State's Administrative Law Judge ruled that, "[a]ccording to testimony, preventive or antecedent strategies which were included in the 2004-2005 behavior support plan were not implemented.  For example, that testimony revealed that the planned peer coaching was not implemented." (Decision

119

at 36, Certified Pleadings at 335).  Accordingly, the ALJ concluded as follows:

> The IDEA requires that an individual's educational program be "provided in conformity with the individualized education program" and Iowa law requires that special education and related services be "in accord with the individuals's IEP." *The behavioral interventions provided to Isabel were not in conformity with the IEP and were in violation of these requirements.*

(Decision at 37, Certified Pleadings at 336) (emphasis supplied & citations omitted).

There is substantial evidentiary support in the record for the ALJ's finding of non-compliance with the provision of Isabel's IEP.  Perhaps the most important of that evidence is the concessions against interest made by a witness for the School District and the AEA.  Monica McKevitt was the School Psychologist on the IEP team during the 2004-2005 academic year, and she testified that a meeting was held on November 14, 2005 to review the implementation of the IEP, a meeting to which the parents were not invited.  She also testified that many sections of the antecedent manipulations of the November 22, 2004 IEP were re-written on November 14, 2005, *not to reflect new data regarding Isabel's need, but to conform the new IEP to actual practice under the old IEP.*  For example, she testified as follows:

> Q. Another change I see, the next line down, "Coach peers to praise Isabel for using her words to interact with them."  Is this a change that was already made or a brand-new one?
>
> *A. That reflected what was going on through the year.*
>
> *Q. So they were not coaching?*
>
> *A. Not to my knowledge.*
>
> Q. And so on November 14th, you just took it out because they weren't doing it?
>
> A. I didn't feel it would be appropriate to leave it if they weren't doing it.
>
> Q. Is it something that should have been done or did you have any data on that point?

A.  We didn't have data.

(Transcript at 1872) (testimony of Monica McKevitt) (emphasis supplied).

In the proceedings below, the School District and the AEA attempted to diminish the importance of these admissions, alleging that the admitted deviations from the IEP were "small changes" reflecting professional judgment and representing a mere "tweaking" of the behavior plan. (Appellees' Brief at 83, Certified Pleadings at 222).  On appeal, the School District and the AEA arguing simultaneously that Psychologist Monica McKevitt was a "high trained school practioner[]" whose opinion was entitled to deference and that she "was not aware" that peer coaching was being used when she made the "one ambivalent statement" in her testimony that is quoted at length above. (Plaintiffs' Appeal Brief at 46 & 63).

The answer to the Plaintiffs' arguments is that Monica McKevitt testified, without ambivalence or ambiguity,  that "more than one change" was made on November 14, 2005 to conform the new IEP to the prior practice.  (Transcript at 1870).  With equally unambiguous candor, she testified that "*these were changes that had been going on from the beginning of the school year until that point in time.*" (*Id.*) (emphasis supplied).  One change was the use of a highly reinforcing activity (playing with a doll or animal from home) as a break time activity.  (*Id.*)  This was not a "data-driven decision," but was "based on what they were doing.  That was based on what was happening. . . . I don't know that Patti used any data to suggest that these activities would be better." (*Id.* at 1870-71).  A second change was the deletion of the gross motor activity of walking around the building, but the author of the new behavior plan didn't "know why the choice was made to stop walking around the building." (*Id.* at 1872).  A third change was eliminating the strategy of coaching peers to praise Isabel for using her words to interact with them, as documented above; again, there

was no data, and the change was made to conform the plan to the prior practice. (*Id.*) A fourth change altered the reinforcement plan; when asked if this was a data-driven decision, Ms. McKevitt responded that "I'm not entirely sure why it was decided that they would not do that." (*Id.* at 1873). A fifth change was a deletion of the requirement for visual cues for multi-step directions. (*Id.* at 1873-74). A sixth change was the deletion of "small group social skills instruction" in favor of "social skills instruction integrated into her day." (*Id.* at 1874). Again, when asked if this was "a data-based decision," Ms. McKevitt responded that the change "was based on what was taking place." (*Id.*)

Under direct examination, Ann Hilliard testified regarding the importance of the strategies set forth in the antecedent strategies section of the November 22, 2004 behavior plan, including the value of peer coaching, the nickle reinforcement system, and using visual cues for multi-step directions. (*See, e.g.,* Transcript at 1155-1160). At least from and after the start of the 2005-2006 academic year, however, the Appellees did far more than "tweak" the antecedent strategies section of Isabel's behavior plan. As visually demonstrated by page 712a of the Appellees' Records in SE-320, the School District and the AEA made a significant number of departures from those strategies, none of which were data-driven, and then, on November 14, 2005, they drafted a new plan to conform to the old practice. Mr. and Mrs. L. respectfully submit that a preponderance of the evidence establishes a far from trivial failure to follow the IEP and, therefore, a substantive denial of FAPE. They also submit that a preponderance of the credible evidence supported the ALJ's finding of a prejudicial violation of the IDEA. This is especially true because "[t]he credibility of witnesses, reconciliation of conflicting statements, a determination of which should be accepted and which should be rejected, and the truthfulness and accuracy of testimony, whether contradictory or

122

not, are issues for the trier of fact." 5 C.J.S. *Appeal and Error* § 940 (2007).[35]

   ***The use of physical force to implement hand-over-hand interventions***.  The behavior plan

developed as part of Isabel's IEP on November 22, 2004 calls for the use of "repetitive task or hand

over hand if Isabel refuses to complete a task or demand . . . ."  (Appellees' Records in SE-320 158

& 180).  In a clear and compelling finding of fact, the State's Administrative Law Judge ruled that

"[t]he record establishes that the hand-over-hand strategy as implemented was inconsistent with

Isabel's behavior support plan.   Testimony from both school psychologists and the behavioral

specialist confirmed that *physical force was inconsistent with the intended intervention*."  (Decision

at 36, Certified Pleadings at 335) (emphasis supplied).  Accordingly, the ALJ concluded that "[t]he

behavioral interventions provided to Isabel were not in conformity with the IEP and were in violation

of the[] requirements" of state and federal law.  (Decision at 37, Certified Pleadings at 336).

   A preponderance of the evidence supported by findings of the State's Administrative Law

Judge, especially if due weight is given to her role as the trier of fact.  Thus, according to the school

psychologist who drafted this reduction oriented consequence strategy, it  was intended to be a form

of "physical guidance" to prevent escape from task.  (Transcript at 1028-29) (testimony of Ann

Hilliard).   "With most of the time that we do hand-over-hand, it's part of the prompting sequence

where you start with a verbal prompt and then you to a visual type of prompt, and then if they're still

not working, then you go to more of a physical prompt to complete an activity." (*Id.*)  As written in

the IEP, the hand-over-hand intervention  was not intended to include the use of physical force.

Thus, Ann Hilliard testified as follows when she was questioned regarding the use of Mandt holds

in connection with the utilization of the hand-over-hand  intervention on December 15, 2004, as

---

[35] *See also* the cases cited in Part I, Subpart A, Section 1(a), *supra*.

documented by the Appellees on page 302 of the Appellees' Records in the proceedings below.

> Q.  Is that something that you had envisioned being part of the hand-over-hand activity when you drafted the plan?
>
> A.  No.
>
> Q.  It is not?
>
> A.  No.

(T1237-38) (testimony of Ann Hilliard); *see also* (T1858) (testimony of Monica McKevitt) ("Q.  Is there anything . . .  that in your mind would advise the parents that the repetitive task or hand-over-hand could entail the use of physical force by one or more people?  A.  No.")

A preponderance of the evidence reveals that the classroom teacher who implemented the November 22, 2004 IEP from and after December 14, 2004 believed that "a behavior plan trumps Mandt," even though "[i]t's not officially Mandt when you're using it in a behavior plan."  (T1449) (testimony of Patti Brinkmeyer).  As a consequence, and as implemented, the hand-over-hand intervention for non-compliance was sometimes enforced by physical restraint, including extreme episodes of physical restraint.  Three examples of this use of restraint can be succinctly summarized:

(1) On December 15, 2004, Isabel was repeatedly restrained for a period of more than an hour, even though she was "fighting to be let go."  (Appellees' Records in SE-320 at 302-306). When Eva L. arrived on the scene, she "saw Isabel held between this big man's legs. . . . Her face was all red, and her eyes were glazed, and she was yelling . . . ."  (Transcript at 690).  (2) On November 10, 2005, physical restraint was used to enforce the hand-over-hand coloring intervention for a period of nearly an hour.  (Appellees' Records in SE-320 at 480-87).  Isabel repeatedly protested that "I can color by myself" (*e.g., id.* at 480), and the adults frequently repositioned their holds on the child (*e.g.,*

124

*id.* at 485).  At 1:17 p.m., Heidi Tow held Isabel's feet, a person with the initials "K.R." held Isabel

in a "side arm hug," and Patti Brinkmeyer did the hand-over-hand coloring, while Kindra Sweeney

documented the intervention.  (Appellees' Records in SE-320 at 486).  (3) On December 1, 2005,

physical restraint was used to enforce hand-over-hand coloring for a period of nearly an hour.  (*Id.*

at 543-47).  At times, four adults were simultaneously engaged in Isabel's physical restraint, while

another adult recorded the activity.  (*E.g., id.* at 544-45).  Eva Loffler was called to the scene, and

she described it as follows:

> A.  I come in, and, oh, I see several people holding Isabel down in her chair, while
> one person has her hand, grabbed Isabel, and Isabel fighting and screaming, and
> somebody is holding Isabel around her stomach in her chair, someone is holding her
> leg, and somebody is holding her hand, and I said–and I–
>
> Q.  Had you ever seen that before?
>
> A.  No, no, no. . . . I touched Patti's hand, and I said, "Patti, this is wrong.  Will you
> please stop?"  And Patti said, "Oh, this is wrong?"  And I said yes. . . . I said, "Well,
> look, she's sensory deprived.  Look at her eyes.  They are all glazed."

(Transcript at 717).  Much of Eva's testimony is confirmed by the Appellees' records.  (R546)

(recording the question, "Do you need us to stop" and noting Mrs. L.'s statement that "her eyes are

glazed.")

The three examples cited above are far from exhaustive.  As the State's Administrative Law

Judge ruled,

> Although witnesses from the LEA and AEA testified that physical restraint was never
> intended to be a component of hand-over-hand guidance, the record reveals repeated
> applications of extensive duration.  Instead of hand-over-hand guidance to prevent
> escape, one or more adults forced, held or restrained Isabel first to complete a task
> and later in response to her aggression.  While the initial applications planned
> 11/22/2004 and implemented throughout the Spring of 2005 may have been the
> intended guidance in classroom setting, the seventeen recorded applications of hand-
> over-hand interventions throughout the Fall of 2005 were for 54 minutes, 25 minutes,

125

> 30 minutes, 20 minutes, 1 hour 25 minutes, 1 hour 10 minutes, 40 minutes, 25 minutes, 8 minutes, 7 minutes, 1 hour 23 minutes, 37 minutes, 59 minutes, 32 minutes, 1 hour 4 minutes, 2 hours 30 minutes, and 1 hour 30 minutes, often involving several adults to implement the intervention.

(Decision at 36, Certified Pleadings at 335).

Mr. and Mrs. L. did not expect, the IDEA did not require, and the ALJ did not demand perfection in the implementation of an IEP's provisions. *Cf. Bradley*, 443 F.3d at 975. But the deviations from the IEP documented above are duly supported by the findings of the trier of fact, are firmly grounded in the evidence presented, and are far from inconsequential and far from *de minimis*. Those violations of the IEP provisions are substantial failures that, in and of themselves, constitute a prejudicial denial of FAPE. For this first and independently sufficient reason, Mr. and Mrs. L. respectfully request that the U.S. District Court affirm the State's decision that the Plaintiffs' use of behavioral interventions on Isabel violated the provisions of the IDEA.

2.    SECOND, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS THAT WERE EXCESSIVE IN LENGTH AND OTHERWISE INCONSISTENT WITH ISABEL'S INDIVIDUAL NEEDS.

In initiating proceedings before the Iowa Department of Education, Mr. and Mrs. L. alleged a second reason why the behavioral interventions use on Isabel were contrary to the IDEA; more specifically, we alleged that the School District and the AEA "have implemented intrusive behavioral interventions that were excessive in length and otherwise inconsistent with Isabel's individual education needs." (Request for Due Process Hearing at ¶ 33(b), Certified Pleadings at 10). The Administrative Law Judge affirmed this allegation, ruling that "[t]he behavior support plan was not implemented in a manner consistent with applicable research and appropriate educational practices

126

. . . [and] was not adequately monitored . . . ." (Decision at 42, Certified Pleadings at 341). Accordingly, she concluded that Mr. and Mrs. L. "have met their burden of showing that [the School District] and Heartland AEA implemented behavioral interventions that were inconsistent with substantive and procedural rights under the IDEA." (*Id.*)

In defending the State's ruling on appeal, we note, as we did in the proceedings before the ALJ, that there are three legal foundations for the parents' allegation. (*See* Appellants' Brief at 40-41, Certified Pleadings at 101-02).   The first legal foundation is that intrusive behavioral interventions must be consistent with research-based educational practices.   The second legal principle is the logical proposition that an intervention cannot be "appropriate" within the meaning of the IDEA if it is harmful to the child and that, accordingly, a school district must give consideration to the potential harmful effects of a proposed behavioral intervention.   This principle is incorporated into the state standard set forth in Rule 281–41.39(4) of the Iowa Rules of Special Education; the cited regulation states that, in selecting a placement for a child with disabilities, each public agency shall ensure that "consideration is given to any potential harmful effect on the eligible individual or on the quality of services that the individual needs."   This state standard   was underscored by ALJ Carl Smith in a 2002 precedent challenging proposed behavioral interventions by Heartland AEA.

> To be contrasted with the consequences of Alex remaining in the general education classroom are the serious factors associated with placement in a more restrictive setting and *the potential negative consequences of an intensive compliance based program* such as described in the behavioral plan currently being proposed by school personnel. . . .

*In re West Des Moines Community School District*, 36 IDELR 222, 102 LRP 22519 (SEA Iowa 2002) (emphasis supplied).

A third and supporting legal principle is that a behavioral or other educational intervention cannot be deemed to be "individualized" within the meaning of the IDEA unless it is based on the child's identified behavioral needs. Thus, in full accord with the federal statute and regulations, Iowa has defined an "appropriate program" under the IDEA as a "specially designed education program *that is based on the individual's specific educational needs*." Iowa Administrative Rules of Special Education, R. 281-41.3(6) (emphasis supplied). The Iowa Department has long held that this state standard extends to a school district's selection and utilization of behavioral interventions. For example, in a 2000 due process decision rendered by the Iowa Department of Education, the ALJ ruled that "the intended purpose of the law's requirement for a behavioral intervention plan is that it should be designed in a manner consistent with providing . . . supports to address *the behaviors of concern*." *In re Mason City Community School District*, 32 IDELR 216, 32 LRP 6234 (SEA Iowa 2000) (emphasis supplied).

Significantly, the Plaintiffs' Appeal Brief ignores two of the three legal foundations for our argument that the intrusive behavioral interventions used on Isabel were excessive in length and otherwise inconsistent with her individual needs. Thus, notwithstanding 104 pages of argument, the Plaintiffs' Appeal Brief does not so much as mention, much less refute the applicability of, Iowa Rule 281–41.39(4). Further, the Plaintiffs' Appeal Brief does not mention, much less refute the applicability of, Iowa Rule 281-41.3(6). These omissions are fatal to the current attack on the State's ruling because the ALJ was bound by the rules duly promulgated by the Iowa Department of Education and because the federal definition of an appropriate education under the IDEA includes compliance with the governing state educational standards. *See, e.g.*, *Anderson v. Iowa Department of Human Services*, 368 N.W.2d 104, 108 (Iowa 1985); 20 U.S.C. § 1402(9)(B) (stating that the term

128

"free appropriate public education" means special education and related services that meet the standards of the State educational agency"); *CJN v. Minneapolis Public School*s, 323 F.3d 630, 639-640 (8th Cir. 2003) (recognizing that administrative rules promulgated by the State educational agency constitute "standards of the State educational agency" within the meaning of the IDEA).

Although the authorities the School District and the AEA have failed to address, as set forth above, fully and independently support the State's decision, this Defendants' Appeal Brief will now answer the Plaintiffs' arguments on the subject of whether their use of intrusive behavioral interventions was, or should have been, consistent with research-based practices. To insure that we answer all arguments presented systematically, and to promote clarity, this discussion will be divided into three sections. Section (a) will refute the Plaintiffs' assertion state law permits the use of all interventions that are not prohibited by the State's corporal punishment statute, and it will also refute their correlated contention that federal law permits the use of all interventions that are not prohibited by the due process clause of the U.S. Constitution. Section (b) will address the long-standing Iowa rule that behavioral interventions used on children with disabilities must be consistent with applicable research findings and appropriate educational practices, and it will also document the fact that, in 2004, the U.S. Congress substantially strengthened Iowa's requirement by mandating compliance with peer-reviewed research to the extent practicable. Finally, Section ( c) will document the evidentiary foundation for the rulings rendered by the State's Administrative Law Judge.

      a.      Contrary to the Plaintiffs' assertions, neither state nor federal law authorizes the types of behavioral interventions used on Isabel.

The School District and the AEA assert that any issue regarding the use of seclusion or restraints is "a matter left to state law." (Plaintiffs' Appeal Brief at 6). They further assert that Iowa

law "permit[s] the use of these behavioral controls, including their use of "seclusionary time-out,"

provided that it did "not exceed 'the length of the school day.'" (*Id.* at 6-7 & 96).  They further assert

that the "ALJ did not discuss Iowa law that allows the use of restraints," and that "[t]here was no

finding by the ALJ of any violation of the Iowa rules." (*Id.* at 69 & 70).  They go so far as to accuse

the State's Administrative Law Judge of attempting "to override a decision arrived at through proper

rule-making authority of the Iowa Department of Education." (*Id.* at 96).

The sole foundation for the Plaintiffs' attacks on the ALJ's decision is Iowa corporal

punishment statute and the general education regulations promulgated to implement that statute.

(See, e.g., Plaintiffs' Appeal Brief at 70 & 96).  This foundation, however, will not support their

arguments.  The reason is the implied assumption that underscores those arguments, *to wit*, the

assumption that Iowa law permits school districts to exercise any form of discipline or behavioral

intervention whatsoever that is not prohibited by its corporal punishment statute.  Significantly, and

notwithstanding more than one hundred pages of arguments, the School District and the AEA have

cited no authority whatsoever to support the assumption that is essential to their arguments on appeal.

The reason why the Plaintiffs have not been able to support the assumption that is vital to

their arguments on appeal is that, on its face, Iowa's corporal punishment statute governs criminal

and civil liability issues, not questions of educational practice for children with disabilities.  Thus,

the statute grants "immunity from any civil or criminal liability" for any school employee "who, in

the reasonable course of the employee's employment responsibilities, comes into physical contact

with a student," subject to various limitations.  Iowa Code §280.21(2) (1995).  If a school employee

violates this statute, he or she can be subjected to "reasonable monetary damages" in a civil action.[36]
*Id.* at § 280.21(3).  The regulations invoked by the Plaintiffs are the general education regulations
that interpret Iowa Code § 280.21.  *See* Rule 281–103.1 *et seq.*  The Iowa Rules of Special Education
are authorized by an entirely different provision of the Iowa Code.  *See* Iowa Code § 280.8 (2005).

ALJ Etscheidt was appointed pursuant to the IDEA and the Iowa Rules of Special Education.
(Certified Pleadings at 17).  Accordingly, she did not have jurisdiction to address civil liability under
Iowa's corporal punishment statute.  As Mr. and Mrs. L. observed in the proceeding below, the
School District and the AEA cannot fairly derive any protective sanction in an IDEA action from
regulations that the ALJ lacked jurisdiction to address:

> If Mr. and Mrs. L. were to bring an action to enforce the Iowa Department of
> Education's regulations implementing the corporal punishment statute, that action
> would no doubt be heard in another, non-IDEA, forum.  It may nonetheless be
> appropriate to note that Isabel's case presents several probable violations of Chapter
> 103 of the administrative rules of the Iowa Department of Education (R1601-1602),
> and we therefore deny the Appellees' assertion that they have complied with those
> rules.  First, we deny the Appellees' allegation that the mere existence of a door
> providing "ventilation from outside" (Appellees' Brief at 99) means that a
> confinement and detention room has "adequate ventilation" within the meaning of
> Rule 281-103.6(2).  Second, we deny that a timeout area created with a mat has
> "reasonable dimensions" within the meaning of Rule 281-103.6(1).  Third, we deny
> that the length of Isabel's confinement was "reasonable" within the meaning of Rule
> 281-103.6(5).  Fourth, we deny that she was always given reasonable break periods
> to attend to bodily needs.  *See* Rule 281-103.6(4).

(Appellants' Reply Brief in SE-320 at 37 n.9, Certified Pleadings at 284 n.9).  Significantly, the
School District and the AEA have not addressed, much less answered, these arguments on appeal.

*The conclusive answer to the Plaintiffs' argument, however, is the nature of the question presented,*

---

[36] The IDEA, of course, does not impose civil or criminal liability on any school district
or AEA employee.  *See, e.g., Thompson v. Board of Special School Dist. No. 1*, 144 F.3d 574,
580 (8th Cir. 1998) (ruling that "'general and punitive damages . . . are not available under
IDEA'") (quoting *Heidemann v. Rother*, 84 F.3d 1021, 1033 (8th Cir. 1996)).

*the IDEA question that the ALJ had jurisdiction to address.*  That question was not whether their behavioral interventions could subject them to civil or criminal liability under Iowa's corporal punishment statute, but, rather, whether those interventions were consistent with the IDEA and the state standards that are an integral part of the IDEA's definition of any appropriate education.

A similar analysis is applicable to the Plaintiffs' arguments regarding federal law.  The School District and the AEA insist on appeal that their behavioral interventions were authorized by federal law unless prohibited pursuant to the standards articulated in *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) and *Heidemann v. Rother*, 84 F.3d 1021, 1029 (8th Cir. 1996).  (See, e.g., Plaintiffs' Appeal Brief at 7 & 34-35).  The singular fallacy in the Plaintiffs' argument is that both *Youngberg* and the cited section of the *Heidemann* decision concern the question of the minimal standards imposed by the due process clause of the U.S. Constitution.  *See Youngberg*, 457 U.S. at 309, 102 S. Ct. at 2454 (stating that the "question presented" concerns "substantive rights under the Due Process Clause of the Fourteenth Amendment"); *Heidemann*, 84 F.3d at 1028 (stating that the "substantive due process claim is governed by the Supreme Court's decision in *Youngberg v. Romeo*").

The underlying assumption that is essential to the Plaintiffs' argument on appeal is that behavioral interventions are authorized under the IDEA unless they are prohibited by the U.S. Constitution.  That assumption is false beyond logical redemption , and, not surprisingly, the School District and the AEA have not been able to cite a single authority that supports it.  Indeed, the Plaintiffs' assumption is refuted by the statute itself, which expressly recognizes that remedies under the IDEA are separate and distinct "from remedies available under the Constitution."  20 U.S.C. §1415(l) (requiring an exhaustion of IDEA remedies prior to seeking relief under the U.S.

Constitution, the Americans with Disabilities Act of 1990, or other federal laws protecting the rights

of children with disabilities).  On information and belief, the U.S. Constitution does not mandate the

creation of an IEP for a child with disabilities, but that fact is no bar to the enforcement of the

provisions of the IDEA mandating the creation of such a document.  *See, e.g., Board of Educ. of*

*Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 205-206, 102 S. Ct. 3034, 3050, 73

L. Ed. 2d 690 (1982).  Similarly, the IDEA's provisions governing the parts of an IEP addressing and

defining programs of behavioral intervention are separate and distinct from any violation of

constitutional rights that might be asserted.

>    b.    Again contrary to the Plaintiffs' assertions, both state and federal law mandate that
>          a school district's programs of behavioral intervention be consistent with research-
>          based evidence of effective practices to the extent that it is possible to do so.

The Plaintiffs assert on appeal that neither state nor federal law mandates "evidence-based

practices" or "sound educational practices."  (Plaintiffs' Appeal Brief at 40-41).  That assertion is

wrong on both counts.

*The State Law Standard*.  With respect to the state standards that are an integral part of the

federal guarantee of an appropriate education, the education provided to an entitled child with

disabilities must be consistent with the applicable research findings and appropriate educational

practices.  This standard is set forth, unequivocally, in the Iowa Rules of Special Education:

> *An appropriate program shall be consistent with applicable research findings and*
> *appropriate educational practices*.  In the absence of empirical evidence on the
> efficacy of any one intervention strategy, the LEA and AEA personnel and parent
> responsible for developing the individual's IEP shall outline a program of education
> which meets the educational needs of the individual.

Iowa Administrative Rules of Special Education, R. 281--41.3(6)(b) (emphasis supplied). The

language of the Iowa rule is plain and mandatory.  Indeed, it is difficult to imagine language more

pointed than the statement that an appropriate program *shall* be consistent with applicable research findings and appropriate educational practices.

Mr. and Mrs. L. duly invoked the state standard set forth in Iowa Rule 281--41.3(6)(b) in the proceedings below. (*See, e.g.*, Appellants' Brief in SE-320 at 35, Certified Pleadings at 6, Appellants' Reply Brief in SE-320 at 38-39, Certified Pleadings at 285-86). Moreover, ALJ Etscheidt emphasized Rule 281--41.3(6)(b) in her Decision, quoting that rule on page 33 (Certified Pleadings at 332) and citing that rule as foundational to her rulings at pages 35, 39, and 40 (*Id.* at 334, 338, & 339). Even so, the Plaintiffs' Appeal Brief ignores the governing Iowa rule as though it did not exist. Accordingly, when the School District and the AEA argue that "[t]here was no finding by the ALJ of any violation of the Iowa rules" (Plaintiffs' Appeal Brief at 70), what they mean is that there was no violation of any Iowa rule that they wish to acknowledge.

Since the Plaintiffs' Appeal Brief systematically ignores this rule, it is fair to invoke the ruling in a First Circuit opinion subsequently affirmed by a unanimous Supreme Court: "We do not believe the Act envisions federal courts releasing school systems from their state-mandated responsibilities. . . ." *Town of Burlington v. Department of Educ. for Com. of Mass.*, 736 F.2d 773, 792 n.24 (1ˢᵗ Cir. 1984), *aff'd sub nom.*, *School Committee of Town of Burlington v. Department of Education of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985); *cf. Yankton School District v. Schramm*, 93 F.3d 1369, 1376 (8ᵗʰ Cir. 1996) (ruling that "the school district is not free to choose which statute it prefers.") Moreover, since the cited state standard is an integral part of the federal guarantee of a free appropriate public education, the Plaintiffs' violation of Iowa Rule 281--41.3(6)(b) would be fully and independently sufficient to sustain the challenged decision on the interventions issue, even if there were no other grounds or rationales for concluding that the use of intrusive behavioral

interventions violated the IDEA. There are, however, other grounds and rationales for that ruling:

*The New Federal Standard*. In its 2004 revision and reauthorization of the IDEA, the U.S. Congress strengthened Iowa's preexisting requirement that educational interventions be based on educational research. As amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 226, 118 Stat. 2647 (2004), the IDEA's definition of an IEP now includes the following language:

> The term "individualized education program" or "IEP" means a written statement for each child with a disability . . . that includes . . . a statement of the special education and related services and supplementary aids and services, *based on peer-reviewed research to the extent practicable*, to be provided to the child, or on behalf of the child . . . .

20 U.S.C. § 1414(d)(1)(A)(i)(IV) (main ed. and Supp. 2005) (emphasis supplied). On appeal, the School District and the AEA have challenged the ALJ's interpretation and application of this language, invoking four separate and distinct arguments with respect to the new Congressional mandate: (1) The Plaintiffs claim that the ALJ disregarded the effective date of the 2004 amendments; (2) they claim that the Eighth Circuit opinion in *Renollett* stands for the proposition that behavioral plans need not be part of the IEP and are therefore not subject to the new Congressional requirement; (3) they claim that the U.S. Department of Education refused to adopt a research-based requirement; and (4) they claim that the peer-reviewed research requirement is too onerous a burden. Each of these claims will now be answered.

**The Effective Date of the 2004 Amendments**. The Plaintiffs' first argument is that "[t]he 2004 Amendments did not become effective until July 1, 2005, and therefore has no application to an IEP developed before July 21, 2005." (Plaintiffs' Appeal Brief at 37-38). They argue that the ALJ erred by invoking the new federal requirement with respect to the IEP developed in November of

2004. (*Id.* at 38).  The answer to this argument is that the Plaintiffs have not read the ALJ's decision with sufficient care.  Consider the following two excerpts from the ALJ's decision:

> The implementation of these two reduction-oriented strategies identified in the 2004 behavior support plan would be inconsistent with hypothesized function from the functional assessment data, inconsistent with research findings and appropriate educational practices [Iowa Administrative Rules of Special Education, 281-- 41.3(6)(b) I.A.C.], and contraindicated by the empirical research offered by the parties. . . .

> A preponderance of evidence reveals that the excessive durations of the timeout interventions were "not consistent with applicable research findings and appropriate educational practices" [Iowa Administrative Rules of Special Education, 281–41.3(6)(b) I.A.C.] or "based on peer-reviewed research to the extent practicable" [20 U.S.C. § 1414(d)(1)(A)(i)(IV)].

(Decision at 35 & 38-39, Certified Pleadings at 334 & 337-38).  As should be apparent from comparing and contrasting these two excerpts, ALJ Etscheidt based her rulings regarding the 2004 IEP on the Iowa rule; she based her rulings regarding the timeouts authorized by the 2005 IEP on *both* the Iowa rule and the new federal mandate.  Accordingly, when the Plaintiffs assert that the ALJ failed to recognize and enforce the effective date of the Individuals with Disabilities Education Improvement Act of 2004, they are mistaken.

**The Ruling in Renollett.**  The Plaintiffs' second argument on appeal takes the form of a logical syllogism:

1.     The peer-reviewed research requirement only applies to provisions of the IEP.

2.     Behavioral interventions are not a part of the IEP.

3.     Therefore, the peer-reviewed research requirement does not apply to behavioral interventions.

(*See* Plaintiffs' Appeal Brief at 37) ("If Congress had intended that all aspects of a child's education be subject to the peer-reviewed research standard, including those not required to be in the written

136

IEP, it could have said so.  It did not.")  The logical flaw in the Plaintiffs' argument is not in its form, but in the fact that the premiss upon which their argument depends is false.  The Plaintiffs cite *School Board of Independent School Dist. v. Renollett*, 440 F.3d 1007 (8th Cir. 2006) for the proposition that "behavior interventions do not have to be written or part of the IEP." (*Id.*)  For at least four compelling reasons, the Plaintiffs' reliance on *Renollett* is misplaced.

The first and conclusive reason why the Plaintiffs' reliance on *Renollett* is misplaced is that, even if their interpretation of the decision were otherwise accurate, it does not appear that Minnesota had a rule similar to Rule 281--41.3(6)(b) of the Iowa Rules of Special Education.  As documented above, the cited Iowa rule mandates that the educational program for an entitled child shall be consistent with applicable research findings and appropriate educational practices, and this mandate extends to behavioral interventions for a child with behavioral needs.  As also documented above, the state standard is an integral part of the federal guarantee of a free appropriate education.  Since the Plaintiffs have not so much as addressed this rule, much less refuted its interpretation or application, they cannot viably contend that their programs of behavioral interventions to address Isabel's behavioral needs were not subject to the requirement that they be consistent with applicable research findings, even if their interpretation of *Renollett* were otherwise correct.

The Plaintiffs' interpretation of *Renollett* is not otherwise correct.  The second reason why their reliance on that opinion is misplaced is that *Renollett* did not address the issue for which it is cited.  Thus, *Renollett* arose out of a due process request filed in August of 2001 and therefore did not address the peer-reviewed research requirement added by the Individuals with Disabilities Education Improvement Act of 2004.  *See* 440 F.3d at 1009-1010.  Accordingly, the requirement is not mentioned in the opinion, much less interpreted.

137

The third reason why the Plaintiffs' reliance on *Renollett* is misplaced is that they have indulged in a drastic misconstruction of the Eighth Circuit's approval of the lower court's ruling. This point can be documented by examining the key passage from the U.S. District Court opinion that was affirmed by the Eighth Circuit:

> The Court agrees with the District and the IHO that, in general, the law does not mandate that a BIP be provided in writing and attached to an IEP.  The inherent flexibility of the IDEA requires individualized assessments for each child. . . . Here, the parties agreed that a BIP was necessary, they formulated a settlement to create a written IEP by the start of the school year, and Josh's IEP references the BIP. *Accordingly, the HRO correctly concluded that a written BIP should have been attached to Josh's IEP.  See Larson ex rel. Larson v. Indep. Sch. Dist. No. 361 et al.*, Civ. No. 02-3611, 2004 WL 432218, at *10 (D. Minn. March 2, 2004) (holding in part that where a student's behaviors are the sole focus of the IEP, a written BIP should be integrated into the IEP).

*School Board of Independent School Dist. No. 11 v. Renollett ex rel Renollett*, Civ. No. 02-3698, 2004 WL 2457810, at *5 (D. Minn. November 1, 2004) (emphasis supplied).  The key decision cited by the U.S. District Court in *Renollett* is equally instructive:

> The Court is mindful that not every situation will call for a formal written BIP [behavior intervention plan], but in cases such as this, where a student's behaviors are the sole focus of the IEP, an FBA [functional behavioral assessment] should have been conducted and its findings should have been used to create a BIP that would be integrated into the IEP.

*Larson ex rel. Larson v. Independent School Dist. No. 361*, Civ. No. 02-3611, 2004 WL 432218, at *10 (D. Minn. March 2, 2004).

The District Court rejected the parental claim in *Renollett* because, "while the absence of a BIP is a procedural error," the parents could not prove harm.  *Id.*  According to the District Court, the evidence "confirmed that the procedures implemented by the District, despite the absence of the BIP, were the appropriate methods of dealing with Josh's behavioral incidents.  The record does not

reflect that the absence of a BIP in any way compromised Josh's right to an appropriate education . . . ." *Id*. Clearly, the opinion affirmed in *Renollett* cannot be fairly used to claim that a written behavior plan is never required, much less that behavioral interventions are exempt from the newly-imposed "peer-reviewed research" requirement.

The fourth reason why the Plaintiffs' reliance on *Renollett* is misplaced is that their analysis of the underlying issue fails to consider the governing statutory language.   Thus, the IDEA affirmatively mandates that IEP teams must consider positive behavioral interventions and supports "in the case of a child whose behavior impedes the child's learning or that of others."   20 U.S.C. §1414(d)(3)(B)(i).  It is important to note that the statutory mandate that an IEP team "shall . . . consider" positive behavioral interventions and supports is the same mandate that requires an IEP team to consider instruction in Braille "in the case of a child who is blind or visually impaired" or to consider "the child's language and communication needs" in "the case of a child who is deaf or hard of hearing."  *Id*. at §§ (ii) & (iii).  *Even more important, the Plaintiffs' current contention is directly refuted by the statute's express statement that "the development of the IEP of the child" shall include "the determination of appropriate positive interventions and supports*."   20 U.S.C. §1414(d)(3)( C) (emphasis supplied).  For this fourth and final reason, the Plaintiffs' reliance on *Renollett* cannot be sustained as a viable rationale for rejecting the careful and through opinion rendered by the Administrative Law Judge appointed by the Iowa Department of Education.

**The Regulations of the U.S. Department of Education**.  On appeal, the School District and the AEA argue that, in promulgating the regulations that implement the 2004 amendments to the IDEA, the U.S. Department of Education "specifically refused to add the requirement that special education, related services and supplementary aids and services be based upon 'evidence-based

practices' or 'emerging best practices' . . . ."   (Plaintiffs' Appeal Brief at 39).  They then interpret the federal regulations to mean that "'evidence based practices' are not mandated" by federal law. (*Id.* at 40).  The answer to the Plaintiffs' argument is that the School District and the AEA have turned the logic of the Department of Education's position upside down.  The U.S. Department of Education did not refuse to embrace "evidence-based practices."  To the contrary, it refused to *relax* the far stricter "peer-reviewed research" standard mandated by the U.S. Congress.

An "evidence-based practices" standard or an "emerging best practices" standard would be substantially less rigorous than the "peer-reviewed research" standard mandated by the U.S. Congress.   Accordingly, in promulgating its regulations, the U.S. Department of Education commented as follows:

> The Act does not refer to "evidence-based practices" or "emerging best practices," which are generally terms of art *that may or may not be based on peer-reviewed research.*  Therefore, we decline to change §300.320(a)(4) in the manner suggested by the commentators.

71 Fed. Reg. 46540, 46665 (August 14, 2006) (emphasis supplied).

Lest there be any doubt whatsoever on this point, the U.S. Department of Education promulgated a regulation stating that the term "scientifically based research" as used in Part B of the IDEA "has the meaning given the term in section 9101(37) of the ESEA [the Elementary and Secondary Education Act]."  34 C.F.R. § 300.35 (August 14, 2006).  The U.S. Department of Education explained that '[t]he definition of scientifically based research is important to the implementation of Part B of the Act" and it set forth that definition in its comments to the newly promulgated special education regulations.  71 Fed. Reg. at 46576.  That definition emphasizes the need not only for research, but research that is subjected to "rigorous, objective, and scientific

140

review":

"Scientifically based research–

"(a) Means research that involves the application of rigorous, systematic, and objective procedures to obtain reliable and valid knowledge relevant to education activities and programs; and

"(b) Includes research that–

"(1) Employs systematic, empirical methods that draw on observation or experiment;

"(2) Involves rigorous data analyses that are adequate to test the stated hypotheses and justify the general conclusions drawn;

"(3) Relies on measurements or observational methods that provide reliable and valid data across evaluators and observers, across multiple measurements and observations, and across studies by the same or different investigators;

"(4) Is evaluated using experimental or quasi-experimental designs in which individuals, entities, programs, or activities are assigned to different conditions and with appropriate controls to evaluate the effects of the condition of interest, with a preference for random-assignment experiments, or other designs to the extent that those designs contain within-condition or across-condition controls;

"(5) Ensures that experimental studies are presented in sufficient detail and clarity to allow for replication or, at a minimum, offer the opportunity to build systematically on their findings; and

"(6) *Has been accepted by a peer-reviewed journal or approved by a panel of independent experts through a comparably rigorous, objective, and scientific review.*"

71 Fed. Reg. at 46576 (quoting section 9101(37) of the ESEA) (emphasis supplied). The School District and the AEA have clearly erred in their analysis. The peer-reviewed research standard adopted by the U.S. Congress in 2004 is a more vigorous standard than the "evidence-based practices" standard that some commentators had favored.

**The Alleged Burden Imposed by the Peer-Reviewed Research Standard**. The Plaintiffs'

141

final argument regarding the "peer-reviewed research" standard is that "[t]he already difficult job of educating disabled students with serious behavioral difficulties in public schools [would]  become even more difficult and uncertain" if this Court were to sustain the enforcement of the "applicable research findings and appropriate educational practices" standard set forth in the Iowa Rules of Special Education or the more rigorous "peer-reviewed research" standard adopted by the U.S. Congress in 2004.  (Plaintiffs' Appeal Brief at 3).  They claim that the State's Administrative Law Judge failed to "heed" her own "warning" that some "authors propose that certain practices in special education are value-based rather than evidence based (suggesting that this interaction will render a consensus regarding validated practices elusive at best, 'even with the soundest of scientific evidence.'" (Plaintiffs Appeal Brief at 40) (quoting Decision at 48 n.18, Certified Pleadings at 347 n.18).  The School District and the AEA also emphasize the ALJ's observation that "'[t]he inclusion of these provisions [peer-reviewed research] has invited debate and discussion concerning how evidence of effective practices might be established and the value of social science empiricism to legal analysis.'" (Plaintiffs' Appeal Brief at 41) (quoting Decision at 48 n.19, Certified Pleadings at 347 n.19).

There are three compelling answers to the Plaintiffs' claim that research-based standards are too onerous to be imposed upon them.  First, the legislative history of the 2004 amendments makes it very clear that the "peer-reviewed research" standard was added to the IDEA precisely *because* local school districts were engaged in behavioral and other interventions that were inconsistent with the applicable research.  For example, in a 1999 hearing before the House Subcommittee on Basic Research, Representative Nick Smith introduced the Subcommittee's mission with the following statement:

New teaching methods often get introduced into classrooms with very little–if any–data proving that they actually work.  The studies that are done are often not done in a scientific way, with adequate control groups or other methods that minimize bias.  *Too often, we end up with popular theories favored by the education community, rather than proven methods.*

*Education Research: Is What We Don't Know Hurting our Children?, Hearing before the Subcommittee on Basic Research of the Committee on Science of the U.S. House of Representatives*, Series No. 106-65 (October 26, 1999) (emphasis supplied).  As a second example, during hearings held in 2002, Dr. Russell Skiba testified as follows: "If we are serious about the call of no child left behind, to make sure that our schools only [use] research-based practices, we would reduce our uses of ineffective practices like suspension and expulsion, and turn instead to instructional strategies for school discipline . . . ."  *State and Local Level Special Education Programs that Work and Federal Barriers to Intervention, Hearing before the Subcommittee on Education Reform of the Committee on Education and the Workforce, House of Representatives*, Serial No. 107-63, 107th Cong., at 16-17 (2002).  *See generally* the detailed history of the peer reviewed research requirement set forth in Addendum No. 1 to the Appellants' Brief in SE-320, Certified Pleadings at 117-131.

On appeal, the Plaintiffs disparage any references to the legislative history of the peer-reviewed research requirement.  (*See, e.g.*, Plaintiffs' Appeal Brief at 38).  In so doing, they ignore the guidance of the U.S. Supreme Court in its landmark decision on the governing federal statute in special education cases.  *Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).  In *Rowley*, the Supreme Court not only reviewed the legislative history in detail, but emphasized that a concern expressed in hearings before the House of Representatives, "stressed repeatedly throughout the legislative history, confirms the impression conveyed by the language of the statute."  458 U.S. at 191-92, 102 S. Ct. at 3043.

The second reason why the Plaintiffs' argument is in error is the plain language of the statute itself.  Thus, as amended in 2004, the IDEA unambiguously states that an IEP must contain "a written statement for each child with a disability . . . that includes . . . a statement of the special education and related services and supplementary aids and services, *based on peer-reviewed research to the extent practicable*, to be provided to the child, or on behalf of the child . . . ."  20 U.S.C. § 1414(d)(1)(A)(i)(IV) (emphasis supplied).  Similarly, and with equal clarity, the IDEA states that *"the development of the IEP of the child" shall include "the determination of appropriate positive interventions and supports."*  20 U.S.C. §1414(d)(3)( C) (emphasis supplied).  In other words, the claim raised by Isabel and her parents is firmly and unequivocally grounded in express statutory provisions.

The third and final reason why the Plaintiffs' argument is in error is the fundamental proposition that the language of the statute is controlling–regardless of whether some academics view the statutory requirement to be controversial and regardless of whether some school districts view the requirement as unduly onerous.  Thus, it is fundamental that "[w]hether an enactment is wise or unwise, . . . whether it is the best means to achieve the desired results, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner are matters for the judgment of the legislature and *the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance*."  16A Am. Jur. 2d *Constitutional Law* § 189 (2008) (emphasis supplied).  In other words, although the State's Administrative Law Judge properly noted that the imposition of a research-based standard had precipitated a debate in some academic circles, she equally properly recognized her duty to enforce both the Iowa standard and the new federal standard as written.  As the Eighth Circuit has ruled, "when legislative intent is clearly

144

expressed, it is not the function of the courts to question the wisdom of Congressional policy, or the ease of its implementation." *Lower Brule Sioux Tribe of South Dakota v. U.S.*, 712 F.2d 349,  355 (8th Cir. 1983); *see also Reeder v. Kansas City Bd. of Police Commissioners*, 796 F.2d 1050, 1055 (8th Cir. 1986) ("If it were our task to judge the wisdom or fairness of this law, we might well come to a different conclusion.  That is not our task.  In general, wisdom, fairness, and policy of statutes are the business of the legislature, not the courts.")

> c.      As the trier of fact properly found, the credible evidence established that the behavioral interventions used on Isabel violated the IDEA because they were excessive in length, because they were implemented without giving adequate consideration to the potential harmful effects, and because there was a serious failure to monitor the impact of the interventions on targeted behaviors.

As Mr. and Mrs. L. argued in the proceedings below, a  preponderance of the evidence presented at the due process hearing supports the parental allegations on each of three levels: First, a preponderance of the evidence establishes the use of excessively prolonged interventions.  Second, a preponderance of the evidence documents the Plaintiffs' failure to give adequate consideration to the potential harmful effects of punitive interventions, including seclusion and restraint.  Third, a preponderance of the evidence establishes that the School District and the AEA utilized highly intrusive interventions without monitoring the effects of those interventions on the targeted behaviors.

*The Use of Excessively Prolonged Behavioral Interventions*.  The record in this case reveals that the School District and the AEA repeatedly subjected Isabel L. to excessively prolonged behavioral interventions.  As the Administrative Law Judge appointed by the Iowa Department of Education ruled, "A preponderance of evidence reveals that the excessive durations of the timeout interventions were 'not consistent with applicable research findings and appropriate educational

145

practices' or 'based on peer-reviewed research to the extent practicable.'" (Decision at 38-39, Certified Pleadings at 337-38) (citations omitted).  Her ruling is fully supported by the record.

When ALJ Etscheidt ruled that "[t]he empirical literatures describes timeout as an option for reducing inappropriate behavior, but consistently indicates that timeout durations should be short," (*id.* at 38), she carefully supported her ruling by citing and summarizing no fewer than six peer-reviewed articles duly introduced into evidence in the proceedings below.  (*See* Decision at 52-53 n.29, Certified Pleadings at 351-52 n.29).  The Plaintiffs Appeal Brief does not so much as mention even one of the six articles cited in the ALJ's decision, much less refute her analysis of those articles. Accordingly, the School District and the AEA cannot fairly claim that the ALJ's decision was not supported by a preponderance of the credible evidence.

Indeed, even the evidence introduced by the School District and the AEA in the proceedings below fully supports the parental position.  Consider, for example, an unambiguous passage from a peer-reviewed article by Mark D. Shriver and Keith D. Allen:

> *Keep it short*.  Short durations of time-out (30 sec-4 min) are preferable.  Longer durations of time-out have not been found to be more effective, are more difficult to enforce, and are more susceptible to "contamination".  That is, the longer a student remains in time-out, the more likely the student will recruit or contract unplanned or uncontrolled sources of reinforcement that contaminate the discriminability between time-in and time-out.

(Appellees' Record in SE-320 at 2211) (emphasis in original).

The record clearly reveals, by more than the required preponderance of the evidence, that Isabel's time-outs were extended owing to the utilization of not one but two contingent release requirements.  The first contingent release requirement was maintaining a body basics posture for a specified period of time.  The second and subsequent contingent release requirement was

146

performing an arbitrary compliance task.   These requirements were not appropriate because they were not "consistent with applicable research findings" within the meaning of  Iowa Rule 281-41.3(6)(b); they were also inconsistent with the peer-reviewed research requirements added by the Individuals with Disabilities Education Act of 2004.

In 1975, Hobbs & Forehand conducted an experiment with mothers and children using time-out with release continent upon 15 seconds of nondisruptive behavior.  (Appellees' Records in SE-320 at 2140).   In 1977, they wrote that their 1975 work was the "only" study to address the "suggested superiority" of contingent release time-out.  (*Id.* at 2144).  In 1985, Karen Harris noted that "substantial progress in the conceptualization and implementation of timeout has been made in the past 5 to 10 years," but that "[c]omparative investigations of contingent release techniques are needed."  (Appellees' Records in SE-320 at 2123 & R2129).  In 1986, F. Charles Mace *et al.* published a peer-reviewed of a study comparing time-out procedures "both *with* and *without* a contingent delay."  (Appellants' Records in SE-320 at 5106).  The discussion portion of their study contains the following observations:

> *The commonly used contingent delay procedure was not found to enhance TO efficacy or ease of implementation. . . . The data suggest that there is little benefit in setting up what may result in a control-countercontrol struggle between the child and caretaker.*

(*Id.* at 5110) (emphasis supplied).  At the due process hearing, Dr. Vincent J. Carbone testified that the work by Mace was "the most recent study" on the issue.  (Transcript at 887).  He further testified that changeover delays should be limited to seconds because you "don't want to get into a power struggle with kids."  (*Id.* at 886-87).  His testimony is confirmed by Shriver and Allen.  (Appellees' Records in SE-320 at 2212).

Mace *et al.* also discussed the ethical issues associated with the use of time-out and included the following observation in the discussion portion of their study: "In view of the growing concern about the use of aversive procedures and TO [timeout] in particular, the potential liabilities associated with the contingent delay deserve careful consideration." (Appellants' Records in SE-320 at 5113) (supporting citations to peer-reviewed literature omitted). In light of this observation, and in light of the evidence presented on the subject at the due process hearing, Mr. and Mrs. L. respectfully submit that a preponderance of the evidenced duly introduced in the proceedings below fully supported by ALJ's finding that the interventions used by the School District and the AEA were excessive in length.

On appeal, the School District and the AEA place particular emphasis on testimony that a panel of experts viewed a videotape of the AEA's use of interventions with another child and allegedly commended their work. (*See, e.g.,* Plaintiff's Appeal Brief at 93). Our response to this argument is threefold: First, neither the videotape nor the plan were introduced into evidence, and there is therefore no method whatsoever whereby the disabilities and behavioral needs of the young man on the videotape can be compared to the disabilities and behavioral needs of Isabel L.. Second, the video-taped sharing of the experience of a single student does not constitute peer-reviewed research of the type mandated by the 2004 IDEA. As Valerie Reyna of the Office of Educational Research and Improvement of the U.S. Department of Education has stated, "*The reason why we can't base practice on mere anecdote . . . is that individual cases may be exceptions. [The individual case] may be the only case of that type*." U.S. Department of Education, *The Use of Scientifically Based Research in Education: Working Group Conference* (2002), *officially posted at* http://www.ed.gov/nclb/methods/whatworks/research/index.html (emphasis supplied).

Third, while the audience may have commended the video-taped presentation, there is no evidence whatsoever that they would or could have viewed similar interventions as being appropriate in the case of Isabel L.. Thus, the Appellees quote Dr. Wacker as saying that the procedures used with Isabel were "extreme, but certainly within the acceptable range." As the ALJ properly noted, however, the School District and the AEA overlooked Dr. Wacker's very next sentence: "However, [these extreme procedures] should only be used for severe problem behavior, and only after other less restrictive plans have been tried." (Appellants' Records in SE-320 at 3660). Dr. Wacker also advised Mr. L. that "I would want a complete explanation for why those procedures were needed at this time. I would also want a plan on paper that indicated how the more aversive aspects of the plan (time-outs) were going to be addressed in the future." (*Id.*)

Ultimately, of course, the question presented is one of educational expertise and the weight and credibility of the evidence. Accordingly, although the School District and the AEA would prefer that greater weight be given to hearsay testimony regarding the alleged reaction of a panel to an unseen videotape, the Administrative Law Judge had the right to give greater weight to the testimony and evidence summarized above and cited in her decision. As the Eighth Circuit has ruled, "we must give 'due weight' to the outcome of administrative proceedings, giving particular consideration to state officials' educational judgments." *Missouri Department of Elementary and Secondary Educ. v. Springfield R-12 School Dist.*, 358 F.3d 992, 998 (8th Cir. 2004); *see also* the authorities cited in Part I, *supra*.

*The Failure to Give Adequate Consideration to the Potential Harmful Effects of Intrusive Interventions*. A preponderance of the evidence in the record also establishes that the use of intrusive behavioral interventions such as seclusion and restraint can have serious harmful effects and thus be

149

inconsistent with a child's needs.[37]   As the ALJ ruled, the excessive use of restraint and seclusion "may subsequently increase a child's negative behavior and decrease positive responses."  (Decision at 37, Certified Pleadings at 336) (citing Transcript at 742-788) (testimony of Dr. Mohr).  As the ALJ also ruled, Mr. and Mrs. L. introduced into evidence "empirical research from both Dr. Mohr and others to support their claim that the holding and restraining interventions implemented with Isabel were excessive and inconsistent with Isabel's needs."  (Decision at 37 & 51-52 n.27, Certified Pleadings at 336 & 350-351 n.27).  The ALJ cites and summarizes no fewer than eleven articles in support of this ruling.  (*Id.*)  Significantly, the Plaintiffs' Appeal Brief does not specifically address even one of the eleven articles.  They cannot fairly claim, therefore, that the ALJ's ruling was not supported by a preponderance of the evidence..

Moreover, even the literature submitted by the School District and the AEA in the proceedings below fully supports the parental claim that the types of interventions used by the School District and the AEA can have serious harmful effects, including but not limited to punishment-induced aggression.  For example, Chapter 8 of Alberto and Troutman's textbook, *Applied Behavior Analysis for Teachers*, devotes considerable attention to aversive behavioral interventions, including seclusionary time-out procedures and  restraint.  (*See, e.g,* Appellees' Records in SE-320 at 2075).  With respect to such interventions, especially those involving the use of physical force, Alberto & Troutman state as follows:

---

[37] The question whether Isabel suffered long-term harmful effects from the use of intrusive behavioral interventions was not an issue in the proceedings below and is not an issue on appeal.  (*See generally* Request for Due Process Hearing, Certified Pleadings at 1-12).  As we noted in the proceedings below, "Since the IDEA does not authorize ordinary damages, the question of whether Isabel sustained lasting injury as a consequence of the . . . use of intrusive behavioral interventions is not an issue to be decided in this forum."  (Appellees' Reply Brief in SE-320 at 25, Certified Pleadings at 272).

>**If an aversive consequence is to be used, the following are critically and ethically important elements involved in making that decision: . . . An understanding of procedure-specific guidelines, such as duration and schedule of administration of the consequence and, of special concern, the potential behavioral and physical negative effects, must be shared by all parties before implementation.**

(*Id.* at 2081-82) (emphasis in original).  The "potential behavioral and physical negative effects" of intrusive behavioral interventions should not be minimized.  As Dr. Mohr has written, "punitive and isolating behavior by staff tended to be significantly associated with children's subsequent increases in negative behavior and decreases in positive behavior." (Appellants' Records in SE-320 at 4472).

*The Failure to Monitor the Impact of Interventions on Targeted Behaviors*.  A preponderance of the evidence establishes that one of the most fundamental principles governing the use of time-out and related behavioral interventions is that it is essential to monitor the effects of the interventions on the targeted behaviors.  As the Administrative Law Judge ruled, the evidence "revealed that these interventions were not adequately monitored. . . .  Absent such monitoring, the IEP team will not be able to ascertain if the planned program is achieving the desired outcomes and is beneficial to the child." (Decision at 39, Certified Pleadings at 338).

A preponderance of the evidence introduced in the proceedings below fully supports the ALJ's ruling on the monitoring issue.  Thus, as early as 1977, Gast *et al.* stated that a "legitimate timeout procedure is one which is . . . coupled with objective observation of whether or not timeout is fruitful in remediating the problem behavior." (Appellees' Records in SE-320 at 2117).  In 1985, Harris wrote that it is one of the "abuses of the concept" to "continue to use a time-out procedure when sufficient data indicate that it is ineffective or inappropriate." (*Id.* at 2127).  Accordingly, "an operational definition of the target behavior and a reliable observation technique must be established . . . ." (*Id.* at 2130).  As Alberto & Troutman summarized, "The results of time-out must be

monitored and evaluated.  *Ongoing data collection should verify that the use of time-out results in a decrease in the occurrence of the target behavior*."  (*Id.* at 2076) (emphasis supplied).

The evidence duly introduced in the proceedings below reveals that, on November 8, 2004, the School District and the AEA completed a full and individual evaluation of Isabel's needs. (Appellees' Records in SE-320 at 130).  They identified three areas of behavioral need, and they secured baseline data on each of those areas of need.  (*Id.* at 133 & 135-136).  The three areas of need were (1) maintaining personal space (using words instead of physical touch), (2) failure to comply with teacher directions, and (3) attention to task (or independent work completion).  (*Id.*)  As the School Psychologist admitted under oath, however, the School District and the AEA did not monitor the impact of their interventions on the behaviors of concern:

> Q.  With respect to compliance, was that a major area, a primary focus of behavioral need based on your full and individual evaluation on November 8?
>
> A.  Yes it was an area of concern.
>
> Q.  Did you develop a behavioral goal for compliance?
>
> A.  No we did not.
>
> Q.  Did you develop any tool for monitoring compliance?
>
> A.  No , we didn't.

(Transcript 1200-01) (testimony of Ann Hilliard).  This and other evidence in the record establishes that the School District and the AEA did not adequately monitor the effect of their interventions on the targeted behaviors from November 8, 2004 until November 18, 2005, when they proposed that Isabel be educated in a room without peers.

After Mr. and Mrs. L. rejected the November 18 proposal, the Appellees began to collect data

on a Structured ABC (Antecedent-Behavior-Consequence) Analysis Form.  Data collection was

begun on November 22, 2005 (Appellees' Records in SE-320 at 428), and the last entry was made

by Kindra Sweeney at 12:50 p.m. on December 21, 2005 (*Id*. at 438).  Even though the Appellees

collected the data, however, they did not analyze it, they did not graph it, and they did not attempt

to determine if it provided any evidence regarding the effectiveness of their behavioral

interventions.[38]  Accordingly, a preponderance of the evidence fully supports the ALJ's ruling that

the School District and the AEA utilized intrusive behavioral interventions without conducting the

monitoring that the relevant research indicates is essential to the appropriate use of those

interventions.

In summary, the trier of fact properly found that Mr. and Mrs. L. sustained their burden of

proving that the behavioral interventions utilized by the School District and the AEA were excessive

in length or otherwise inconsistent with Isabel's individual needs.  Thus, a preponderance of  the

credible evidence established that the behavioral interventions used on Isabel violated the IDEA

because they were excessive in length, because they were implemented without giving adequate

consideration to the potential harmful effects, and because there was a serious failure to monitor the

impact of the interventions on targeted behaviors.  For this second and independently sufficient

reason, we respectfully request that the District Court sustain the ALJ's ruling that the Plaintiffs' use

of behavioral interventions violated the IDEA.

---

[38] Mr. and Mrs. L.  prepared demonstrative exhibits of the ABC data collected by the
School District and the AEA from and after November 22, 2005.  The exhibits were set forth in
Addendum No. 2 to the Appellants' Brief filed with the ALJ.  (See Certified Pleadings at 133-
139).  As ALJ Etscheidt observed, "*the two month data reveal an increase in non-compliance
and aggression and, therefore, the need to modify the behavioral interventions*.  (Decision at 39,
Certified Pleadings at 338) (emphasis supplied).

3.   THIRD, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS THAT WERE NOT SUPPORTED BY THEIR FUNCTIONAL ASSESSMENTS OF THE CHILD.

*The Legal Foundation for the Appellants' Issue*.  In initiating the proceedings below, Mr. and Mrs. L. set forth a third reason why the use of intrusive behavioral interventions on Isabel violated the provisions of the IDEA.  More specifically, they alleged that the School District and the AEA had "implemented intrusive behavioral interventions that were not supported by an adequately documented functional behavioral analysis that was consistent with available information regarding the child's disabilities and educational needs."  (Request for Due Process Hearing at ¶ 33( c), Certified Pleadings at 10).  After reviewing the exhibits and the testimony, the State's Administrative Law Judge sustained the parents' contention.  She ruled that "[t]he implementation of these two reduction-oriented strategies identified in the 2004 behavior support plan would be inconsistent with the hypothesized function from the functional assessment data, inconsistent with research findings and appropriate educational practices, and contraindicated by the empirical research offered by the parties."  (Decision at 35, Certified Pleadings at 334) (supporting citations omitted).  We respectfully submit that the ALJ's ruling should be sustained on appeal and that, for this third and independently sufficient reason, Mr. and Mrs. L. sustained their burden of proving that the Plaintiffs' use of intrusive behavioral interventions violated the provisions of the IDEA.  To support this contention, we will address both the supporting law and the supporting evidence.

*The Legal Foundation for the ALJ's Ruling*.  The legal foundation for the ALJ's ruling is threefold.  First, a long-standing Iowa requirement, as set forth in a duly promulgated rule of special education, is that behavioral interventions must be "consistent with applicable research findings and appropriate educational practices."  Iowa Administrative Rules of Special Education, R. 281--

41.3(6)(b).  Significantly, the Plaintiffs' Appeal Brief does not so much as mention, much less refute

the applicability of, the cited regulation.  This failure is significant for two reasons: First, ALJ

Etscheidt based her ruling on the research-based deficiencies of the November 2004 IEP on the

provisions of the Iowa Rule–and not on the stronger provisions enacted by the U.S. Congress that

went into effect in July of 2005.  (*See* Decision at 35, Certified Pleadings at 334) (citing the Iowa

Administrative Rules of Special Education, 281–41.3(6)(b)).  Second, the preexisting Iowa standard

was and is an integral part of the federal guarantee of an appropriate public education.  *See* 20 U.S.C.

§ 1402(9) (emphasis supplied) (defining a "free appropriate public education" as an education that

meets "the standards of the State educational agency"); *see also* the analysis and authorities set forth

in Part I, Subpart A, Section 1( c), *supra*.

A second legal foundation for the ALJ's ruling reinforces the first.  A core concept of the

IDEA is that an entitled child must be educated in accordance with an "individualized" education

program.  *See, e.g.,* 20 U.S.C. § 1414(d).  Accordingly,  Iowa has defined an "appropriate program"

under the IDEA as a "specially designed education program *that is based on the individual's specific*

*educational needs*."   Iowa Administrative Rules of Special Education, R. 281-41.3(6) (emphasis

supplied); *see also In re Mason City Community School District*, 32 IDELR 216, 32 LRP 6234 (SEA

Iowa  2000) (ruling that the individualization requirement extends to provisions designed to address

the behaviors of concern).   Significantly, the Plaintiffs' Appeal Brief does not so much as address,

much less refute the applicability of, Iowa Rule 281–41.3(6).  This failure is significant, not only

because the state standard is an integral part of the federal guarantee of an appropriate education, as

documented above, but because the parental argument in the proceedings below was based on the

failure of the School District and the AEA to devise interventions consistent with their own

assessments of Isabel's behavioral needs.  (*See* "The Factual Foundation for the ALJ's Ruling, *infra*.)

A third legal principle that reinforces the two others that have just been documented is the IDEA's emphasis on positive behavioral supports.  As documented at greater length above, the IDEA specifically and unequivocally states that "the development of the IEP of the child" shall include "the determination of appropriate positive behavioral interventions and supports."   20 U.S.C. § 1414(d)(3)( C).  The Plaintiffs' Appeal Brief does not mention this critical statutory provision, much less refute its applicability.  Accordingly, it should be concluded that the ALJ's ruling has at least three legal foundations–(1) the Iowa standard requiring interventions based on sound research, (2) the federal and state provisions requiring an individualization of those interventions to address an individual child's needs, and (3) the IDEA's express requirement that positive behavioral supports are part of an entitled child's IEP.

**The Factual Foundation for the ALJ's Ruling**.  In addressing the third reason why the Plaintiffs' use of intrusive behavioral interventions violated the IDEA, the State's Administrative Law Judge observed that the issue raised by Isabel and her parents was "that the behavior support plans developed for Isabel were not consistent with the functional assessments conducted." (Decision at 34, Certified Pleadings at 33).  As Mr. and Mrs. L. argued in the proceedings below, "[t]he gist of the current issue . . . is that, when the Behavioral Support Plan was developed on November 22, 2004, the [School District and the AEA] failed to select interventions consistent with their own functional assessments."  (Appellants' Reply Brief at 43, Certified Pleadings at 290).  We further argued that "[t]his is so with respect to each of the targeted behaviors," including "reinforcing escape-motivated behavior with break activities" and "[t]he use of hand-over-hand interventions in response to attention-seeking behavior."  (Id. at 43 & 45, Certified Pleadings at 290 & 292).  The

State's Administrative Law Judge correctly ruled that Isabel and her parents sustained their burden of proving each and both factual allegations.

*Reinforcing escape-motivated behavior with break activities.*  School psychologist Ann Hilliard conducted a functional assessment of two of Isabel's targeted behaviors in October and November of 2004. She concluded that Isabel's non-compliance was a function of escaping task and that Isabel's noncompliant behavior would be reduced if "she is not allowed to escape task." (Appellees' Records in SE-320 at 140x).  As Dr. G. Roy Mayer has recently observed, this functional assessment was important because "[i]t is clear that interventions that match the function(s) of aberrant behaviors are much more likely to be effective than those chosen arbitrarily."  (G. Roy Mayer, *Why Must Behavior Intervention Plans be Based on Functional Assessments?* (Bay Area Association for Behavior Analysis, Jan. 25, 1997), Appellants' Records in SE-320 at 3924, 3927).

After the Appellees made their November 2004 determination that Isabel's instances of non-compliance were escape-motivated behavior, they drafted a behavior plan which systematically rewarded Isabel for non-compliant behavior with escapes to preferred activities.  Thus, the November 2004 IEP called for a break "when Isabel becomes non-complaint."  (Appellees' Records in SE-320 at 157).  The plan also stated that a break activity should be used if Isabel refuses to complete a task or demand.  (*See id.* at 158)  (stating that the special education teacher should "[u]se repetitive task or hand over hand if Isabel refuses to complete a task or demand *and a break activity does not change her behavior*") (emphasis supplied); *see also, e.g., id.* at 238a (stating that a break should be given when Isabel was "refusing to work" or "yelling 'No'")).  As a result, and as Dr. Vincent Carbone testified at the due process haring, the plan that was developed by the School District and the AEA actually prescribed the negative reinforcement of noncompliant behavior.  (*See, e.g.,*

Transcript at 821) (stating that "the timing of the break is critical. A break after problem behavior is very, very troubling, especially if you've already identified the function as being reinforced by breaks. *Now you provide the break, and you actually strengthen the problem behavior, and throughout the record, there is example after example of that*") (emphasis supplied).

Dr. Carbone's testimony regarding the counter-therapeutic effect of providing a break for non-complaint behavior is fully consistent with the discussion of a "negative reinforcement cycle" contained in the Alberto & Troutman text produced by the School District and the AEA in the proceedings below. (Appellees' Records in SE-320 at 2042). This text states that negatively reinforcing behavior "*can contribute to the development of spectacularly inappropriate behavior*." (*Id.*) (emphasis supplied). The testimony and the text were further confirmed by the testimony of the expert witness retained by the School District and the AEA, Dr. Keith Allen. As Dr. Allen testified under examination by the counsel for the Appellees:

> Q. Now we have the break time listed over there also to calm her down when she becomes noncompliant.
>
> A. That would be less smart.
>
> Q. When they're already out of compliance?
>
> A. Yes. If they're already becoming noncompliant, at that point to provide a break, *you would be concerned that you're now reinforcing the escape behavior, and so you would think, "Okay. I don't want to do that."*

(T1977) (emphasis supplied).

At the hearing in the proceedings below, the School District and the AEA offered testimony that the break activity was intended as a type of differential reinforcement because it was not "highly reinforcing. A preferred activity would be an activity that would be highly reinforcing to the child,

such as playing games or toys, or whatever the things are that that particular child likes to do." (Transcript at 1131) (testimony of Ann Hilliard). Mr. and Mrs. L. answered this assertion[39] by observing that, during the months in which Isabel's non-compliance allegedly reached critical proportions (October and November of 2005), the Appellees were systematically rewarding Isabel's noncompliance by providing her with access to preferred activities, including her Pippi doll. (*See, e.g.,* Appellees' Records in SE-320 at 637). As Patti Brinkmeyer testified, Pippi was "a very favorite item for Isabel." (Transcript at 1471). Not surprisingly, therefore, the Plaintiffs' Appeal Brief appears to abandon their original differential reinforcement theory altogether, at least as an alleged justification for their provision of breaks to Isabel contingent upon noncompliant behavior.

Instead of defending their original theory that their use of breaks contingent upon non-complaint behavior was a form of differential reinforcement, the School District and the AEA now assert that "[t]here are a number of peer-reviewed articles contained in the materials that indicate that a break followed by return to the original demand is appropriate even when the misbehavior is serving an escape function for the child." (Plaintiffs' Appeal Brief at 61). There are two answers to this new theory. The first is factual, and the second is legal.

The factual answer to the Plaintiffs' current theory is that, while the School District and the AEA claim that "a number of peer-reviewed articles contained in the materials" support their position, they cite only one, and the article they cite is not actually in the record, but, rather, is referenced in one of the articles introduced into evidence. (*See* Plaintiffs' Appeal Brief at 61) (citing "the Steege study of 1990" that is referenced in the textbook by Alberto & Troutman) The Plaintiffs

---

[39] This answer is set forth in the Appellants' Brief. (*See* Appellants' Brief in SE-320 at 47-48).

do not quote from the Steege study, however, and they do not even quote from Alberto & Troutman's summary of the Steege study. Instead, the reference to the Steege study is followed by a series of undocumented statements[40] and the assertion of counsel that "[t]his is the 'functional communication training' which is what both Colorado and Waukee were attempting–to teach Isabel to ask for a break rather than engaging in inappropriate behaviors." *(Id.)*[41]

In fact, the Alberto & Troutman text makes it very clear that reinforcing problematic behavior increases the likelihood of that behavior.

This is a negative reinforcement cycle:

> 1. student is confronted with an aversive stimulus [such as a math assignment],
>
> 2. student engages in inappropriate behavior,
>
> 3. teacher removes aversive stimulus,

---

[40] Since the statements of counsel are not a substitute for evidence, this Brief will not dwell on the various undocumented statements set forth in the Plaintiffs' Appeal Brief. We will note, however, that, contrary to the representations made on appeal, a "positive reinforcer" does not mean "giving something to the person that the person finds pleasant." (Plaintiffs' Appeal Brief at 61). A positive reinforcer is "positive" in the sense that a stimulus (whether pleasant or unpleasant) is added rather than removed. Thus, the definition of a "positive reinforcer" is set forth in the textbook introduced into evidence by the Plaintiffs: "Positive reinforcement is the contingent presentation of a stimulus, immediately following a response, that increases the future rate or probability of the response." (Alberto & Troutman, Appellants' Records in SE-320 at 2005).

[41] The Plaintiffs also claim that they implemented differential reinforcement by providing "lots of attention" and "praise and rewards for on-task behavior." (Plaintiffs' Appeal Brief at 62). The fact remains that they rewarded non-compliant behavior by giving Isabel breaks in which she could play with her favorite toy. This practice is inconsistent with differential reinforcement. As the ALJ explained in her expert analysis of the Steege article, "[t]he study cited by [the School District and the AEA] by Steege *et al.* (1990) would be an example of negative reinforcement combined with differential reinforcement." (Decision at 50 n.23, Certified Record at 349 n.23).

4. student is negatively reinforced by for the inappropriate behavior,

5. next time the student is confronted by the aversive stimulus, the cycle is repeated.

In such situations negative reinforcement may be at work for both teacher and student. Taking the task away from the student may be negatively reinforcing for the teacher because the behavior disrupting the classroom has ceased. [T]his cycle can contribute to the development of spectacularly inappropriate behavior. . . .

(Alberto & Troutman, Appellees' Records in SE-320 at 2042).[42]

In addressing the negative reinforcement issue, the State's Administrative Law Judge ruled as follows: "The empirical research offered by [Isabel and her parents] confirms that access to activities as an escape from demands may reinforce and increase undesirable or inappropriate behavior and that when negative reinforcement was effective, it was in combination with other positive interventions such as differential reinforcement. The offered research also includes alternative interventions efficacious in reducing escape-maintained behavior." (Decision at 34-35, Certified Pleadings at 333-34) (footnotes 22, 23, & 24 omitted). ALJ Etscheidt cites and summarizes no fewer than eleven research articles in support of this ruling, and each and every one of those articles was duly introduced into evidence. (Decision at 50-51 nn. 22-24, Certified Pleadings at 349-350). Insofar as we can discern, the Plaintiffs' Appeal Brief does not so much as mention even one of the eleven research articles cited by the State's Administrative Law Judge.

The legal answer to the Plaintiffs' argument on appeal is therefore conclusive: The issue

---

[42] As Mr. and Mrs. L. argued in the proceedings below, during the fall semester of the 2005-2006 academic year, the School District and the AEA were both negatively reinforcing Isabel's noncompliant behaviors (by providing a temporary escape from undesired tasks) and positively reinforcing those noncompliant behaviors (by providing access to preferred activities contingent upon engaging in those behaviors). It is difficult to escape the conclusion that this double reinforcement may have contributed "to the development of spectacularly inappropriate behavior," as predicted by Alberto & Troutman. (Appellees' Records in SE-320 at 2042).

clearly involves both factual determinations regarding the weight and credibility of the evidence and questions of educational policy. These are determinations and issues in which deference is owed to the trier of fact, as well as to the educational expertise of the hearing officer appointed by the State's educational agency. *See, e.g., Fort Zumwalt School Dist. v. Clynes*, 119 F.3d 607, 615 (8th Cir. 1997) (identifying the school authorities to whom deference is due on questions of educational policy as the "state educational experts on the hearing panel"); *Strawn v. Missouri State Board of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000) (identifying the school authorities to whom deference is due on questions of educational policy as "the administrative panel [that] had an opportunity to observe the demeanor of the witnesses"); *Gill ex rel. Gill v. Columbia 93 School Dist.*, 217 F.3d 1027, 1037 (8th Cir. 2000) (ruling that a "federal court should give 'due weight' to administrative proceedings and should not substitute its own notion of educational policy for that of the administrative panel.")

*The use of hand-over-hand interventions in response to attention-seeking behavior*. The Appellees' functional assessment of Isabel's inappropriate peer relationships in November of 2004 indicated that her behaviors were a function of seeking attention and that she did not know appropriate ways to gain peer attention. (Appellees' Records in SE-320 at 140v). Accordingly, the school psychologist drafted a behavior plan which withheld attention contingent upon attention-seeking targeted behaviors. (*Id.* at 158). As Ann Hilliard testified:

> Q. So the way you have drafted this, if I'm not mistaken, you would use the first strategy [ "withhold praise and attention" etc.] for peer interaction skills, but not the second?
>
> A. Correct.
>
> Q. So that if hand-over-hand were used for poor peer interaction skills, it would not be consistent with the way you drafted this provision?

A.  Correct.

(Transcript at 1223).  As implemented, however, the plan quickly led to the use of hand-over-hand coloring as a consequence for inappropriate peer contact.  This is first demonstrated by the events of December 15, 2004.  (Appellees' Records in SE-320 at 302).  As Dr. Carbone testified, the provision of attention, even negative attention, reinforced and therefore exacerbated the targeted attention-seeking behavior.   (See, e.g., Transcript at 843-44) (testifying that the provisions relating to attention-seeking behavior "add[ed] up to a plan that was doomed to failure from the very beginning.")

In the proceedings below, the School District and the AEA responded to this evidence by asserting that "the withholding of attention that would be called for by attention seeking misbehavior also allows her to escape work demands. . . ."  (Appellees' Brief at 57, Certified Pleadings at 198). As we observed below, the answer to this assertion is threefold:  First, the Plaintiffs' claim that Isabel's inappropriate peer contacts allowed her to escape work demands is inconsistent with their own functional assessments.  There is not even a scintilla of a suggestion in any of their assessments of Isabel's behavior that escape played any significant role in her inappropriate  contact with peers. (See, e.g., Appellees' Records in SE-320 at 140v).  Second, the claim that withholding attention for attention seeking behavior is  "unworkable in a school setting" would appear to be an indictment of the plan that was written in November of 2004 and which remained in effect until December of 2005. (See id. at 158).  Third, and in any event, both the  expert witnesses and the literature verify that reinforcing attention-seeking behavior with attention, even aversive attention, is even less workable. (See, e.g., Sandy K. Magee & Janet Ellis, *The Detrimental Effects of Physical Restraint as a Consequence for Inappropriate Classroom Behavior*, 34 Journal of Applied Behavior Analysis 501,

501 (2001), Appellants' Records in SE-320 at 4665) (stating that "restraint could function as a positive reinforcer for problem behavior that is maintained by attention from others.")[43]

After reviewing the testimony and the exhibits, the State's Administrative Law Judge ruled as follows:

> The record also shows that the hand-over-hand strategy was used for inapprop0riate peer contact, an attention-based behavior.  While Appellees defend that this aggression was non-compliance to a teacher demand to "stop hitting another student," peer aggression is distinct from non-compliance with adult demands and was hypothesized to be attention-based.  Both experts testified that presenting hand-over-hand for behaviors assessed to be attention-based would be contraindicated. [Mr. and Mrs. L.] offered empirical research showing that the hand-over-hand would be ineffective for behaviors maintained by non-escape functions.

(Decision at 35, Certified Pleadings at 334).  ALJ Etscheidt cited and summarized two peer-reviewed research articles in support of this ruling, including Lee Kern *et al.*'s 2002 study entitled *An Analysis of Physical Guidance as Reinforcement for Noncompliance* and Dorothea C. Lerman *et al.*'s 1994 study entitled *Transfer of Behavioral Function as a Contributing Factor in Treatment Relapse*.  (*Id.* at 51 n.25, Certified Pleadings at 350 n.25).  Both articles were duly introduced into evidence.  (See Appellants' Brief in SE-320 at 4606 *et seq.* & 4477 *et seq.*)  Even so, the Plaintiffs' Appeal Brief does not so much as mention either study, much less refute its applicability.

In November of 2004, the School District and the AEA adopted interventions that were inconsistent with their own analysis of Isabel's behavioral needs.  As documented above, the interventions that were used on Isabel were inconsistent with the applicable research, and thus contrary to the state standard that is an integral part of the federal guarantee of an appropriate

---

[43] As Dr. Allen testified, "even if you have a behavior that you know is escape maintained, that doesn't mean it couldn't become attention maintained, and so you don't want to be giving the child a lot of attention trying to complete the hand-over-hand procedure." (T1986).

education.  Moreover, those interventions were not individualized to Isabel's needs and were, in fact,

counter-therapeutic.  The ALJ's rulings on this score are amply supported in the testimony and the

exhibits, and, indeed, the School District and the AEA have not seriously challenged the authorities

cited by the State's Administrative Law Judge in support of her rulings.  For these reasons, we

respectfully request that the District Court sustain the State's decision on the interventions issue for

a third and independently sufficient reason: As the ALJ ruled, Mr. and Mrs. L. sustained their burden

of proving that those interventions were inconsistent with the Plaintiffs' assessments of Isabel's

needs.


4.      FOURTH, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY
        IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS THAT WERE
        INCONSISTENT WITH THE POSITIVE BEHAVIORAL SUPPORTS MANDATED BY
        THE IDEA.

        In initiating the proceedings below, Mr. and Mrs. L. set forth a fourth independently sufficient

reason why the Plaintiffs' use of intrusive behavioral interventions violated the IDEA: More

specifically, we alleged that the School District and the AEA "have implemented intrusive behavioral

interventions that were not consistent with the provision of the positive behavioral supports mandated

by the IDEA."  (Request for Due Process Hearing at ¶ 33(d), Certified Pleadings at 10).  The

Administrative Law Judge appointed by the Iowa Department of Education sustained this allegation,

ruling in relevant part as follows:

        Nothing in this decision should be interpreted as minimizing the challenges IEP teams
        face in addressing the behavioral needs of students with autism and other disabilities.
        Yet the IDEA requires that those efforts focus on positive behavioral supports and not
        punitive techniques such as restraint, extended isolation, or time out. . . . While the
        one-to-one instruction in isolation has serious LRE implications, the extended
        restraint and time out durations clearly implicate the provision of FAPE.  The
        opportunity for educational benefit, academic or behavioral, would be significantly

limited.  The federal and state provisions for positive supports direct IEP teams to develop "proactive" approaches to challenging behaviors and "improve the educational results for students with disabilities."

(Decision at 40, Certified Pleadings at 339) (quoting Senate Committee on Healath, Education, Labor, and Pensions, November 3, 2003, 108th Congress, 1st Session, 108 S. Rept. 185 (2003)).  This Defendants' Appeal Brief will defend both the legal and the factual foundation for the ALJ's ruling.

**The Legal Foundation for the ALJ's Ruling**.  The legal foundation for the ALJ's ruling can be found in both the governing federal statute and the implementing state and federal regulations. Thus, the IDEA affirmatively mandates that IEP teams must consider positive behavioral interventions and supports "in the case of a child whose behavior impedes the child's learning or that of others."   20 U.S.C. §1414(d)(3)(B)(i).  The statutory mandate that an IEP "shall . . . consider" positive behavioral interventions and supports is the same mandate that requires an IEP team consider instruction in Braille "in the case of a child who is blind or visually impaired" or to consider "the child's language and communication needs" in "the case of a child who is deaf or hard of hearing."  *Id*. at §§ (ii) & (iii).   The implications are self-evident, and they are reinforced by the statute's express statement that "the development of the IEP of the child" shall include "the determination of appropriate positive interventions and supports."  20 U.S.C. §1414(d)(3)( C).

As we noted in the proceedings below, the federal mandate is reinforced by Rules 281-41.62 and 281-41.67(5)(b)(1) of the Iowa Rules of Special Education.  Rule 281-41.62 contains the requirement currently set forth in  20 U.S.C. §1414(d)(3)( C), and Rule 281-41.67(5)(b)(1) contains the requirement currently set forth in 20 U.S.C. §1414(d)(3)(B)(i).  The Iowa rules had been in effect since their promulgation in 1999, but the Plaintiffs' Appeal Brief does not address either of them.

The intent of the IDEA's mandate regarding positive behavioral interventions is to develop

proactive, preventive approaches to behavior problems rather than reactive or punitive responses such as time-out or suspension.   Thus, in 2004, the U.S. Congress strengthened the positive behavior support requirement, and the legislative history reveals that the reason was a belief that proactive approaches could result in reductions of problem behaviors.   As the Senate Committee reported in 2003, "The committee believes that, in most cases, the behavior of students can be addressed and prevented effectively through positive behavioral interventions and supports. *Therefore, section 614(d)(3)(B)(i) requires IEP teams to provide positive behavioral interventions and supports for children with disabilities whose behavior impedes their learning or the learning of others*. The committee believes that taking this proactive approach should result in reductions in behavior problems and disciplinary referrals, as well as improved educational results for students with disabilities."   Senate Committee on Health, Education, Labor, and Pensions, November 3, 2003, 108th Congress, 1st Session, 108 S. Rpt. 185 (2003) (emphasis supplied).

**B.  The Factual Foundation for the ALJ's Ruling**.   A preponderance of the evidence admitted in the proceedings below established that the consistent and documented use of antecedent manipulations is essential to the effective implementation of positive behavior supports and to achieving the goals intended by the U.S. Congress and the Iowa Department of Eeducation.   The testimony of Dr. Vincent Carbone on this point was corroborated by the professional literature.   For example, Dr. Iovannnone *et al.* observed in 2003,

> Positive behavior support (PBS) evolved from the roots of applied behavior analysis as a new scientific approach that has changed the way problem behavior is viewed, assessed, and addressed. . . . A great deal of research over the past 15 years had provided compelling evidence regarding the effectiveness of PBS for addressing the problem behaviors of students with [autism spectrum disorders] . . . . Interventions (e.g., support plans) should be comprehensive and *focus on performing antecedent manipulations and teaching replacement behaviors*. . . .

167

(Rose Iovannone *et al.*, *Effective Educational Practices for Students with Autism Spectrum Disorders*, 18 Focus on Autism and Other Developmental Disabilities 150, 161 (2003), Appellants' Records in SE-320 at 4423) (emphasis supplied).

Similarly, the Alberto & Troutman text introduced by the School District and the AEA states that "[s]everal requirement must be met in implementing procedures for behavior reduction. The first requirement is that movement along the heirarchy [from reinforcement-based strategies to more intrusive interventions] must be data based." (Appellees' Records in SE-320 at 2052).

> [B]efore deciding that a currently employed procedure is not effective and that an alternative, possible more intrusive procedure should be used, *the data collected during the intervention must substantiate the ineffectiveness of the procedure*.

(*Id.*) (emphasis supplied). A preponderance of the evidence in the record before the Administrative Law Judge established that the School District and the AEA failed to monitor the targeted behavior and therefore failed to substantiate the effectiveness or ineffectiveness of antecedent manipulations that might have proactively prevented the behaviors that Isabel exhibited that led to the use of intrusive behavioral interventions.

On appeal, the School District and the AEA assert that they implemented many positive behavioral supports, and they challenge the ALJ's finding that they failed to implement the strategies which were included in the November 2004 IEP. (*See, e.g.,* Plaintiffs' Appeal Brief at 63) (asserting that "one ambivalent statement hardly supports the conclusion reached by the ALJ that . . . 'the preventive or antecedent strategies which were included in the [November 2004 Plan] were not implemented.'") The flaw in the Plaintiffs' assertion is that the ALJ's finding was based on far more than an allegedly ambivalent statement regarding a single intervention strategy. Instead, it was based on a confession against interest by the School Psychologist Monica McKevitt who testified, without

ambivalence or ambiguity,  that "more than one change" was made on November 14, 2005 to conform the new IEP to the prior practice. (Transcript at 1870).  With equally unambiguous candor, she testified that "*these were changes that had been going on from the beginning of the school year until that point in time.*" (*Id.*) (emphasis supplied).  One change was the use of a highly reinforcing activity (playing with a doll or animal from home) as a break time activity.  (*Id.*)  This was not a "data-driven decision," but was "based on what they were doing.  That was based on what was happening. . . . I don't know that Patti used any data to suggest that these activities would be better." (*Id.* at 1870-71).  A second change was the deletion of the gross motor activity of walking around the building, but the author of the new behavior plan didn't "know why the choice was made to stop walking around the building."  (*Id.* at 1872).

A third change was eliminating the strategy of coaching peers to praise Isabel for using her words to interact with them, as documented above; again, there was no data, and the change was made to conform the plan to the prior practice.  (*Id.*)  A fourth change altered the reinforcement plan; when asked if this was a data-driven decision, Ms. McKevitt responded that "I'm not entirely sure why it was decided that they would not do that."  (*Id.* at 1873).  A fifth change was a deletion of the requirement for visual cues for multi-step directions.  (*Id.* at 1873-74).  A sixth change was the deletion of "small group social skills instruction" in favor of "social skills instruction integrated into her day."  (*Id.* at 1874).   Again, when asked if this was "a data-based decision," Ms. McKevitt responded that the change "was based on what was taking place."  (*Id.*)  In short, at least from and after the start of the 2005-2006 academic year, however, the School District and the AEA failed to implement many of the important antecedent strategies set forth in Isabel's IEP.  As visually demonstrated by page 712a of the Appellees' Records in SE-320, the School District and the AEA

made a significant number of departures from those strategies, none of which were data-driven, and then, on November 14, 2005, they drafted a new plan to conform to the old practice.

In a collateral argument, the Plaintiffs also assert that the ALJ made no finding that any particular supplementary aid or service should have been considered or implemented by the IEP team. (*See, e.g.*, Plaintiffs' Appeal Brief at 27). The answer to this assertion is that ALJ Etscheidt cited and summarized no fewer than nine articles that were introduced into evidence regarding "alternative interventions efficacious in reducing escape-maintained behavior." (Decision at 35 & 50-51 nn. 23-24, Certified Pleadings at 334 & 349-50 nn. 23-24). It is noteworthy that the Plaintiffs' Appeal Brief does not so much as mention even one of the nine articles cited by the State's Administrative Law Judge, much less refute the efficacy of the interventions for which those articles are cited.

In short, a preponderance of the evidence in the record support the ALJ's finding that "the reliance on the reductive strategies of isolation, restraint, and extended time out interfered with the implementation of the preventive strategies." (Decision at 40, Certified Pleadings at 339). A preponderance of evidence also supports her finding that "[t]he emphasis on consequent, reactive interventions for Isabel was neither proactive nor effective." (*Id.*) Accordingly, Mr. and Mrs. L. respectfully request that the District Court sustain the ALJ's finding that the behavioral interventions utilized by the School District and the AEA were "inconsistent with the positive behavioral supports mandated by the IDEA." (*Id.*) We also submit that this fourth reason why the Plaintiffs' utilization of intrusive behavior interventions violated the idea constitutes full and independently sufficient support for her ultimate conclusion that the parents sustained their burden of persuasion on the interventions issue.

5.    FIFTH, THE SCHOOL DISTRICT AND THE AEA VIOLATED THE IDEA BY
IMPLEMENTING INTRUSIVE BEHAVIORAL INTERVENTIONS WITHOUT
PROVIDING PRIOR WRITTEN NOTICE TO THE PARENTS &/OR BY PROVIDING
FALSE OR MISLEADING NOTICE TO THE PARENTS.

In the proceedings below, Mr. and Mrs. L. alleged that the School District and the AEA

"implemented intrusive behavioral interventions without providing the written prior notice mandated

by the IDEA." (Request for Due Process Hearing at ¶ 33(e), Certified Pleadings at 10).  They also

alleged that the School District and the AEA "violated the provisions of the IDEA mandating a

partnership with parents by providing false and/or misleading and/or materially incomplete

information to Mr. and Mrs. L. regarding the use of intrusive behavioral interventions."  (*Id.* at ¶

33(f), Certified Pleadings at 10-11).  Following the receipt and review of extensive testimony and

written evidence, the State's Administrative Law Judge sustained the parental allegations:

> The record supports a conclusion that [Mr. and Mrs. L.] were not provided notice
> regarding the implementation of the restraint that accompanied the hand-over-hand
> intervention, nor were they aware or supportive of the extended durations of timeout.
> As such, these procedural inadequacies may not be dismissed as harmless error.

(Decision at 42, Certified Pleadings at 341).

Mr. and Mrs. L. respectfully submit that, even if the four other reasons documented above

were found wanting, the ALJ's findings on the notice issue would fully and independently support

her ultimate conclusion that the behavioral interventions utilized by the School District and the AEA

were a violation of the IDEA.  The reason is that the procedural protections for parents set forth in

the IDEA have substantial legal importance:  As the U.S. Supreme Court ruled in the landmark

*Rowley* opinion, "we think that the importance Congress attached to these procedural safeguards

cannot be gainsaid.  It seems to us no exaggeration to say that Congress placed every bit as much

emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard." *Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 205-206, 102 S. Ct. 3034, 3050, 73 L. Ed. 2d 690 (1982).

The ALJ's ruling on the notice issue is firmly grounded in an important procedural protection expressly set forth in the governing federal statute.[44]  Thus, in material part,  20 U.S.C. § 1415(b)(3) states that a local educational agency must given "written prior notice to the parents of the child whenever" it "proposes to initiate or change" or "refuses to initiate or change . . . provision of a free appropriate public education to the child."  As Mr. and Mrs. L. observed in the proceedings below, this written prior notice requirement is highly relevant to these proceedings because "[t]he utilization of restraint, seclusion, or any other intrusive behavioral intervention *as part of a program of behavior modification* is a very significant change in the provision of education to a child." (Appellants' Reply Brief in SE-320 at 47, Certified Pleadings at 294) (emphasis in original).  Significantly, therefore,

---

[44] In addition to the statutory requirement now emphasized, the need for parental notice is also emphasized in the research-based literature and the policies of the Iowa Department of Education.  Thus, in the proceedings below, the School District and the AEA introduced into evidence the following guidelines from a 1994 review of cases litigating the use and abuse of seclusionary time-out procedures.

> Written procedures for the use of time-out should be developed, and each teacher should have a copy.  Parents and students must be informed of the possible use of time-out, of the procedures, and of behaviors that will lead to its use. . . . Written permission from parents should be obtained indicating informed consent.

(Paul A. Alberto & Anne C. Troutman, Applied Behavior Analysis for Teachers 283 (7th ed. 2006), Appellees' Records in SE-320 at 2075).  Significantly, Alberto & Troutman emphasize a "special concern" regarding "the potential behavioral and physical negative effects" of aversive interventions, and they state that this information "must be shared by all parties before implementation."  (*Id.* at 2082).

ALJ Etscheidt ruled that there is a difference between "temporary removals [that] may be necessary and appropriate" and "the consistent and continued use of such measures as an intervention to manage behavior."  (Decision at 38, Certified Pleadings at 337).

The ALJ's ruling on the notice issue is firmly supported by a mandate expressly set forth in the governing federal statute.  In the proceedings below, however, the School District and the AEA asserted that any violation of the statutory notice provision was harmless error because "the parents were well aware of what the District was proposing or refusing."  (Appellees' Brief in SE-320 at 4, Certified Pleadings at 143).  On appeal, the School District and the AEA contend that they "shared significant documentation on the use of the hand-over-hand procedure and restraints" with Mr. and Mrs. L..  (Plaintiffs' Appeal Brief at 78).  There are three compelling answers to the Plaintiffs' contention on appeal.

First, and as a matter of law, the prior written notice mandated by statute requires, not only a notice of the action proposed, but an explanation of why the agency proposes the action, a description of any options the agency considered and the reasons why those options were rejected, a description of each evaluation procedure, test, record or report the agency uses as a basis for the proposal, and a description of any other factors that are relevant to the agency's proposal.  20 U.S.C. § 1415( c)(1) (setting forth the mandated content of the prior written notice); *see also* Rule 281-41.104(1) of the Iowa Rules of Special Education.  The importance of sharing this information is revealed by the U.S. Supreme Court's observation that school districts have a "'natural advantage' in information," but that "Congress addressed this when it obliged schools to safeguard the procedural rights of parents and to share information with them."  *Schaffer v. Weast*, 546 U.S. 49, 60, 126 S. Ct. 528, 536, 163 L. Ed. 2d 387 (2005).  The importance of the information that must be

shared pursuant to the provisions of 20 U.S.C. § 1415( c)(1) strongly underscores ALJ Etscheidt's ruling that the failure to contemporaneously share that information "may not be dismissed as harmless error."  (Decision at 42, Certified Pleadings at 341).

The second answer to the Appellees' contention on appeal is that the School District and the AEA have greatly exaggerated the extent to which the parents were contemporaneously aware of the nature of the intrusive behavioral interventions used on Isabel, much less of the alleged rationale for the use of those interventions.  Consider, for example, the School District's assertion that, on October 27, 2004, they removed Isabel to a quiet room to calm her down because she had been "yelling for about 1 ½ hours" and that she "had been screaming and disturbing the educational program of every other child in the class for 1 ½ hours."  (Appellees' Brief in SE-320 at 62, Certified Pleadings at 201).  While this was the version of the facts contemporaneously shared with the parents (Appellees' Records in SE-320 at 1049-1050), the evidence introduced at the hearing established a very different version of the facts, including significant information that was not contemporaneously shared with the parents.

The record establishes that, on October 27, 2004, the School District and the AEA were experimenting with various forms of behavioral interventions, including the use of arbitrary compliance tasks such as pulling socks.  (*See, e.g., id.* at 140s).  Isabel did "socks" at 10:15 a.m. and was moved to the time-out room at 10:18 a.m.  (*Id*. at 268).  The School District's records indicate that, while Isabel was in the time-out room, she was told that when she sat quietly, they would start the timer.  (*Id.*)  Every time the staff thanked Isabel for sitting quietly and told her they were going to start the timer, "she started yelling again."  (*Id.*)   This scenario is far different from the one contemporaneously communicated to the parents and indicates that the parents were not fairly

174

advised of the relevant facts.

There was significant evidence to underscore the ALJ's finding that the School Distrit and the AEA did not provide adequate notice to the parents regarding their use of timeout procedures. *Indeed, just three weeks prior to the use of a timeout procedure on October 27, 2005, school district and AEA personnel had made a deliberate decision to delay securing parental consent.* Thus, on October 6, 2005, Monica McKevitt advised the special education teacher as follows: "Here is a document on the use of time out.  On page 43, there is a parent consent form.  *I would hold off on having parents sign at this point.*"  (Appellees' Records in SE-320 at 673) (emphasis supplied).

Consider, as a second example, the notice and consent form given to the parents on November 18, 2005 and signed by Eva L. on that date.  The signed notice was part of the final December 2, 2005 IEP, as officially forwarded to the parents on February 18, 2006.  (Appellants' Records in SE-320 at 3745; *see also id.* at 3729).  The contemporaneous written record establishes that Mr. and Mrs. L. took this notice and consent form very seriously.  (*See, e.g.,* R723) (detailing their understanding of the time-out procedures that had been authorized).

The notice given to the parents on November 18, 2005 did not fairly or accurately describe the behavioral interventions that the School District and the AEA actually employed.  The notice indicated that Isabel would be in time-out for about "one minute per year of age of the child." (R3745).  It indicated that she would be "welcomed back into the classroom" when the timer went off.  (*Id.*)  And it indicated that the only contingent release requirement was that a "quiet time of 30-60 seconds may also be required before the student may leave timeout."  (*Id.*)  As an expert witness for the School District and the AEA conceded under oath, *the notice and consent form given to the parents did "not describe the timeout that we implemented."*  (Transcript at 2250-51) (testimony of

Dr. Barb Rankin) (emphasis supplied).

In light of the prior written notice mandate expressly set forth in the IDEA, it is axiomatic that a local school district cannot deceive the parents as to the nature of the interventions being proposed or implemented.   Indeed, "'[t]he core of the statute . . . is the cooperative process that it establishes between parents and schools.'" *Bradley ex rel. Bradley v. Arkansas Dept. of Educ.*, 443 F.3d 965, 968 (8th Cir. 2006) (quoting *Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528, 532, 163 L. Ed. 2d 387 (2005)).   Clearly, there was substantial support for the ALJ's finding that the failure of the School District and the AEA to fairly advise the parents of the true nature of the behavioral interventions used on Isabel "may not be dismissed as harmless error."   (Decision at 42, Certified Pleadings at 341).

Consider, as a third example, the School District's use of a mat held by multiple adults to create a portable time-out room in general education environments.   Dr. Allen testified that he reviewed "all of the material that had been collected," including anecdotal records and handwritten materials.   (Transcript at 1962).   Even so, he was not aware that mats had been used to create a portable timeout room for Isabel in front of her peers, and he was not aware that such a behavioral intervention was a proposed addition in the IEP developed by the Appellees on January 23, 2006. (Transcript at 2023-2024).   If the whole record was not sufficient to put an expert witness on notice that this behavioral intervention was being employed, then it was also insufficient to fully and fairly advise the parents.   Clearly, there was substantial support for the ALJ's factual determination that Mr. and Mrs. L. were not adequately informed of the true nature of the behavioral interventions being used on their daughter.

The third, final, and conclusive answer to the Plaintiffs' contention on appeal, however, is

that the School District and the AEA have erroneously invited the U.S. District Court to invade the province of the trier of fact. For example, in a highly selective presentation of part of the evidence, they observe that, on October 23, Mr. L. indicated that he had read through Patti Brinkmeyer's "behavioral notes" on Isabel. (Plaintiffs' Appeal Brief at 78) (citing Appellants' Records in SE-320 at 677). The School District and the AEA then ask this District Court to assume, without direct evidence, that those notes "would have included all of the significant incidents of hand-over-hand and restraint used from September 20 through October 7, 2005." (*Id.*) Similarly, the Plaintiffs note that Mrs. L. "was in the classroom on December 15, 2004," as though this fact were material to the notice issue (*Id.*) They fail to mention, however, Mrs. L.'s testimony about that experience:

> I remember that very vividly because it was very traumatic for me. I heard screaming as I came very close to that room. I opened the door. . . . I saw Isabel held between this big man's legs. At the time, I didn't know who he was. Her face was all red, and her eyes were glazed, and she was yelling, and I asked–I believe I must have turned white. My jaw dropped . . . . [M]y vision was tunneled straight to Isabel and this man, and I knew there were people around writing hysterically, but I remember just seeing Isabel and seeing the stress she was in. I immediately asked him to release her. I took her in my arms.

(Transcript at 690-91). Critically, Mr. and Mrs. L. were not advised that this episode was precipitated by the use of physical force to implement the hand-over-hand coloring intervention. Instead, they were told that Isabel "was completely out of control." (*Id.* at 691).

In short, the State's Administrative Law Judge was entitled to credit the evidence that the School District and the AEA did not fairly and contemporaneously advise Mr. and Mrs. L. of the true nature of the behavioral interventions they were using on Isabel. She was entitled to credit the evidence that the School District and the AEA deliberately delayed giving notice to the parents regarding the use of timeout, and that, when they did give notice, the notice did not accurately

177

describe the intrusive timeout procedures actually employed.  Finally, she was entitled to credit the parents' testimony that they were shocked when they received a more accurate description of the time-out procedures that were actually employed.  Thus, Eva L. testified as follows regarding her reaction upon first viewing the videotape made on December 7, 2005:

> To say I was appalled would be–I had to go to the bathroom and I was sick.  You know, there's just–it was this sinking feeling, and I was just–I don't think there's any words that can describe at that moment, and I could not believe what I was seeing. . . . After seeing that tape, I threatened my husband I would move.  I said there's no way I can stay in Iowa anymore.

(Transcript at 729-730).   Given Mrs. L.'s unequivocal testimony that the failure to provide contemporaneous notice was far from harmless, and given the fact that the State's Administrative Law Judge chose to credit that testimony, this is clearly a case where it is appropriate to invoke the rule of due deference to the findings of the trier of fact.  *See, e.g., School Board of Independent School Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1010 (8th Cir. 2006) (repeating the rule that the "district court must give 'due weight' because the administrative panel had an opportunity to observe the demeanor of the witnesses"); *see also* the cases cited in Part I, Subpart A, Section 1, *supra*.

In short, the programs of intrusive behavioral interventions that were used on Isabel violated the IDEA because the School District and the AEA failed to comply with the mandatory prior written notice provisions of that statute.  They not only failed to contemporaneously advise the parents of the nature of the interventions being used, but they deliberately delayed notice to Mr. and Mrs. L. and subsequently provided woefully inaccurate notice.  This violation of the statutory mandate was far from harmless and, for this fifth and independently sufficient reason, we respectfully request that the U.S. District Court affirm the State's ruling that Isabel and her parents sustained their burden of proof on the interventions issue.

CONCLUSION

Owing to the importance of the issues presented, the proceedings before the Administrative Law Judge were extensive and the evidence that was introduced was voluminous.  Dr. Etscheidt rendered a careful and thorough ruling based on the evidence, and we are grateful for this opportunity to defend that ruling on appeal.

Although many issues were presented below and on appeal, one point warrants particular emphasis in this conclusion: The School District and the AEA are, in purpose and effect, asking this U.S. District Court to rule that the Iowa Department of Education does not have the authority to enforce state standards governing the use of seclusion and restraint on children with disabilities.  As the First Circuit ruled in a case subsequently affirmed by a unanimous Supreme Court, "We do not believe the Act envisions federal courts releasing school systems from their state-mandated responsibilities. . . ." *Town of Burlington v. Department of Educ. for Com. of Mass.*, 736 F.2d 773, 792 n.24 (1st Cir. 1984), *aff'd sub nom.*, *School Committee of Town of Burlington v. Department of Education of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985).

This fundamental principle is particularly important in light of the facts.  Thus, the School District and the AEA admit that watching the videotape of one of the many interventions that they used on Isabel is "difficult" or "uncomfortable." (Plaintiffs' Appeal Brief at 49).  Without supporting testimony or articles, however, they assert that their practices were equivalent to "letting a toddler cry through the night." (*Id.* at n.8).  Mr. and Mrs. L. strenuously deny the assertion.  Without commenting on whether parents should or should not let their infant cry through the night, we respectfully submit the following observations:

•        Letting a child cry through the night is not equivalent to having several adults physically hold

that child in a chair while another adult forces her to color against her will, especially when the physical restraint and compulsion lasts for extended periods of time, and especially pursuant to the theory that the child needs to be taught how to comply with adult demands.

- Letting a child cry through the night is not equivalent to teaching that child in an isolated room and then subjecting her to extended hours of timeout, especially when the child is denied bathroom privileges, and especially after school personnel painstakingly record the fact that she is moving urine around on the floor and wiping it off on her clothes. (Appellants' Records in SE-320 at 460).

- Letting a child cry through the night is not equivalent to having four or more adults create an isolation chamber with a gym mat, especially when the child is screaming to be let loose, and especially when her general education peers are standing around watching, "laughing at her" and "making fun of her."  (Transcript at 734) (Eva L.'s testimony regarding a use of mats on another child, as witnessed by Isabel's younger sister).

As we stated in our opening arguments at the due process hearing in the proceedings below, "we do not know any name for what we are opposing," but "[w]e oppose the extreme forms of whatever these things are that are called interventions."  (Transcript at 34).

In documenting our opposition to the extreme form of interventions utilized by the School District and the AEA, and in setting forth a child's right to be education in the least restrictive appropriate environment, Mr. and Mrs. L. have emphasized the basic principles of IDEA law, as set forth in the governing federal statute and the precedents interpreting that statute.  We have also emphasized the basic principles derived from a considerable body of research on the effective use of behavioral interventions, especially in cases where children have disabilities such as autism.  An Administrative Law Judge with expertise in the field has sustained our arguments.  Accordingly, for the reasons set forth in her careful and thorough decision and for the reasons documented at length in this Defendants' Appeal Brief, we respectfully request that the U.S. District Court affirm the rulings rendered in the proceedings below.

180

### REQUEST FOR ORAL ARGUMENT

The Plaintiffs, while denying any responsibility to sustain any burden of persuasion on appeal, have nonetheless assumed the strategic position of a party bearing the burden of proof.  They have done so  by submitting the first brief on appeal and by reserving the opportunity for a reply brief.  In this Defendants' Appeal Brief, and on behalf of Isabel and her parents, we have made every effort to give systematic attention to each and every material contention that the School District and the AEA have advanced in their primary brief on appeal.  Even so, the School District and the AEA may claim that we have overlooked an argument of importance or may yet assert such an argument in their reply brief.

For these reasons, and because the outcome of these proceedings will affect the treatment of children with disabilities across the State of Iowa, we request that the U.S. District Court grant the parties an opportunity to present oral arguments on the issues presented.

Respectfully submitted,

/s/ Curt L. Sytsma

_____

Curt L. Sytsma
Attorney at Law
753 19th Street
Des Moines, Iowa 50314

515-282-2747
CurtSytsma@Yahoo.com

/s/ Mary M. Richard

_____

Mary M. Richard
Dell A. Richard Law Office
1150 5th Street, Suite 280
Coralville, Iowa 52241

319-354-9592
Mary@darichardlaw.com